UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| | | PRISONER |
| GERALD CODERRE, | : | CIVIL  NO. 3:02CV1096 (RNC)(DFM) |
| *PLAINTIFF,* | : | |
| | : | |
| V. | : | |
| | : | |
| EDWARD PESANTI, ET AL., | : | |
| *DEFENDANTS.* | : | FEBRUARY 23, 2004 |

## DEFENDANTS' MEMORANDUM OF LAW IN
## SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Plaintiff brings this action against Dr. Edward Pesanti, Dr. Edward Blanchette, Dr. Germain Bianchi and Nurse Enrica White under 42 U.S.C. § 1983 complaining that he received delayed medical care for his Hepatitis C.

## I.     FACTS

Plaintiff dropped out of high school in his senior year.  Statement of Material Facts Not in Dispute par. 1.  Plaintiff used marijuana at age 16 and occasionally snorted cocaine in the 1980's.  Statement of Material Facts Not in Dispute par. 1.  Plaintiff first started using heroin in 1995.  Statement of Material Facts Not in Dispute par. 1.  Plaintiff started injecting heroin in 1996.  Statement of Material Facts Not in Dispute par. 1.

Plaintiff has been in and out of DOC custody since February 1996.  Statement of Material Facts Not in Dispute par. 2.  Plaintiff received his GED while in prison in 1999.  Statement of Material Facts Not in Dispute par. 2.

In a DOC medical intake screening form dated February 23, 1996, plaintiff reported intravenous use of 4 bags of heroin daily.  Statement of Material Facts Not in Dispute par. 3.  In a DOC medical intake screening form dated October 1, 1996, plaintiff reported drinking 1 liter of

vodka daily and using 4-5 bags of heroin daily. Statement of Material Facts Not in Dispute par. 3. Plaintiff also reported that his last drug use was on the preceding day. Statement of Material Facts Not in Dispute par. 3. Plaintiff also reported that he had been in a detox program at Danbury Hospital one and a half years prior for Alcohol and Heroin addiction. Statement of Material Facts Not in Dispute par. 3.

In a DOC medical intake screening form dated June 9, 1997 plaintiff reported drinking a pint of Vodka a day and that he last drank on June 2, 1997. Statement of Material Facts Not in Dispute par. 4. Plaintiff also reported using 3 bags of heroin a day and reported that he last used heroin on June 3, 1997. Statement of Material Facts Not in Dispute par. 4. Plaintiff also reported that he had been in a detox program in March 1997. Statement of Material Facts Not in Dispute par. 4.

In a DOC medical intake screening form dated March 18, 1998, plaintiff reported drinking a quart of whiskey a day and reported that he last drank on March 17, 1998. Statement of Material Facts Not in Dispute par. 5. Plaintiff also reported using 5 bags of heroin a day and reported last using heroin on March 17, 1998. Statement of Material Facts Not in Dispute par. 5.

In a DOC medical intake screening form date September 21, 1998, plaintiff reported drinking 1 pint of absolute vodka daily and using 5 to 10 bags of heroin daily. Statement of Material Facts Not in Dispute par. 6. Plaintiff reported that he had his last drink on September 19, 1998 and he last used heroin on September 19, 1998. Statement of Material Facts Not in Dispute par. 6. Plaintiff also reported that he had been in a detox program in March 1998 called Meridian Hill. Statement of Material Facts Not in Dispute par. 6.

Plaintiff testified that he voluntarily went to Meridian Hill in 1998 for alcohol and heroin detox.  Statement of Material Facts Not in Dispute par. 7.

In a DOC medical intake screening form dated January 3, 2000, plaintiff reported using one bag of heroin daily.  Statement of Material Facts Not in Dispute par. 8.  Plaintiff reported that he last used heroin on January 2, 2000.   Statement of Material Facts Not in Dispute par. 8.  Plaintiff also reported that he had been in a detox program in 1998 called Meridian Hill for heroin.  Statement of Material Facts Not in Dispute par. 8.

In a DOC medical intake screening form dated December 14, 2000, plaintiff reported drinking between a pint to a liter of rum/vodka daily and using ½ to 1 bag of heroin daily.  Statement of Material Facts Not in Dispute par. 9.  Plaintiff reported that he last drank on December 13, 2000 and he last used heroin on December 13, 2000.  Statement of Material Facts Not in Dispute par. 9.  Plaintiff also reported that he had been in a detox program in 1998 called Meridian Hill and was diagnosed with Hepatitis C in 1997.  Statement of Material Facts Not in Dispute par. 9.

Plaintiff was out of DOC custody from March 25, 1998 to September 21, 1998.  Statement of Material Facts Not in Dispute par. 10.  Plaintiff does not recall if he sought any treatment for his Hepatitis C during this time period.   Statement of Material Facts Not in Dispute par. 10.

According to a mental health note on October 19, 1998, plaintiff had been opium dependent since the age of 16 and was preoccupied with drug use.  Statement of Material Facts Not in Dispute par. 11.  Plaintiff was quoted as saying that he was glad he was incarcerated as he couldn't stop himself out there.  Statement of Material Facts Not in Dispute par. 11.  Plaintiff

also reported that he had highly active Hepatitis C.  Statement of Material Facts Not in Dispute par. 11.

According to a note from Dr. Berkowitz, a psychiatrist, on October 18, 1998, plaintiff was using a liter of alcohol a day, and 10 bags of heroin and had last used 1 month ago. Statement of Material Facts Not in Dispute par. 12.  According to his RT 60 Inmate Movement Sheet, plaintiff was readmitted to DOC custody on September 21, 1998.  Statement of Material Facts Not in Dispute par. 12.

AST and ALT are liver enzymes.  Statement of Material Facts Not in Dispute par. 13.  In individuals who have tested positive for the Hepatitis C virus, persistent, elevated liver enzymes suggest that chronic Hepatitis C is present.  Statement of Material Facts Not in Dispute par. 13.

On October 6, 1999, plaintiff's AST levels were 149 and his ALT levels were 359. Statement of Material Facts Not in Dispute par. 14.  According to his RT 60 Inmate Movement Sheet, plaintiff was transferred to a halfway house in November 1999 and came back to prison on January 3, 2000 for a technical violation which was apparently drug use.  Statement of Material Facts Not in Dispute par. 14.  More specifically, according to plaintiff's January 3, 2000 medical intake form, he used heroin on January 2, 2000.  Statement of Material Facts Not in Dispute par. 14.

On January 7, 2000 plaintiff's AST levels were 115 and his ALT levels were 211. Statement of Material Facts Not in Dispute par. 15.  On April 5, 2000, plaintiff's AST levels were 130 and his ALT levels were 355.  Statement of Material Facts Not in Dispute par. 15.  On September 21, 2000, plaintiff's AST levels were 147 and his ALT levels were 312.  Statement of Material Facts Not in Dispute par. 15.

According to a chart entry dated October 8, 2000, although plaintiff was diagnosed with Hepatitis C AB, he had no symptoms.  Statement of Material Facts Not in Dispute par. 16. According to his RT 60 Inmate Movement Sheet, plaintiff discharged from DOC custody on November 9, 2000 for time served.  Statement of Material Facts Not in Dispute par. 16.

