UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GERALD CODERRE | : | CIVIL NO. 3:02CV1096(RNC)(DFM) |
| v. | : | |
| EDWARD PESANTI, ET AL. | : | FEBRUARY 20, 2004 |

## AFFIDAVIT OF EDWARD PESANTI, MD

1. I am over the age of 18 and understand and believe in the obligations of an oath:

2. I am a physician licensed to practice medicine in the State of Connecticut since 1982.

3. I completed my residency in medicine at Barnes Hospital in St. Louis Maryland.

4. From December 1997 to April 2002 I was the Medical Director for UConn Correctional Managed Health Care. In this capacity, I am familiar with the medical care and treatment provided to the plaintiff in this case. According to his medical chart, plaintiff's date of birth is 9-3-65.

5. In a DOC medical intake screening form dated February 23, 1996, plaintiff reported intravenous use of 4 bags of heroin daily. In a DOC medical intake screening form dated October 1, 1996, plaintiff reported drinking 1 liter of vodka daily and using 4-5 bags of heroin daily. Plaintiff also reported that his last drug use was on the preceding day. Plaintiff also reported that he had been in a detox program at Danbury Hospital one and a half years prior for Alcohol and Heroin addiction.

6. In a DOC medical intake screening form dated June 9, 1997 plaintiff reported drinking a pint of Vodka a day and that he last drank on June 2, 1997. Plaintiff also reported

using 3 bags of heroin a day and reported that he last used heroin on June 3, 1997. Plaintiff also reported that he had been in a detox program in March 1997.

7. In a DOC medical intake screening form dated March 18, 1998, plaintiff reported drinking a quart of whiskey a day and reported that he last drank on March 17, 1998. Plaintiff also reported using 5 bags of heroin a day and reported last using heroin on March 17, 1998.

8. In a DOC medical intake screening form date September 21, 1998, plaintiff reported drinking 1 pint of absolute vodka daily and using 5 to 10 bags of heroin daily. Plaintiff reported that he had his last drink on September 19 1998 and he last used heroin on September 19 1998, Plaintiff also reported that he had been in a detox program in March 1998 called Meridian Hill.

9. In a DOC medical intake screening form date January 3 2000, plaintiff reported using one bag of heroin daily. Plaintiff reported that he last used heroin on January 2, 2000. Plaintiff also reported that he had been in a detox program in March 1998 called Meridian Hill.

10. In a DOC medical intake screening form date December 14, 2000, plaintiff reported drinking between a pint to a liter of rum/vodka daily and using ½ to 1 bag of heroin daily. Plaintiff reported that he last drank on December 13, 2000 and he last used heroin on December 13, 2000. Plaintiff also reported that he had been in a detox program in 1998 called Meridian Hill and was diagnosed with Hepatitis C in 1997.

11. According to a mental health note on October 19, 1998, plaintiff had been opium dependent since the age of 16 and was preoccupied with drug use. Plaintiff was quoted as saying that he was glad he was incarcerated as he couldn't stop himself out there. Plaintiff also reported that he had highly active hepatitis C.

12. According to a note from Dr. Berkowitz, a psychiatrist, on October 18, 1998, plaintiff was using a liter of alcohol a day, and 10 bags of heroin and had last used 1 month ago. According to his RT60 inmate movement sheet, plaintiff was readmitted to DOC custody on September 21, 1998.

13. AST and ALT are liver enzymes. In individuals who have tested positive for the hepatitis C virus, persistent, elevated liver enzymes suggest that chronic hepatitis C is present.

14. On October 6, 1999, plaintiff's AST levels were 149 and his ALT levels were 359. According to his RT 60, inmate movement sheet, plaintiff was transferred to a halfway house in November 1999 and came back to prison on January 3, 2000 for a technical violation, which was apparently drug use. More specifically, according to plaintiff's January 3, 2000 medical intake form, he used heroin on January 2, 2000.

15. On January 7, 2000 plaintiff's AST levels were 115 and his ALT levels were 211. On April 5, 2000, plaintiff's AST levels were 130 and his ALT levels were 355. On September 21, 2000, plaintiff's AST levels were 147 and his ALT levels were 312.

16. According to a chart entry dated October 8, 2000, although plaintiff was diagnosed with Hep C AB, he had no symptoms. According to his RT 60, inmate movement sheet, plaintiff discharged from DOC custody on November 9, 2000 for time served.

17. Plaintiff was readmitted to DOC custody on December 14, 2000.

18. On June 26, 2001, the Utilization Review Committee denied the request for hepatitis C treatment for plaintiff until plaintiff completed a substance abuse program.

19. Pursuant to Correctional Managed Health Care (CMHC) Guidelines, the plaintiff was not a candidate for treatment with Interferon alpha and Ribivarin therapies because he had

not undergone a drug treatment program with the DOC and in fact had been through several detox programs only to go back to his daily routine of using 1 pint or more of alcohol and 1-5 or more bags of heroin.