Plaintiff was readmitted to DOC custody on December 14, 2000.  Statement of Material Facts Not in Dispute par. 17.  Plaintiff testified that he probably used heroin during the month he was out in the street.  Statement of Material Facts Not in Dispute par. 17.  Plaintiff also testified that he was probably drinking alcohol during this time period, stating, "One goes with the other." Statement of Material Facts Not in Dispute par. 17.

According to the plaintiff, his only claims against Dr. Blanchette were that he ordered plaintiff's blood be taken in December 2000 which showed elevated ALT and AST levels consistent with Hepatitis C.  Statement of Material Facts Not in Dispute par. 18.  However, plaintiff admitted that in January 2001, he told medical staff that if he saw heroin right then, he would use it.  Statement of Material Facts Not in Dispute par. 18.

Plaintiff testified that he has always felt tired all the time but in January 2001, his knees, ankles and back began feeling achey.  Statement of Material Facts Not in Dispute par. 19.  At plaintiff's request, on June 25, 2001, Dr. Bianchi submitted a request to the Utilization Review Committee for Hepatitis C treatment for the plaintiff as he had elevated LFT scores.  Statement of Material Facts Not in Dispute par. 19.

On June 26, 2001, the Utilization Review Committee denied the request for Hepatitis C treatment for plaintiff until plaintiff completed a substance abuse program.  Statement of Material Facts Not in Dispute par. 20.

Pursuant to Correctional Managed Health Care (CMHC) Guidelines, the plaintiff was not a candidate for treatment with Interferon alpha and Ribivarin therapies because he had not undergone a drug treatment program with the DOC and in fact had been through several detox programs only to go back to his daily routine of using 1 pint or 1 quart of alcohol and 1-5 bags of heroin a day. Statement of Material Facts Not in Dispute par. 21.

Plaintiff did not seek to enroll in a substance abuse program within the Department of Correction until that was made a condition of him receiving Interferon and Ribivarin therapies. Statement of Material Facts Not in Dispute par. 22.

The May 2000 CMHC guidelines provide "Because treatment of Hepatitis C will not have any long term benefits if recurrent infections occur, only inmates who were not using cocaine or IV drugs for at least 6 months prior to the current incarceration or who have very long sentences (> 5 years) [will be approved for GI consultations]. Statement of Material Facts Not in Dispute par. 23. Inmates who were successfully enrolled in methadone programs prior to incarceration are eligible for therapy." Statement of Material Facts Not in Dispute par. 23.

The majority of people with chronic Hepatitis C have no symptoms of liver disease. Statement of Material Facts Not in Dispute par. 24, 16. If symptoms are present they are usually mild, non specific, and intermittent. Statement of Material Facts Not in Dispute par. 24. Hepatitis C is a chronic disease. Statement of Material Facts Not in Dispute par. 24. In most cases it takes over 30 years for an individual with Hepatitis C to develop serious liver problems. Statement of Material Facts Not in Dispute par. 24. Therefore, it is much more prudent to wait until you are sure that a patient is no longer using intravenous drugs, drinking alcohol and/or will

6

not again start using intravenous drugs before beginning treatment.  Statement of Material Facts Not in Dispute par. 24.

Indeed, the Federal Bureau of Prison guidelines provide, "Inmates with evidence of substance abuse, either in the present or the recent past (check urine toxicology screen if drug use is suspected and check Sentry for disciplinary actions related to drug or alcohol use.) should be referred for counseling and assessment prior to considering antiviral therapy."  Statement of Material Facts Not in Dispute par. 25.  According to the Federal Bureau of Prisons policy, an Absolute Contraindication for the use of interferon is "Ongoing alcohol or illicit drug usage-refer for evaluation."  Statement of Material Facts Not in Dispute par. 25.  A Relative Contraindication is "History of recent alcohol abuse or illicit drug usage-refer for evaluation."  Statement of Material Facts Not in Dispute par. 25.  The Federal Bureau of Prisons policy also provides that "Eradication of HCV infection without resolution of alcoholism is unlikely to prevent end-stage liver disease."  Statement of Material Facts Not in Dispute par. 25.  The defendants in this case concur with this opinion.  Statement of Material Facts Not in Dispute par. 27.

In a May 1997 publication entitled "Management of Hepatitis C the National Institute of Health ," stated, ". . .  given the current status of therapies for Hepatitis C treatment is clearly recommended only in a selected group of patients."  Statement of Material Facts Not in Dispute par. 26.  The publication also stated that for others, treatment decisions are less clear and should be made on an individual basis or in the context of clinical trials.  Statement of Material Facts Not in Dispute par. 26.  According to the National Institute of Health "Treatment for addiction should be provided prior to treatment for Hepatitis C."  Statement of Material Facts Not in

Dispute par. 26. According to the National Institute of Health, "those addicted to alcohol or drugs should be helped to obtain treatment for their addiction so that they <u>might qualify</u> for anti-HCV therapy." Statement of Material Facts Not in Dispute par. 26 (emphasis added).

Patients who are cured of Hepatitis C are not immune to Hepatitis C and can be re-infected with the virus. Statement of Material Facts Not in Dispute par. 28. Thus, if an individual is still using drugs, or use IV drugs in the future, they are at risk of re-infecting themselves with Hepatitis C. Statement of Material Facts Not in Dispute par. 28. In such a case, the risks of the interferon treatment would far outweigh the benefits. Statement of Material Facts Not in Dispute par. 28.

More specifically, nearly all patients who take interferon develop side effects from treatment especially in the first few weeks of therapy. Statement of Material Facts Not in Dispute par. 29. Common side effects of alpha interferon and peginterferon include fatigue, muscle aches, headaches, nausea and vomiting, skin irritations at the injection site, low grade fever, weight loss, irritability, depression, mild bone marrow suppression, hair loss (reversible). Statement of Material Facts Not in Dispute par. 29. Interferon can also cause or worsen thyroid disease, and can unmask or worsen autoimmune diseases such as rheumatoid arthritis and systemic lupus erythematosis. Statement of Material Facts Not in Dispute par. 29. Interferon worsens psoriasis and can rarely damage the eyes. Rare side effects include confusion, psychosis, lung or kidney damage or death. Statement of Material Facts Not in Dispute par. 29. Alpha interferon has multiple neuropsychiatric effects. Statement of Material Facts Not in Dispute par. 29.

Plaintiff filed a medical grievance on or about November 9, 2001 complaining about denial of medication for Hepatitis C. Statement of Material Facts Not in Dispute par. 30. Nurse White denied the grievance and noted that because plaintiff did not complete a substance abuse course by DOC, he did not meet Dr. Pesanti's guidelines and referred plaintiff to the June 26, 2001 URC denial. Statement of Material Facts Not in Dispute par. 30. Nurse White put plaintiff on the list to see the medical doctor. Statement of Material Facts Not in Dispute par. 30.

Plaintiff appealed the denial of his grievance to Level 2 and his appeal was denied by Bryan Castle, the Health Services Administrator who advised plaintiff that he did not meet the criteria for treatment and would continue to be monitored for his medical issues. Statement of Material Facts Not in Dispute par. 31.

On May 3, 2002, URC approved a consultation with a gastroentrologist on June 4, 2002. Statement of Material Facts Not in Dispute par. 32. Plaintiff transferred out of Carl Robinson Correctional Institution on June 19, 2002 and Dr. Bianchi has not seen him since. Statement of Material Facts Not in Dispute par. 33.