20. The May 2000 CMHC guidelines provide ""Because treatment of hepatitis C will not have any long term benefits if recurrent infections occur, only inmates who were not using cocaine or IV drugs for at least 6 months prior to the current incarceration or who have very long sentences (> 5 years) [will be approved for GI consultations]. Inmates who were successfully enrolled in methadone programs prior to incarceration are eligible for therapy."

21. Most people with chronic Hepatitis C have no symptoms of liver disease. If symptoms are present they are usually mild, non specific, and intermittent. Hepatitis C is a chronic disease. In most cases it takes over 30 years for an individual with Hepatitis C to develop serious liver problems. Therefore, it is much more prudent to wait until you are sure that a patient is no longer using intravenous drugs, drinking alcohol and/or will not again start using intravenous drugs before beginning treatment.

22. Patients with Hepatitis C should not drink alcohol since it increases their chance of developing Cirrhosis and liver cancer.

23. Patients who are cured of Hepatitis C are not immune to Hepatitis C and can be re-infected with the virus. Thus, if an individual is still using drugs, or use IV drugs in the future, they are at risk of re-infecting themselves with Hepatitis C. In such a case, the risks of the interferon treatment would far outweigh the benefits.

24. More specifically, nearly all patients who take interferon develop side effects from treatment especially in the first few weeks of therapy. Common side effects of alpha

interferon and peginterferon include fatigue, muscle aches, headaches, nausea and vomiting, skin irritations at the injection site, low grade fever, weight loss, irritability, depression, mild bone marrow suppression, hair loss (reversible). Interferon can also cause or worsen thyroid disease, and can unmask or worsen autoimmune diseases such as rheumatoid arthritis and systemic lupus erythematosis. Interferon worsens psoriasis and can rarely damage the eyes. Rare side effects include confusion, psychosis, and lung or kidney damage or death. Alpha interferon has multiple neuropsychiatric effects.

25. It is my understanding that plaintiff was discharged to Parole on September 13, 2002.

26. Plaintiff was readmitted into DOC custody on March 24, 2003 for violation of his probation. His current estimated discharge date according to his RT 55 is September 2008.

27. According to his medical intake sheet, plaintiff stated he was drinking a liter of vodka a day and had last drank on 3/22/03 and was using a bag of heroin a day and had last used on 3/22/03.

28. The interferon treatment available in 1998, 1999, 2000, 2001 and even in the summer of 2002 was not as good as the current treatment. The side effects were much more frequent and the success rate in clearing the virus was lower. During this time period, if a patient did not have severe, advanced Hepatitis C, I recommended waiting until new, better medication was approved by the FDA.

29. The plaintiff did not sustain any clinical, significant progression of his illness by a delay in treatment. Rather, in my professional opinion, it was just the opposite, the plaintiff actually benefited by the delay. More specifically, in October 2002, shortly after his readmission

to custody, the present standard of interferon therapy in the form of Peginterferon alpha-2, had been approved by the U.S. Food and Drug Administration and marketed by Roche as Pegasys (R).   The U. S. Food and Drug Administration did not approve combination therapy with Pegasys and ribavirin until December 3, 2002.

30. Pegasys is a pegylated interferon that remains active in the bloodstream longer and at a more constant level than the previous medications used in the treatment of hepatitis C.

31. Moreover, had treatment been started on plaintiff prior to his parole in September 2002, he 1) may not have finished the treatment, on the outside, thereby rendering it useless or 2) reinfected himself with the virus through IV drug use rendering the treatment useless.

32. In my opinion, these are very real possibilities given that 1) plaintiff refused to go to a drug treatment program which was a requirement of his parole and  2) plaintiff admitted using IV drugs while out on parole.

33. The plaintiff has been receiving treatment with Pegasys, the pegylated interferon in conjunction with ribivarin for approximately six months.  The plaintiff had blood tests after three months of interferon therapy which indicated that he is responding to therapy.

34. It is the current standard in the community that individuals who use IV drugs do not receive treatment for Hepatitis C in the form of interferon/ribivarin therapy.  Treatment of

35. Hepatitis C will not have any long term benefit if recurrent infections occur. Thus, the risks of treatment do not warrant treatment.

Edward Pesanti, MD

Subscribed to and sworn to before me, this 20th day of February, 2004.

Notary Public/Commissioner
of Superior Court

DEFENDANTS
Edward Pesanti, et al.

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY:
Ann E. Lynch
Assistant Attorney General
110 Sherman Street
Hartford, CT  06105
Federal Bar #ct08326
E-Mail:  ann.lynch@po.state.ct.us
Tel.: (860) 808-5450
Fax: (860) 808-5591

**CERTIFICATION**

      I hereby certify that a copy of the foregoing was mailed to the following on this 15th day of January, 2004:

Gerald Coderre, Inmate 245210
Osborn Correctional Institution
100 Bilton Road
Somers, CT 06071

                                                                  Ann E. Lynch
                                                                  Assistant Attorney General