Plaintiff was sent to UCONN for a liver biopsy on September 9, 2002 which confirmed that plaintiff had Hepatitis C that was treatable. Statement of Material Facts Not in Dispute par. 34. Plaintiff was discharged to Parole on September 13, 2002. Statement of Material Facts Not in Dispute par. 35.

Plaintiff was readmitted into DOC custody on March 24, 2003 for violation of his parole. Statement of Material Facts Not in Dispute par. 36. His current estimated discharge date according to his RT 55 is September 2008. Statement of Material Facts Not in Dispute par. 36.

Plaintiff explained his Parole violation stating that Parole ordered him to complete a drug treatment program because a couple of people plaintiff was working with reported that plaintiff was using drugs. Statement of Material Facts Not in Dispute par. 37. Plaintiff testified that he refused to go into the program, quit his job, and lived out of his car, spending a night or two in a shelter. Statement of Material Facts Not in Dispute par. 37.

According to his medical intake sheet dated March 24, 2003, plaintiff stated he was drinking a liter of vodka a day and had last drank on 3/22/03 and was using a bag of heroin a day and had last used on 3/22/03. Statement of Material Facts Not in Dispute par. 38. Plaintiff admitted to signing this intake form. Statement of Material Facts Not in Dispute par. 38. Indeed plaintiff admitted that he used heroin between the time he was paroled in September 2002 and March of 2003 when he was returned to DOC custody. Statement of Material Facts Not in Dispute par. 39.

Plaintiff worked a job in the kitchen from July 2003 to September 2003. Statement of Material Facts Not in Dispute par. 40. Plaintiff testified he could not "hack the job" anymore "the day I go on the Interferon treatment." Statement of Material Facts Not in Dispute par. 40. On July 22, 2003, plaintiff started receiving Pegasys interferon treatment of 180 mcg injection every week for six months and 400 milligrams of ribavirin in the morning and again at night every day for six months. Statement of Material Facts Not in Dispute par. 41.

On August 1, 2003, plaintiff's AST levels were 50 and his ALT levels were 91. Statement of Material Facts Not in Dispute par. 42. On August 22, 2003, plaintiff's AST levels were 31 and his ALT levels were 43. Statement of Material Facts Not in Dispute par. 42. On September 23, 2003, plaintiff's AST levels were 30 and his ALT levels were 36. Statement of

Material Facts Not in Dispute par. 42.  On October 27, 2003, his AST levels were 31 and his ALT levels were 40.  Statement of Material Facts Not in Dispute par. 42.  On November 24, 2003, his AST levels were 34 and his ALT levels were 51.  Statement of Material Facts Not in Dispute par. 42.  On December 22, 2003, his AST levels were 26 and his ALT levels were 33.  Statement of Material Facts Not in Dispute par. 42.

The interferon treatment available in 1998, 1999, 2000, 2001 and even in the summer of 2002 was not as good as the current treatment.  Statement of Material Facts Not in Dispute par. 43.  The side effects were much more frequent and the success rate in clearing the virus was lower.  Statement of Material Facts Not in Dispute par. 43.  During this time period, if a patient did not have advanced Hepatitis C, Dr. Blanchette, Dr. Gittzus and Dr. Pesanti all infectious disease specialists, recommended waiting until new, better medication was approved by the FDA.  Statement of Material Facts Not in Dispute par. 43.  Dr. Bianchi submitted a URC request in June 2001, for plaintiff because plaintiff was demanding treatment for his Hepatitis C.  Statement of Material Facts Not in Dispute par. 43.

The plaintiff did not sustain any clinical significant progression of his illness by a delay in treatment.  Statement of Material Facts Not in Dispute par. 43.  Rather, in Dr. Blanchette's, Dr. Gittzus', Dr. Bianchi's and Dr. Pesanti's professional opinion, it was just the opposite.  Statement of Material Facts Not in Dispute par. 43.  The plaintiff actually benefited by the delay.  Statement of Material Facts Not in Dispute par. 43.  More specifically, in October 2002, shortly after his parole from DOC custody, the present standard of interferon therapy in the form of Peginterferon alpha-2, had been approved by the U.S. Food and Drug Administration and marketed by Roche as Pegasys (R).  Statement of Material Facts Not in Dispute par. 44.  The

U.S. Food and Drug Administration did not approve combination therapy with Pegasys and ribavirin until December 3, 2002.  Statement of Material Facts Not in Dispute par. 44.

The approval of Pegasys interferon was an important milestone for the treatment of Hepatitis C patients.  Statement of Material Facts Not in Dispute par. 45.  Pegasys is a pegylated interferon that remains active in the bloodstream longer and at a more constant level than the previous medications used in the treatment of Hepatitis C.  Statement of Material Facts Not in Dispute par. 45.

Moreover, had treatment been started on plaintiff prior to his parole in September 2002, he 1) may not have finished the treatment, on the outside, thereby rendering it useless or 2) may have re-infected himself with the virus through IV drug use rendering the treatment useless. Statement of Material Facts Not in Dispute par. 46.

It is Dr. Blanchette's, Dr. Gittzus' and Dr. Pesanti's opinion, that these are very real possibilities given that 1) plaintiff refused to go to a drug treatment program which was a requirement of his parole and  2) plaintiff admitted using IV drugs while out on parole. Statement of Material Facts Not in Dispute par. 47.

The plaintiff has been receiving treatment with Pegasys, the pegylated interferon in conjunction with ribivarin for approximately six months.  Statement of Material Facts Not in Dispute par. 48.  The plaintiff had blood tests after beginning interferon therapy which indicated that he is responding to therapy.  Statement of Material Facts Not in Dispute par. 48.  Plaintiff will have tests done when he completes the pegasys/ribavirin therapy.  Statement of Material Facts Not in Dispute par. 48.  In addition, plaintiff's liver enzymes will be checked six months

from the end of the drug therapy to determine if he is a sustained responder to treatment. Statement of Material Facts Not in Dispute par. 48.

It is the current standard in the community that individuals who use IV drugs do not receive treatment for Hepatitis C in the form of interferon/ribivarin therapy. Statement of Material Facts Not in Dispute par. 49. Treatment of Hepatitis C will not have any long term benefit if recurrent infections occur. Statement of Material Facts Not in Dispute par. 49. Thus, the risks of treatment do not warrant treatment. Statement of Material Facts Not in Dispute par. 49.

## II.    ARGUMENT

### A.    SUMMARY JUDGMENT STANDARD

Under Rule 56(c), Fed. R. Civ. P., summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). See also, Quarles v. General Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985) (per curiam). A party may not rely "on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986). The party opposing a motion for summary judgment "may not rest upon the mere allegation or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. § 56(e).

Summary judgment dispositions have been encouraged as a valuable means for avoiding unnecessary trials, and modern Supreme Court and Second Circuit cases have encouraged its use for that purpose.  See, e.g., Celotex Corp. v. Catrett 477 U.S. 317, 106 S.Ct. 2548, 2555, 91 L.Ed. 2d 265 (1968); H.L. Hayden Co. of N.Y. v. Siemens Medical Systems, 879 F.2d 1005, 1011 (2nd Cir. 1989); Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2nd Cir. 1986) cert. denied 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).  Thus "[w]here the record could not lead a rational trier of facts to find for the non-moving party, there is then no 'genuine issue for trial.'" Clements v. County of Nassau, 835 F.2d 1000, 1004 (2d Cir. 1987).  The record in this case, even when considered in a light most favorable to the plaintiff, fully supports the granting of a summary judgment in favor of the defendants.

### B.    PLAINTIFF HAS NO EIGHTH AMENDMENT CLAIM

Plaintiff cannot establish that defendants were deliberately indifferent to his medical condition.   Accordingly, summary judgment should enter in favor of the defendants.

> . . . the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment. . . . prison officials must ensure that inmates receive adequate. . . . medical care. . . .

Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 1976 (1994).

> Our cases have held that a prison official violates the Eighth Amendment only when two requirements are met.  First, the deprivation must be, objectively, sufficiently serious. . . The second requirement . . . [is that] a prison official must have a sufficiently culpable state of mind.  [citations omitted].  In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety.  [citations omitted].

Id. at 1977.

In order to establish an unconstitutional denial of medical care, a prisoner must show that prison officials were deliberately indifferent to his serious medical needs.  Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir.  1994) cert. denied, 115 S. Ct. 1108 (1995) (citing Estelle v. Gamble, 429 U.S.  97, 103 (1976).  However, every claim by an inmate that he has not received adequate medical attention does not constitute a violation of the Eighth Amendment.  Estelle v. Gamble, 429 U.S. 97, 105, 97 S.Ct. 285, 291 (1976).

1.     **Plaintiff Cannot Establish that the Defendants Were Deliberately Indifferent**

Deliberate indifference is more than negligence. Farmer v. Brennan, 114 S. Ct. 1970, 1978 (1994).  "[T]he protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials." Davidson v. Cannon, 474 U.S. 344, 348 106 S.Ct. 668, 671 (1986);  Daniels v. Williams, 474 U.S. 327, 332-333, 106 S.Ct. 662, 666 (1986).  "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."  Daniels v. Williams, 474 U.S. at 333, 106 S.Ct. at 666 citing   Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct 285, 292, 50 L.Ed. 251 (1976).  Rather, the plaintiff must demonstrate that the defendant was deliberately indifferent to the plaintiff's health and safety and thus had a sufficiently culpable state of mind.   Farmer v. Brennan, 511 U.S. 825, 834;. Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994), cert. denied sub nom. Foote v. Hathaway, 115 S.Ct. 1108 (1995); Chance, 143 F.3d at 703 (citing Farmer v. Brennan, 511 U.S. 825, 837, 128 L. Ed. 2d 811, 114 S. Ct. 1970 (1994)).

The official must have known of and disregarded, "an excessive risk to inmate health or safety."  Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998).  Differences of opinion between a prisoner and prison officials concerning the appropriate response and treatment of a

medical complaint, or allegations of medical malpractice, generally do not satisfy the deliberate indifference standard. Id at 702. "We do not sit as a medical board of review. Where the dispute concerns not the absence of help, but the choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, we will not second guess the doctors." Sires v. Berman, 834 F.2d 9, 13 (1st. Cir. 1987). A pure "issue of medical judgment" cannot form the basis for an eighth amendment claim. Hernandez v. Keane, 341 F.3d 137, 146-47(2d Cir. 2003)(Summary judgment granted where "[p]laintiff's claim of deliberate indifference rests largely upon delays in providing a treatment that was risky to begin with.").

"[A] prison official does not act in a deliberately indifferent manner unless that official 'knows and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Farmer v. Brennan, 511 U.S. at 837. A prison official who is aware of a risk of harm to an inmate and responds reasonably to the risk will not be found liable under the Eighth Amendment. Farmer, 511 U.S. at 844-45. This is true even if the harm to the inmate is ultimately not avoided. See. Id.

The Eighth Amendment must "draw its meaning from the evolving standard of decency that mark the progress of a maturing society." Id.

Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. Thomas v. Pate, 493 F.2d 151, 157 (7th Cir. 1974), cert. denied, 423 U.S. 877, 96 S.Ct. 149, 46 L.Ed. 2d 110 (1975). Moreover, courts have repeatedly held that a prisoner does not have the right to the treatment of his choice. See Dean v. Coughlin, 804

F.2d 207, 215 (2d Cir. 1986);  see also Jackson v. Fair, 846 F.2d 811, 817-18 (1st Cir. 1988);

Ross v. Kelly, 784 F. Supp. 35, 44-45 (W.D.N.Y. 1992).

> Federal courts are generally hesitant to second guess medical judgments and to constitutionalize claims which sound in state tort law.  Dean v. Coughlin, 804 F.2d 207, 215 (2d. Cir. 1986). . . So strong is this view that determinations of medical providers concerning the care and safety of patients are given a "presumption of correctness." Perez v. the County of Westchester, 83 F. Supp. 2d 435, 440 (S.D.N.Y. 2000)(citing Kulak v. City of New York, 88 F.3d 63, 77 (2d Cir. 1996). . . . Thus disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim.  Those issues implicate medical judgments and, at worst negligence amounting to medical malpractice, but not the Eighth Amendment.

> Sond v. St. Barnabus Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).

> We agree that the mere malpractice of medicine in prison does not amount to an Eighth Amendment violation. See Estelle, 429 U.S. at 107; Hathaway, 37 F.3d at 66. This principle may cover a delay in treatment based on a bad diagnosis or erroneous calculus of risks and costs, or a mistaken decision not to treat based on an erroneous view that the condition is benign or trivial or hopeless, or that treatment is unreliable, or that the cure is as risky or painful or bad as the malady. See, e.g., Estelle, 429 U.S. at 105--106

Harrison v. Barkley, 219 F.3d at 139.

The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves." Ross v. Kelly, 784 F. Supp. 35, 45 (W.D.N.Y. 1992) quoting Ruiz v. Estelle,  679 F.2d 1115, 1149 (5th Cir.) vacated in part as moot 688 F.2d 266 (5th Cir. 1982), cert. denied 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed. 2d 795 (1983).

In McGinnis, the district court dismissed an inmate's § 1983 complaint wherein he claimed he received improper medication.  On appeal, the Second Circuit Court of Appeals affirmed stating:

> "The prisoner's right is to medical care-not the type or scope of medical care which he personally desires.  <u>A difference of opinion between a physician and a patient does not give rise to a constitutional right or sustain a claim under § 1983</u>." [citations omitted].

<u>United States Ex Rel. Hyde v. McGinnis</u>, 429 F.2d at 867-68 (emphasis added).

Recently, courts have held that withholding of Hepatitis C medication does not translate into a deliberate indifference finding.  In a case similar to the one at bar, a district judge in Colorado, relying on reports from the National Institute of Health, ("NIH") granted summary judgment in favor of defendants responsible for a policy under which an inmate first had to complete a substance abuse program before receiving Hepatits C treatment.  <u>Fenner v. Suthers</u>, 2001 U.S. Dist. Lexis 24018 (D. Colo. 2001) (Attached).

> Defendants do not dispute Mr. Fenner's assertion that Hepatitis C is a serious medical need.  <u>However, they maintain that the DOC's Hepatitis C treatment policy is constitutional because substance abuse treatment actually is part of the treatment for Hepatitis C.  In support of this argument, Defendants cite reports issued or endorsed by the National Institutes of Health.</u>  In relevant part, these reports indicate that (1) sharing contaminated needles is the most common route of infection for hepatitis C, (2) <u>Hepatitis C progresses at a slow rate</u>, (3) the only approved treatment for Hepatitis C is an anti-viral therapy program involving use of alpha interferon either alone or in combination with ribavirin, (4) a contraindication to interferon therapy is active substance or alcohol abuse, (5) interferon therapy can be associated with relapse in people with a prior history of substance abuse, (6) reinfection with Hepatitis C is possible even after successful interferon therapy and (7) <u>at least six months of substance abuse treatment should precede interferon therapy treatment for Hepatitis C</u>.  See Management of Hepatitis C.  NIH Consensus Statement Online 1997, March 24-26 . . . . <u>Mr. Fenner has failed to demonstrate that he has a clearly established constitutional right to receive interferon therapy treatment without prior substance abuse treatment</u>.  The DOC's Hepatitis C treatment policy is not unconstitutional on its face and summary judgment should be granted in favor of Mr. Suthers and Mr. Kleinsasser.

<u>Id</u> at *7-*10 (emphasis added).

In holding that denial of Hepatitis C case was not deliberate indifference, a district judge

for the Southern District of New York stated,

> In essence, rather than knowing of and disregarding an excessive risk to Plaintiff's health and safety in refusing to treat him with Interferon and Ribavirin, the physicians acted pursuant to their medical judgment (as based on the Hepatitis C Guideline and current medical literature on the relevant subject matter) to protect Plaintiff's health. Such conduct does not constitute deliberate indifference. . . . . Moreover, although Plaintiff disagrees with the physicians' treatment decisions as well as their decompensated cirrhosis diagnosis and claims that he is entitled to consult with a specialist regarding a different diagnosis and treatment plan, such disagreements and allegations do not amount to Eighth Amendment violations.

McKenna v. Wright, 2002 U.S. Dist. Lexis 3489 at *20-22 (S.D.N.Y. 2002) (Attached).

Similarly, summary judgment was granted in Gresh v. Berks Co, 2002 U.S. Dist Lexis

13347 (Ed. Pa. 2002) (Attached).

> . . . . Gresh was not a suitable candidate for the drug combination therapy.  His liver function, while not normal, was not sufficiently impaired to warrant the therapy.  He had not been declared psychologically fit, a failure especially relevant in light of his previous attempted suicide.

 Id at *17.

Similarly, a New Jersey Federal District Judge granted summary judgment holding:

> Plaintiff further contends that the denial of his request for treatment of his hepatitis C with interferon/ribavirin combination therapy is evidence of deliberate indifference.  The record, however, does not contain compelling evidence that interferon/ribavirin is the appropriate treatment for Plaintiff at this time. . . . the regulations suggest that prisoners with histories of depression and/or psychiatric illness should not take interferon/ribavirin, because such treatment could cause severe psychiatric problems.  Plaintiff's present course of treatment, in which his liver functions and liver enzymes are monitored regularly, is consistent with standards set forth by the Bureau of Prisons.  The medical evidence does not demonstrate that Plaintiff's hepatitis C has reached the point where an intensive program of drug therapy, such as interferon/ribavirin, would be preferred over Plaintiff's present course of treatment.  Indeed, Dr. John noted in his report that starting Plaintiff on a drug therapy program might even aggravate Plaintiff's symptoms and damage his liver. . . .  Even were this Court to find that

interferon/ribavirin treatment is appropriate in Plaintiff's case, Plaintiff still has not met his burden of showing the denial of such treatment constitutes a violation of the Eighth Amendment. . . . . <u>While the standard protocol for treating hepatitis C may be evolving, nothing in the record suggest that interferon/ribavirin is necessary for proper treatment and there is no evidence that the course of treatment adopted by Defendants deviates from the standard medical practice</u>.

<u>Christy v. Robinson</u>, 216 F. Supp. 2d 398, 415-16 (D. N.J. 2002)(emphasis added); <u>See also</u>, <u>Hassan v. Khanyile</u>, 1998 U.S. Dist. Lexis 7636 (S.D.N.Y. 1998)(Denying motion for temporary injunction when interferon treatment stopped because defendants' expert stated in "his affidavit that interferon is effective in only a small number of hepatitis patients, and that even for those patients who respond well to such treatment, there is a high rate of relapse.") (Attached); <u>McQueen v. Revell</u>, 2001 U.S. Dist. Lexis 17155 (N.D. Texas 2001)("If plaintiff's physicians responsible for treatment of his Hepatitis C consider it inadvisable to administer Interferon/Ribaviron[sic] treatment while plaintiff is taking certain psychiatric medication, the failure to administer Interferon/Ribaviron [sic] treatment, in the face of plaintiff's refusal to consent to discontinuance of his psychiatric medication, does not constitute deliberate indifference.") (Attached).

Here, at plaintiff's request, in June 2001, Dr. Bianchi submitted a URC request for an outside consultation for plaintiff's Hepatitis C. Statement of Material Facts Not in Dispute par. 19. Plaintiff has not alleged any facts and cannot allege any facts to suggest that Dr. Bianchi was deliberately indifferent to the plaintiff. To the contrary, Dr. Bianchi regularly measured plaintiffs' ALT and AST levels and submitted a URC request when the levels were elevated and when plaintiff asked to pursue an outside consultation for his Hepatitis C. Accordingly, summary judgment should enter in Dr. Bianchi's favor. As a matter of law, the treatment rendered by Dr. Bianchi did not constitute deliberate indifference.

Moreover, summary judgment should also enter in favor of Dr. Blanchette.  Plaintiff alleges that Dr. Blanchette ordered plaintiff's blood work in December 2000.[1]  Plaintiff's blood was tested in December 2000 which showed elevated ALT and AST levels consistent with hepatitis C.  Statement of Material Facts Not in Dispute par. 18.  However, plaintiff admitted that in January 2001, he told medical staff that if he saw heroin right then, he would use it.  Statement of Material Facts Not in Dispute par. 18.  As a matter of law, plaintiff cannot establish that Dr. Blanchette was deliberately indifferent in failing to send plaintiff out for Hepatitis C medication in December 2000 based upon one report of elevated liver enzymes when plaintiff was still actively suffering from his heroin addiction.

Plaintiff's sues Dr. Pesanti alleging the denial of the URC request for hepatitis C treatment in June 2001 constituted deliberate indifference.  Given the undisputed facts of this case, plaintiff cannot establish that Dr. Pesanti was deliberately indifferent in denying the June 2001 URC request.  Plaintiff has a long history of substance abuse problems.   According to the plaintiff, he started injecting heroin in 1996.  Statement of Material Facts Not in Dispute par. 1.  Given this behavior, not surprisingly, plaintiff has been in and out of the Connecticut Department of Corrections since February 1996.   Statement of Material Facts Not in Dispute par. 2.  According to various DOC medical intake screening forms, plaintiff has used anywhere from 1-10 bags of heroin a day and drank a liter, a pint or a quart of alcohol daily.  Statement of Material Facts Not in Dispute par. 3-6, 7-9.

In October 2000, it was noted in plaintiff's medical records that although he had been diagnosed with hepatitis C, he was asymptomatic.  Statement of Material Facts Not in Dispute

---

[1]  Defendants dispute that Dr. Blanchette ordered the blood work, but for purposes of this motion, only, will presume the truth of plaintiff's allegations.

par. 16.  The majority of individuals with Hepatitis C are asymptomatic.  Statement of Material Facts Not in Dispute par. 16.

At plaintiff's request on June 25, 2001, Dr. Bianchi submitted a URC request for Hepatitis C treatment.  Statement of Material Facts Not in Dispute par. 19.  The URC denied the request because plaintiff had not completed a substance abuse treatment program.  Statement of Material Facts Not in Dispute par. 20.  Pursuant to Correctional Managed Health Care (CMHC) guidelines, plaintiff was not a candidate for interferon alpha and Ribavirin therapies because he had not undergone a drug treatment program within the DOC.  Statement of Material Facts Not in Dispute par. 21.  Plaintiff did not seek to enroll into a substance abuse program with the DOC until that was made a condition of his receiving Interferon Alpha and Ribavirin therapies.  Statement of Material Facts Not in Dispute par. 22.

In addition, the May 2000 CMHC guidelines provide that "Because treatment of Hepatits C will not have any long term benefits if recurrent infections occur, only inmates who were not using cocaine or IV drugs for at least 6 months prior to the current incarceration or who have very long sentences (> 5 years) [will be approved for GI consultations.]"  Statement of Material Facts Not in Dispute par. 23.  In June 2001, plaintiff's expected release date was 7/6/2003.  Statement of Material Facts Not in Dispute par. 19.

Indeed, the Federal Bureau of Prison guidelines provide, "Inmates with evidence of substance abuse, either in the present or the recent past (check urine toxicology screen if drug use is suspected and check Sentry for disciplinary actions related to drug or alcohol use.) should be referred for counseling and assessment prior to considering antiviral therapy."   Statement of Material Facts Not in Dispute par. 25.

According to the Federal Bureau of Prisons policy, an Absolute Contraindication for the use of interferon is "Ongoing alcohol or illicit drug usage-refer for evaluation."  Statement of Material Facts Not in Dispute par. 25.  A Relative Contraindication is "History of recent alcohol abuse or illicit drug usage-refer for evaluation."  Statement of Material Facts Not in Dispute par. 25.  The Federal Bureau of Prisons policy also provides that "Eradication of HCV infection without resolution of alcoholism is unlikely to prevent end-stage liver disease."  Statement of Material Facts Not in Dispute par. 25 (emphasis added).  The defendants agree that patients with Hepatitis C should not drink alcohol since it increases their chance of developing cirrhosis and liver cancer.  Statement of Material Facts Not in Dispute par. 27.

Similarly, according to the National Institute of Health "Treatment for addiction should be provided prior to treatment for Hepatitis C" and  "those addicted to alcohol or drugs should be helped to obtain treatment for their addiction so that they might qualify for anti-HCV therapy."  Statement of Material Facts Not in Dispute par. 26 (emphasis added).  A publication entitled "Management of Hepatitis C the National Institute of Health ," states, ". . .  given the current status of therapies for Hepatitis C treatment is clearly recommended only in a selected group of patients."  Statement of Material Facts Not in Dispute par. 26.  This publication goes on to say that for others, treatment decisions are less clear and should be made on an individual basis or in the context of clinical trials.  Statement of Material Facts Not in Dispute par. 26.

According to the Federal Bureau of Prison Guidelines and the defendants, most people with chronic Hepatitis C have no symptoms of liver disease.  Statement of Material Facts Not in Dispute par. 24.  If symptoms are present they are usually mild, non specific, and intermittent.  Statement of Material Facts Not in Dispute par. 24.  Hepatitis C is a chronic disease.  Statement

of Material Facts Not in Dispute par. 24.  In most cases it takes over 30 years for an individual with Hepatitis C to develop serious liver problems.  Statement of Material Facts Not in Dispute par. 24.  Therefore, it is much more prudent to wait until you are sure that a patient is no longer using intravenous drugs, drinking alcohol and/or will not again start using intravenous drugs before beginning treatment.  Statement of Material Facts Not in Dispute par. 24.

Patients who are cured of Hepatitis C are not immune to Hepatitis C and can be re-infected with the virus.  Statement of Material Facts Not in Dispute par. 28.  Thus, if an individual is still using drugs, or uses IV drugs in the future, they are at risk of re-infecting themselves with Hepatitis C.  Statement of Material Facts Not in Dispute par. 28.  In such a case, the risks of the interferon treatment, such as muscle aches, headaches, nausea, vomiting, skin irritations, low grade fever, weight loss, irritability, depression, mild bone marrow suppression and reversible hair loss would far outweigh the benefits.  Statement of Material Facts Not in Dispute par. 29.

In September 2002, plaintiff was discharged to Parole, which he violated, causing him to return to DOC custody in March 2003 with a five year sentence.  Statement of Material Facts Not in Dispute par. 35, 36.  More specifically, the Board of Parole ordered plaintiff to complete a drug treatment program, which plaintiff refused to do, choosing instead to quit his job and live out of his car and take all necessary measures to avoid contact with the Board of Parole.  Statement of Material Facts Not in Dispute par. 37.  Instead of pursuing a drug and alcohol free life outside the prison walls, plaintiff continued using alcohol and heroin and ended up back in prison.  At the time of plaintiff's readmission in March 2003, he admitted to using a liter of vodka a day and a bag of heroin a day.  Statement of Material Facts Not in Dispute par. 38.

Nonetheless, in July 2003, as plaintiff's sentence was greater than five years, and as he was ultimately enrolled in a substance abuse program  plaintiff began receiving the Pegagys Interferon with ribavirin treatment.  Statement of Material Facts Not in Dispute par. 41, 36. Plaintiff's AST and ALT levels indicated that plaintiff was responding to the therapy.  Statement of Material Facts Not in Dispute par. 42, 48.  Plaintiff's blood levels will be checked in the summer of 2004 to determine if plaintiff is a sustained responder to the treatment.  Statement of Material Facts Not in Dispute par. 48.

It is the opinion of Doctors Bianchi, Pesanti, Blanchette and Gittzus that the interferon treatment available in 1998 through summer of 2002 was not as good as the medication which plaintiff received.  Statement of Material Facts Not in Dispute par. 43.  The side effects were much more frequent and the success rate in clearing the virus was lower.  Statement of Material Facts Not in Dispute par. 43.  During this time period, if a patient did not have advanced Hepatitis C, Doctors Blanchette, Gittzus, and Pesanti, all infectious disease specialists, recommended waiting until the new, better medication was approved by the FDA.  Statement of Material Facts Not in Dispute par. 43.  It is the opinion of doctors Blanchette, Gittzus, Pesanti and Bianchi that plaintiff did not sustain any clinically, significant progression of his Hepatitis C by a delay in treatment.  Statement of Material Facts Not in Dispute par. 44.  Rather, it was just the opposite.  Statement of Material Facts Not in Dispute par. 44.  Plaintiff benefited by the delay because in October 2002, the FDA approved the medication which was used to treat his Hepatitis C, Peginterferon alpha 2 which is known as Pegasys.  Statement of Material Facts Not in Dispute par. 44.  The FDA did not approve combination therapy with Pegasys and Ribavirin until December 2002.  Statement of Material Facts Not in Dispute par. 44.

In addition the URC's denial of the GI consult prompted plaintiff to seek out and subsequently enroll in a substance abuse treatment program. Statement of Material Facts Not in Dispute par. 22. The goal of this program is to prevent plaintiff from using drugs and alcohol upon his discharge. The URC is not alone in having an inmate complete a substance abuse treatment before undergoing weekly injections of interferon with twice daily dosages of Ribavirin. The Federal Bureau of Prisons Policy and the National Institute of Health both provide that treatment for substance abuse should be provided prior to treatment for Hepatitis C. Statement of Material Facts Not in Dispute par. 25, 26.

Here, had plaintiff received Hepatitis C treatment in June 2001, when he sought it, he may have re-infected himself, when out on parole from September 2002 – March 2003 thus rendering the treatment all for naught. Second, the treatment plaintiff received in July 2003 was better than the treatment which was available in June 2001. Plaintiff's initial tests indicate that he responded to the medication he received from July 2003 – January 2004. Statement of Material Facts Not in Dispute par. 48. Quite simply, given his substance abuse problems, plaintiff cannot establish that Dr. Pesanti was deliberately indifferent in denying plaintiff Hepatitis C medication in June 2001 because he had not completed a substance abuse program. Moreover, plaintiff cannot establish that Dr. Blanchette was deliberately indifferent in failing to send plaintiff out for a consult based upon one report of elevated AST/ALT levels, given plaintiff's statement that if he saw heroin he would use it. Finally, plaintiff cannot establish that Dr. Bianchi's actions in monitoring his AST/ALT levels and in submitting a URC request constituted deliberate indifference. Accordingly, summary judgment should issue in defendants' favor.

C.    **PLAINTIFF HAS FAILED TO ALLEGE LEGALLY SUFFICIENT CLAIMS AGAINST NURSE WHITE**

"Complaints relying on civil rights statutes are plainly insufficient unless they contain some specific allegation of fact indicating a deprivation of civil rights, rather than simple conclusions." Koch v. Yunich, 533 F. 2d 80, 85 (2nd Cir. 1976) (emphasis added); see, e.g. Powell v. Jervis, 460 F.2d 551, 553 (2d Cir. 1976); Louis v. Ward, 444 F.Supp. 1107, ll09 (S.D.N.Y. 1978). A complaint relying on civil rights "must set forth facts showing some intentional and purposeful deprivation of constitutional rights." Snowden v. Hughes, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944). The plaintiff must allege facts that indicate that the defendant has acted under color of state law to deprive him of a constitutionally or federally protected right. Lugar v. Edmondson Oil Co., 457 U.S. 922, 930 (1982); Washington v. James, 782 F.2d 1134, 1138 (2d. Cir. 1986) (emphasis added); see also, Alfaro Motors, Inc. v. Ward, 814 F.2d 883, 887 (2d Cir. 1987); Mazurek v. Wolcott Bd. of Educ., 815 F. Supp. 71, 77 (D. Conn. 1993).

A claim that arises entirely from the "review of denial" of a grievance is legally insufficient. Graham v. Wright, 2003 U.S. Dist. Lexis 16106 (S.D.N.Y. 2003) (Attached).

> [W]e find that plaintiff's claim against defendant Keane should be dismissed for failure to state a claim. Plaintiff's claim against Keane stems entirely from Keane's review and denial of plaintiff's grievance. . . . In the instant case, plaintiff has not suggested that defendant Keane, as part of his investigation of plaintiff's grievance, failed to appropriately rely on the opinion of medical staff in coming to his determination, nor has he alleged that defendant Keane was deliberate or malicious in his ultimate denial of the grievance. Accordingly, we find that plaintiff has failed to state a claim against Keane and dismiss plaintiff's claim against him in his individual capacity.

Graham v. Wright, 2003 U.S. Dist. Lexis 16106 (S.D.N.Y. 2003).

Here, plaintiff's claims against Nurse White stem entirely from her denial of plaintiff's medical grievance. Amended Complaint par. 6. Plaintiff grieved URC's denial of his request for

an outside consultation for his Hepatitis C.   Amended Complaint par. 6.   In denying this

grievance, Nurse White referred plaintiff to the June 26, 2001 URC response which indicated

that plaintiff first needed to complete a substance abuse course before he underwent Hepatitis C

treatment.   Statement of Material Facts Not in Dispute par. 30.   Nurse White also put plaintiff on

the list of inmates to see the doctor.   Statement of Material Facts Not in Dispute par. 30.

Finally, plaintiff appealed the denial of the grievance to the next level.   Statement of Material

Facts Not in Dispute par. 31.   The Health Services Administrator reiterated Nurse White's

response that plaintiff first needed to complete a substance abuse program.   Statement of

Material Facts Not in Dispute par. 31.   Because plaintiff cannot establish that Nurse White

violated any of his constitutional rights by denying his grievance, summary judgment should

enter in Nurse White's favor.

### D.     PLAINTIFF'S CONCLUSORY CONSPIRACY CLAIMS ARE LEGALLY INSUFFICIENT

"Complaints relying on civil rights statutes are plainly insufficient unless they contain

some specific allegation of fact indicating a deprivation of civil rights, rather than simple

conclusions."   Koch v. Yunich, 533 F. 2d 80, 85 (2nd Cir. 1976) (emphasis added); see, e.g.

Powell v. Jervis, 460 F.2d 551, 553 (2d Cir. 1976); Louis v. Ward, 444 F.Supp. 1107, ll09

(S.D.N.Y. 1978).   A complaint relying on civil rights "must set forth facts showing some

intentional and purposeful deprivation of constitutional rights."   Snowden v. Hughes, 321 U.S. 1,

64 S.Ct. 397, 88 L.Ed. 497 (1944).  The plaintiff must allege facts that indicate that the defendant

has acted under color of state law to deprive him of a constitutionally or federally protected right.

Lugar v. Edmondson Oil Co., 457 U.S. 922, 930 (1982); Washington v. James, 782 F.2d 1134,

1138 (2d. Cir. 1986) (emphasis added); see also, Alfaro Motors, Inc. v. Ward, 814 F.2d 883, 887

(2d Cir. 1987); Mazurek v. Wolcott Bd. of Educ., 815 F. Supp. 71, 77 (D. Conn. 1993).

In paragraph 66 of his complaint, plaintiff alleges that there was a "conspiracy [among

the defendants] to deny [sic] the plaintiff his civil rights to medical care being deliberately

indifferent, cruel and unusual."  Plaintiff is bound to do more than merely state vague and

conclusory allegations respecting the existence of conspiracies.  It is incumbent upon him to

allege with at least some degree of particularity overt acts in which defendants engaged that were

reasonably related to the promotion of a claimed conspiracy.  Hoffman v. Halden, 268 F.2d 280,

295 (9th Cir. 1959), rev'd in part on other grounds, 300 F.2d 34 (9th Cir. 1962).

> In a civil conspiracy, the conspiracy itself is not a cause of action, without overt
> acts, because again it is the overt act which moves the conspiracy from the area of
> thought and conversation into action and causes the civil injury and resulting
> damage. Accordingly, the cases hold that the damage in a civil conspiracy flows
> from the overt acts and not from the conspiracy.
> Therefore, the certainty we look for in a proper complaint under the Civil Rights
> Statutes, is not in the general allegations of conspiracy, purpose, intent and color
> of authority but the certainty and substance in the particular acts which are alleged
> to have caused damage. The real question is whether or not the amended
> complaint, in addition to the general allegations referred to above, sets forth with
> certainty facts showing particularly what a defendant or defendants did to carry
> the conspiracy into effect, whether such acts fit within the framework of the
> conspiracy alleged, and whether such acts, in the ordinary course of events, would
> proximately cause injury to the plaintiff.

Id. at 295 (emphasis added).

In Jones v. Owen Federal Bank, 147 F. Supp. 2d 219 (S.D.N.Y. 2001), the Court found

that claims of conspiracy to violate the civil rights of a property owner whose mortgage default

had led to foreclosure were insufficient to withstand a motion to dismiss. Plaintiff claimed that

defendants conspired against him during foreclosure proceedings, but the court held that the

alleged claims "merely recited the state foreclosure history and are not sufficiently clear to have

provided … a fair understanding of what the plaintiff is complaining about or to have allow the [defendants] to know whether there is a legal basis for recovery." <u>Jones</u>, 147 F. Supp. 2d at 224. To claims that the defendants engaged in conduct proscribed by the Fair Debt Collection Practices Act which violated his civil rights, the court found that "Plaintiff fails to allege what that conduct consisted of, who specifically engaged in the conduct and when the conduct took place." <u>Id</u>.

Similarly, a court found that allegations devoid of substantive facts were too conclusory as to be actionable in <u>Vitale v. Nuzzo, Jr., et al.</u>, 674 F. Supp. 402 (D. Conn. 1986). In <u>Vitale</u>, the plaintiff alleged that defendants has conspired with the state trial judge to deprive him of equal protection rights as well as the Eighth Amendment guarantee against cruel and unusual punishment.

> The Court held:
> It is of course generally true that a complaint may be dismissed "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations", <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984), <u>citing</u> <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957), and a pro se complaint is naturally held to "less stringent standards than formal pleadings drafted by lawyers", <u>Haines v. Kerner</u>, 404 U.S. 519, 520, 30 L. Ed. 2d 652, 92 S. Ct. 594 (1972). On the other hand, there must be factual allegations of substance beyond conclusory labels and assertions, "at least some allegations of facts indicating a deprivation of civil rights", <u>Fine v. City of New York</u>, 529 F.2d 70, 73 (2d Cir. 1975). (citation omitted). That minimum safeguard to indicate the genuine existence of a federally actionable claim, moreover, is particularly appropriate when the complaint rests on a broad claim of "conspiracy", in which case "diffuse and expansive allegations are insufficient", <u>Ostrer v. Aronwald</u>, 567 F.2d 551, 553 (2d Cir. 1977).

<u>Id</u>. at 404 (emphasis added). <u>See</u> <u>e.g.</u>, <u>Kashelkar v. Rubin & Rothman</u>, 97 F. Supp. 2d 383 (S.D.N.Y. 2000); <u>Scheiner v. Wallace</u>, 1995 U.S. Dist LEXIS 11070 (S.D.N.Y. 1995); <u>See also</u>, <u>e.g.</u>, <u>Powell v. Jarvis</u>, 460 F.2d 551 (2d Cir. 1972).

Here, because plaintiff has failed to allege any facts to suggest that the defendants conspired to violate his civil rights, summary judgment should enter on the conspiracy claims.

**E.   DEFENDANTS HAVE QUALIFIED IMMUNITY AND THUS ARE ENTITLED TO SUMMARY JUDGMENT**

Because the defendants did not violate any clearly established statutory or constitutional rights of the plaintiff, they are entitled to qualified immunity.

The defense of qualified immunity is a well-settled doctrine which protects government officials from civil suits arising from the performance of their discretionary functions when that performance "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); Lennon v. Miller, 66 F.3d 416, 420-21 (2d Cir. 1995); Oliviera v. Mayer, 23 F.3d 642, 649 (2d Cir. 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 721, 130 L.Ed.2d 627 (1995). Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action assessed in light of the legal rules that were "clearly established" at the time it was taken. Id. The doctrine evolved as an accommodation between the need to provide private redress when government officials abuse their positions of public trust and the need to shield officials who responsibly perform their duties from the costs of defending an action. See Anderson v. Creighton, 483 U.S. 635, 638-39, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1997); Harlow v. Fitzgerald, 457 U.S. at 814, 102 S.Ct. at 2736.

Qualified immunity for government officials serves not only as a defense from liability, but also to spare public officials from shouldering the burdens and expense of litigation. See, e.g., Warren v. Dwyer, 906 F.2d 70, 74 (2d Cir.), cert. denied, 498 U.S. 967, 111 S.Ct. 431, 112

L.Ed.2d 414 (1990).  "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery . . .".  Behrens v. Pelletier, ___ U.S. ___, 116 S.Ct. 834, 839, 133 L.Ed.2d 773 (1996).  "[B]are allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery ....  Until this threshold immunity question is resolved, discovery should not be allowed."  Harlow, 457 U.S. at 817, 102 S.Ct. at 2738.

Here, plaintiff cannot point to any clearly established law violated by the defendants which would take this case out of the protection of qualified immunity.  Moreover, at a minimum, reasonable prison physicians could disagree over whether a patient, with a long history of alcohol and IV drug use, should first undergo an in-house substance abuse treatment program before starting a treatment regimen of Interferon injections and Ribavirin medication.  Indeed, UConn Managed Health Care's policies are in line with the Federal Bureau of Prisons' guidelines and literature from the National Institute of Health.  Statement of Material Facts Not in Dispute par. 23, 25, 26.  Accordingly, defendant Pesanti, is entitled to qualified immunity.

Similarly, at a minimum, reasonable prison physicians could disagree  as to whether plaintiff should have been sent out for a consult based upon one report of elevated AST/ALT levels, given plaintiff's statement that if he saw heroin he would use it.  Accordingly, Dr. Blanchette is entitled to qualified immunity.

Likewise, at a minimum, reasonable prison physicians could disagree over whether it was reasonable to continue monitoring plaintiff's AST/ALT levels and in submitting a URC request for an outside consult.  Accordingly, summary judgment should issue in Dr. Bianchi's favor.

Finally, at a minimum, reasonable correctional nurses could disagree over whether it was proper to deny plaintiff's grievance about his hepatitis C treatment and to refer plaintiff to the URC response and to sign the plaintiff up to see the doctor.  Accordingly, summary judgment should issue in Nurse White's favor.

Because the defendants all have qualified immunity, summary judgment should enter in their favor.

## **CONCLUSION**

For all the foregoing reasons, defendants respectfully move for summary judgment in this matter.

                    DEFENDANTS

                    Edward Pesanti, et al.

                    RICHARD BLUMENTHAL
                    ATTORNEY GENERAL


                    _____
        By:    Ann E. Lynch
                    Assistant Attorney General
                    Federal Bar No. ct10835
                    110 Sherman Street
                    Hartford, CT 06105
                    Tel.:  (860) 808-5450
                    Fax:  (860) 808-5591
                    Fed Bar No. Ct 08326

## **CERTIFICATION**

I hereby certify that a copy hereof was mailed on this 19th day of February 2004, first class postage prepaid, to:

Gerald Coderre, Inmate #245210
Osborn Correctional Institution
335 Bilton Road
P.O. Box 100
Somers, CT 06071

_____
Ann E. Lynch
Assistant Attorney General