FILED

2004 JUN 24  P 12: 34

U.S. DISTRICT COURT
HARTFORD, CT.

## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

GERALD CODERRE        :
     *Plaintiff*           :    CIVIL NO. 3:02CV1096 (RNC) (DFM)

V.

DR. EDWARD PESANTI, ET AL.
     *Defendants*       :    JUNE 23, 2004

## MEMORANDUM OF LAW
## IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

This is a civil rights action by Gerald Coderre, a Connecticut inmate who was

denied medical treatment for Hepatitis C. The plaintiff submits this memorandum of law

in response to the defendants' motion for summary judgment dated February 23, 2004.

### I.    FACTS

The plaintiff began smoking marijuana at the age of 16. (Affidavit of Gerald

Coderre, Para. 5). He had a career as a truck driver, which was interrupted when he began

using heroin in the 1990s. (Coderre affidavit, Para, 4, 6). His problems with drugs led to

encounters with the legal system. At the age of 30, he was arrested for the first time and

incarcerated on February 23, 1996. Since that time, he has been in and out of the custody

of the Connecticut Department of Correction (hereinafter "DOC"). (Coderre affidavit,

Para. 7).

On June 3, 1997, the plaintiff began a 30-day prison sentence. While incarcerated at

Gates Correctional Institution in Niantic during that month, blood tests showed an AST level of 117 and an ALT level of 295. (Coderre affidvait, Para 10; Exhibit A to Coderre affidavit). AST and ALT are liver enzymes. In patients who have tested positive for the Hepatitis C virus, persistent, elevated liver enzymes suggest that a patient suffers from chronic Hepatitis C. (Affidavit of Dr. Edward Blanchette, Para. 14). Chronic Hepatitis is inflammation of the liver. Continued inflammation damages the liver, eventually producing cirrhosis[1] and liver failure. At the times of the events that gave rise to this suit, liver enzyme levels were considered to be elevated if the ALT stayed above 100 for a period of four to six months in a patient who was positive for the antibody of the Hepatitis C virus (hereinafter also "HCV"). (NIH Consensus Statement Regarding Management of Hepatitis C (Excerpted), Appendix to CMHC Guidelines for the Management of Chronic Hepatitis C, July 7, 2000, (Exhibit R to Coderre affidavit)).

The plaintiff was not informed of the elevated enzyme levels prior to discharging from the one-month sentence on July 2, 1997, or during a one-week period of incarceration that began on March 18, 1998. (Coderre affidavit, Para. 10-11). After discharging from the latter sentence, the plaintiff voluntarily enrolled in a methadone maintenance clinic. (Coderre affidavit, Para. 12). Upon the advice of clinic personnel, he

---

[1] Cirrhosis is a liver disease characterized by diffuse damage to liver cells and interference with blood flow in the liver. Cirrhosis results in jaundice, portal hypertension, ascites and, ultimately, liver failure. See Stedman's Medical Dictionary 345 (26th ed. 1995).

2

submitted to blood tests at Danbury Hospital. In June 1998, after tests at the hospital

showed that he was positive for the antibody, the plaintiff learned that he had Hepatitis C.

At that time, his AST level was 161, and his ALT level was 456. (Coderre affidavit, Para.

13; Exhibit B to Coderre affidavit). The plaintiff was instructed to return to Danbury

Hospital in three months for follow-up monitoring and the possible initiation of Interferon

therapy to treat his HCV. (Coderre affidavit, Para. 14).

Before he could return to the hospital for the follow-up appointment, the plaintiff

was arrested again on September 21, 1998. (Coderre affidavit, Para. 15). He alerted the

medical staff at the Bridgeport Correctional Center about the HCV diagnosis. (Coderre

affidavit, Para. 16). The medical staff at Connecticut's prisons are employees of

Correctional Managed Health Care (hereinafter "CMHC"), which is part of the University

of Connecticut Health Center (hereinafter "UConn") and has a contract with the DOC to

provide medical services to inmates. The medical staff in Bridgeport drew blood from the

plaintiff for tests, but he was not informed of the results of those tests. (Id.) On January

15, 1999, the plaintiff was transferred to Robinson Correctional Institution (hereinafter

"Robinson") in Enfield. (Coderre affidavit, Para. 17). Once again, he alerted the medical

staff to the HCV diagnosis. (Coderre affidavit, Para. 18). One of the defendants, Dr.

Germain Bianchi, informed the plaintiff that HCV treatment could not be provided

because insufficient time remained on his sentence. (Coderre affidavit, Para. 19).

3

The plaintiff was out of prison for a brief period from August 20 to September 23, 1999. (Coderre affidavit, Para. 21). After his return to prison, blood tests were performed on October 6, 1999, that showed an AST level of 149 and an ALT level of 359. The plaintiff was not informed about the results of those tests. (Coderre affidavit, Para. 23; Exhibit D to Coderre affidavit). He was out of prison again from November 10, 1999, to January 3, 2000. (Coderre affidavit, Para. 24-26). After his return, blood work taken on January 7, 2000, showed an AST level of 115 and an ALT level of 211. (Coderre affidavit, Para. 28; Exhibit E to Coderre affidavit). On March 20, 2000, a prison nurse informed the plaintiff about the elevated liver enzymes dating back to 1997. She asked whether he would like a consultation for a liver biopsy and possible treatment for HCV. (Coderre affidavit, Para. 29).

Not all those who are positive for the HCV antibody and have elevated liver enzyme levels are candidates for HCV treatment. Among others, treatment is not recommended for patients who have advanced cirrhosis, have a major depressive illness or are currently drinking excessive amounts of alcohol of injecting illegal drugs. (NIH Consensus Statement Regarding Management of Hepatitis C (Excerpted), Appendix to CMHC Guidelines for Management of Chronic Hepatitis C, July 7, 2000 (Exhibit R to Coderre affidavit)). Before approving HCV treatment, CMHC requires that an inmate be seen at the UConn gastroenterology (hereinafter "GI") clinic for an evaluation and, probably, a

4

liver biopsy. (See Request for Consultation, Exhibit O to Coderre affidavit). In a 1997

publication offered by the defendants, the National Institutes of Health (hereinafter

"NIH") said a liver biopsy is "considered to be the gold standard" for determining

whether a person is a candidate for HCV treatment. (Management of Hepatitis C,

National Institutes of Health, P. 9).

One of the defendants, Dr. Edward Blanchette, ordered blood work that was taken

on March 24, 2000. It revealed an AST level of 204 and an ALT level of 529. (Coderre

affidavit, Para. 30). A month later, the AST level was 130 and the ALT level was 355.

(Coderre affidavit, Para. 31). An entry in the plaintiff's prison medical file dated July 16,

2000, indicated that he was a candidate for an evaluation at UConn because his ALT level

was "markedly" elevated. (Coderre affidavit, Para. 32). But the evaluation did not take

place. The prison nurse told the plaintiff that not enough time remained on his sentence.

(Coderre affidavit, Para. 33).

The plaintiff discharged from prison on November 9, 2000, but returned on new

charges a little more than a month later, on December 14, 2000. From that date, he was

incarcerated continuously for the next 21 months. (Coderre affidavit, Para. 35-36). Part of

that time, from December 14, 2000, to May 1, 2001, he was on pretrial status. During that

time, his liver enzyme levels were not monitored. (Coderre affidavit, Para. 36-37). After

the plaintiff was sentenced, Dr. Bianchi ordered blood work, which showed an AST level

of 178 and an ALT level of 217. (Coderre affidavit, Para. 43; Exhibit N to Coderre

affidavit). A week later, on June 25, 2001, Dr. Bianchi sent a request to the Utilization

Review Committee (hereinafter "URC") of CMHC, asking that the plaintiff be sent to the

GI clinic for an evaluation and probable liver biopsy. (Coderre affidavit, Para. 44; Exhibit

O to Coderre affidavit). The following day, the URC denied the request. (Coderre

affidavit, Para. 45; Exhibit P to Coderre affidavit). The stated reason for the denial was

that the plaintiff was required to complete a substance abuse course in prison prior to

being considered for HCV treatment. (Coderre affidavit Para. 53; Exhibit P to Coderre

affidavit).

   The plaintiff had often felt fatigued and, in January 2001, he began to feel aches in

his knees and other joints. (Coderre affidavit, Para. 39). Beginning approximately in

March 2002, he began to experience pain over both kidneys. (Coderre affidavit, Para. 77).

He had severe headaches and muscle aches in his back and legs. (Coderre affidavit, Para

78). He had difficulty urinating, and tests showed there was blood in his urine. (Coderre

affidavit, Para. 79). After referral to a GI specialist and a urologist failed to find a cause

for his symptoms, the URC, on July 3, 2002, finally approved a liver biopsy, which was

performed on September 9, 2002. (Coderre affidavit, Para. 80, 83). After the biopsy, a

specialist concluded that the plaintiff was suffering from "[c]hronic hepatitis, active,

severe." (Coderre affidavit, Para. 83, Exhibit KK to Coderre affidavit). Four days after the

6

biopsy, the plaintiff was released from prison when he was paroled to a halfway house. (Coderre affidavit, Para. 86).

While at the halfway house, the plaintiff sought treatment at Danbury Hospital. Before treatment was begun, the plaintiff was returned to prison on March 24, 2003. (Coderre affidavit, Para. 88). On July 25, 2003, the plaintiff began HCV treatment. (Coderre affidavit, Para. 89). The treatment came more than six years after blood tests first showed elevated liver enzyme levels and more than two years after the URC denied the request to send the plaintiff for a GI consultation.

Further facts will be asserted elsewhere in this memorandum.

## II.    STANDARD FOR DECIDING MOTION FOR SUMMARY JUDGMENT

A party against whom a claim is asserted "may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. P. 56 (b). "Summary judgment is appropriate only when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." Abdu-Brisson v. Delta Air Lines, 239 F.3d 456, 465 (2d Cir. 2001). "When determining whether there is a genuine issue of fact to be tried, the court must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought." Winter v. United States, 196 F.3d 339, 346 (2d Cir. 1999). "A motion for summary judgment must be rejected 'if the evidence is such that a

reasonable jury could return a verdict for the non-moving party.' " <u>Abdu-Brisson</u>, 239

F.3d at 465, (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). When

ruling upon a motion for summary judgment, a Court is not required to make findings of

fact. "The inquiry performed is the threshold inquiry of determining whether there is a

need for trial - whether, in other words, there are any genuine factual issues that properly

can be resolved only by a finder of fact because they may reasonably be resolved in favor

of either party." <u>Anderson</u>, 477 U.S. at 250.

## III.  ARGUMENT

### A.  <u>THE PLAINTIFF HAS A SERIOUS MEDICAL NEED FOR WHICH THE CONSTITUTION REQUIRES THAT HE BE PROVIDED TREATMENT</u>

The United States Supreme Court has held that deliberate indifference to the serious

medical needs of sentenced inmates constitutes cruel and unusual punishment in violation

of the Eighth Amendment to the United States Constitution. <u>Estelle v. Gamble</u>, 429 U.S.

97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).[2] Similar claims by pretrial detainees are

analyzed under the due process clause of the Fourteenth Amendment, rather than the

Eighth Amendment. <u>Bryant v. Maffucci</u>, 923 F.2d 979, 983 (2d Cir. 1991). Although it is

unclear whether the standard for pretrial detainees is the same as the deliberate

---

[2]

The Eighth Amendment's ban on cruel and unusual punishment is made applicable to the
states through the Fourteenth Amendment. <u>Robinson v. California</u>, 360 U.S. 660, 666
(1962).

indifference standard, the Second Circuit has held that the standard would, at the very least, require more than ordinary negligence. Id. at 984.

The deliberate indifference standard includes both subjective and objective components, as follows:

> First, the alleged deprivation must be, in objective terms, "sufficiently serious." Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." Id. An official acts with the requisite deliberate indifference when that official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 837, 128 L. Ed. 2d 811, 114 S. Ct. 1970 (1994).

Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998).

In regard to the objective component of the deliberate indifference standard, a serious medical need is present where "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." Id. (quoting Gutierrez v. Peters, 111 F.3d 1364, 1373 (7th Cir. 1997)) (internal quotation marks and citations omitted). There is no question that HCV qualifies as a serious medical need because those infected by the virus are at risk for liver failure. According to the NIH publication offered by the defendants, HCV "is responsible for an estimated 8,000-10,000 deaths annually" and is "the leading reason for liver transplantation in the United States." (Management of Hepatitis C, National Institutes of Health, P. 3). "Case law ... recognizes that Hepatitis C qualifies as a serious condition for purposes of an

Eighth Amendment analysis." Johnson v. Wright, 234 F. Supp. 2d 352, 360 (S.D.N.Y. 2002).

Since HCV qualifies as a serious medical need, the Constitution requires that prison medical personnel not be deliberately indifferent to that need. The defendants suggest this is not the case when they make the generalized statement that "courts have held that withholding of Hepatitis C medication does not translate into a deliberate indifference finding. (Defendants' memorandum, P. 18). The defendants cite a case, Fenner v. Suthers, 2001 U.S. Dist. LEXIS 24018 (D.Colo. 2001), in which they claim "a district judge in Colorado, relying on reports from the National Institute of Health ("NIH"), granted summary judgment in favor of defendants responsible for a policy under which an inmate first had to complete a substance abuse program before receiving Hepatitis C treatment." (Id.) Actually, the Fenner opinion cited by the defendants was a recommendation from a magistrate judge that a motion to dismiss be granted in part; it was not a decision by a district judge to grant summary judgment. The defendants fail to point out that the magistrate's recommendation was rejected by the district judge, who found that the magistrate had improperly taken judicial notice of evidence whose admissibility was in question. See Fenner v. Suthers, 194 F. Supp. 2d 1146 (D. Colo. 2002).

Other cases cited by the defendants are equally unavailing. In McKenna v. Wright, 2002 U.S. Dist. LEXIS 3489 (S.D.N.Y. 2002), the inmate was not a candidate for HCV

treatment because he already had decompensated cirrhosis of the liver. In other words, it was too late to provide HCV treatment. In Gresh v. Berks Co., 2002 U.S. Dist. LEXIS 13347 (E.D.Pa. 2002), Christy v. Robinson, 216 F. Supp. 2d 398 (D.N.J. 2002), and McQueen v. Revell, 2001 U.S. District LEXIS 17155 (N.D. Texas 2001), the plaintiffs had histories of psychiatric problems that made them unsuitable candidates for HCV therapy. In Hassan v. Khanyile, 1998 U.S. Dist. LEXIS 7636 (S.D.N.Y. 1998), the inmate filed suit when a doctor discontinued interferon treatment because it was not doing the inmate any good.[3] In the instant case, the defendants do not claim that the plaintiff had any psychiatric problems that made him an unsuitable candidate for HCV treatment at the time of the URC denial on June 26, 2001. They do not claim that it was too late to treat the plaintiff at that time or that treatment would not do him any good. In fact, CMHC has since provided him with treatment. The only reason given for denying treatment in 2001 was the plaintiff's failure to complete a substance abuse course while in prison. As is clear from the following sections, that reason did not justify the denial of treatment.

**B.** **DR. EDWARD PESANTI, DR. EDWARD BLANCHETTE AND DR. GERMAIN BIANCHI WERE DELIBERATELY INDIFFERENT TO THE PLAINTIFF'S SERIOUS MEDICAL NEED**

On June 25, 2001, the URC was asked to approve a request to send the plaintiff to a

---

[3]

The Gresh, Christy, McQueen and Hassan decisions are cited on pages 19-20 of the defendants' memorandum

specialist for a GI consultation and probable liver biopsy. The URC denied the request the

next day. Although the URC is called a "committee," the decision to deny the request was

made by a single person, Dr. Edward Pesanti, the medical director of CMHC at the time.

(Coderre affidavit, Para. 46; Exhibit Q to Coderre affidavit). The stated reason for the

denial was that the plaintiff was required to complete a substance abuse course prior to

being considered for treatment. (Coderre affidavit, Para. 53; Exhibit P to Coderre

affidavit).

Dr. Pesanti formulated the guidelines for determining when an inmate afflicted with

HCV would be provided with treatment. (Coderre affidavit, Para. 47, Exhibit Q to

Coderre affidavit). The relevant provision in the guidelines, promulgated by Dr. Pesanti

on July 7, 2000, said treatment would only be provided to "inmates who were not using

cocaine or IV drugs for at least 6 months prior to the current incarceration or who have

very long sentences (>5 years)." The provision further stated that inmates who had been

successfully enrolled in methadone programs prior to incarceration would be eligible for

therapy. (Coderre affidavit, Para. 48; Exhibit R to Coderre affidavit). Prior to July 7,

2000, the CMHC guidelines had not contained such a provision. (Coderre affidavit, Para.

51; Exhibit S to Coderre affidavit). When CMHC again revised its guidelines in February

2002, the provision was eliminated. (Coderre affidavit, Para. 52; Exhibit T to Coderre

affidavit).

The defendants claim that their position that the plaintiff was not a candidate for treatment is consistent with recommendations published by the NIH. (Defendants' memorandum, P. 23). They cite a May 1997 NIH publication on the management of Hepatitis C, which says the following: "Treatment for addiction should be provided prior to treatment for Hepatitis C." (Id.). The defendants fail to mention a highly relevant portion of the same paragraph in which the quote appears. That portion clarifies the NIH position by stating:

> [T]reatment of patients who are drinking significant amounts of alcohol or who are <u>actively using</u> illicit drugs should be delayed until these habits are <u>discontinued for at least 6 months</u>. Such patients are at risk for the potential toxic effects of alcohol and other drugs and also present problems with compliance.

Management of Hepatitis C, National Institutes of Health, P. 13.[4] (emphasis added).

The full NIH position is incorporated into the July 7, 2000, CMHC guidelines through an appendix to the guidelines. (Coderre affidavit, Para. 49, Exhibit R to Coderre affidavit). The appendix conflicts with the provision barring treatment unless an inmate had not used illegal drugs or excessive amounts of alcohol in the six months prior to the beginning of his incarceration.

The form on which Dr. Germain Bianchi requested a GI consultation for the plaintiff asked whether the plaintiff had "used illegal drugs within the past 6 months or, if

---

[4]

This publication is attached to the Defendants' Local Rule 56(a)(2) Statement.

incarcerated during that period, in the 6 months prior to incarceration." Dr. Bianchi

answered "no," but noted that the plaintiff had a history of alcohol abuse. (Request for

Consultation dated June 25, 2002 (Exhibit O to Coderre affidavit)). At that time, the

plaintiff had been incarcerated continuously for more than six months, since being

readmitted to DOC custody on December 14, 2000. (Coderre affidavit, Para. 35; Inmate

Movement Sheet (attached to Defendants' Local Rule 56(a)(2) Statement)). During that

six-month period, the plaintiff had not had a drink of alcohol or used illicit drugs.

(Coderre affidavit, Para. 57). In fact, he has never used such substances during the periods

in which he has been incarcerated. (Coderre affidavit, Para. 58). Of course, the use of

alcohol or illegal drugs by an incarcerated individual would be contrary to prison rules.

The possession or use of such substances would subject an inmate to a Disciplinary

Report for contraband and/or intoxication. (Coderre affidavit, Para. 59; Exhibit U to

Coderre affidavit). The plaintiff has never received a Disciplinary Report accusing him of

possessing or using alcohol of illegal drugs. (Coderre affidavit, Para. 60).

On June 26, 2001, when Dr. Pesanti denied the request for a GI consultation, the use

of alcohol or illicit drugs by the plaintiff already had been discontinued for a period of at

least six months. Therefore, according to the NIH, the plaintiff's history of substance

abuse did not disqualify him from consideration for HCV therapy. The defendants argue

that "it is much more prudent to wait until you are sure that a patient is no longer using

14

intravenous drugs, drinking alcohol and/or will not again start using intravenous drugs before beginning treatment. (Defendants' memorandum, P. 6-7.) Of course, there is no way to make sure that a person who has had a drug addiction in the past will not revert to use of drugs in the future, no matter how much substance abuse counseling is provided. More importantly, such a guarantee is not required by the NIH, the main authority the defendants cite to justify the denial of treatment to the plaintiff in June 2001. At the time the NIH simply recommended that HCV treatment not begin until habits of using illicit drugs or drinking significant amounts of alcohol had been discontinued for six months. In the plaintiff's case, those habits had been discontinued for the requisite period of time.

The other authority cited by the defendants is the Federal Bureau of Prisons Clinical Practice Guidelines for the Prevention and Treatment of Viral Hepatitis February 2003. According to the defendants, the guidelines state that "ongoing alcohol or illicit drug usage" is an absolute contraindication for interferon therapy, and "recent alcohol abuse or illicit drug usage" is a relative contraindication. (Defendants' memorandum, P. 23). There was no "ongoing" use of alcohol or illegal drugs by the plaintiff; he had not used such substances for more than six months. The defendants cite no definition of "recent" in the Federal Bureau of Prisons' guidelines. The defendant has admitted to using alcohol and illegal drugs prior to the time his incarceration began on December 14, 2000. (Plaintiff's Local Rule 56(a)(2) Statement, Para. 17). Even if this drug use could be considered

15

"recent" at the time the request for a GI consultation was denied on June 26, 2001, the Federal Bureau of Prisons' Guidelines do not justify the denial of treatment. The defendants have presented no evidence to show that the guidelines were developed using sound medical criteria or even that they were formulated by persons with training in medicine. Merely citing the policy used by another prison system does not provide justification for the defendants' actions. If the Federal Bureau of Prisons' policy is unconstitutional, it is no defense that CMHC simply adopted the unconstitutional policy.

There was no medical reason for the denial of HCV treatment on June 26, 2001. However, the evidence suggests that there was a non-medical reason. Dr. Bianchi told the plaintiff that Dr. Pesanti does not approve HCV treatment for inmates because it costs too much. (Coderre affidavit, Para. 44). The CMHC guidelines, formulated by Dr. Pesanti, were supposed to allow physicians to determine whether an inmate met the medical criteria for Rebetron treatment, a combination of the drugs interferon and ribavirin. But the guidelines contained the following curious language:

> As you might expect, the drugs are costly and side effects are common and sometimes severe. The wholesale cost of Rebetron is $445 to $600 for a 2 week supply ($10,680-$14,400 per course), depending on the dose of ribavirin to be administered. Looked at another way, it costs $24,800 to $33,490 per responder.

CMHC Guidelines for Management of Chronic Hepatitis C (Exhibit R to Coderre affidavit) July 7, 2000, P. 1.

Interference with medical judgment for non-medical reasons violates the Eighth

Amendment. <u>Durmer v. O'Carroll</u>, 991 F.2d 64, 68-69 (3d Cir. 1993); <u>Jones v. Johnson</u>, 781 F.2d 769, 771 (9th Cir. 1986). In a suit by a plaintiff alleging denial of medical care while housed in a city jail, the Fifth Circuit stated: "Although financial considerations may reasonably concern a municipality, such concerns may not trump the constitutional rights of individuals who are left at the mercy of the municipality." <u>Scott v. Moore</u>, 85 F.3d 230, 236 (5th Cir. 1996). The evidence cited by the plaintiff raises genuine issues of material fact regarding whether the decision to deny the request for a GI consultation was based upon financial concerns and whether the stated reason for the denial (the fact that the plaintiff had not completed a substance abuse course) was merely a pretext.

The defendants in essence are arguing that substance abuse treatment was part of the proper medical regimen for HCV treatment, no matter how remote the use of alcohol and illicit drugs. Even if the Court accepts that argument, summary judgment should not be granted. If a substance abuse course was part of the medical regimen, the defendants had a duty to provide the plaintiff with an opportunity to attend such a course. They shirked that duty, as is clear from the following facts.

From December 14, 2000, to May 1, 2001, the plaintiff was a pretrial detainee housed at the Bridgeport Correctional Center. He could not sign up for a substance abuse course because such courses were not available at Bridgeport. (Coderre affidavit, Para. 36). Furthermore, on April 16, 2001, while still on pretrial status and still housed at

17

Bridgeport, the plaintiff received a Class A Disciplinary Report accusing him of assaulting another inmate. (Coderre affidavit, Para.40, Exhibit K to Coderre affidavit). The plaintiff pleaded guilty to the Class A infraction. The guilty finding made him ineligible for prison programs, including substance abuse courses, for a period of four months. (Coderre affidavit, Para. 41, Exhibit L to Coderre affidavit). Therefore, for the entire period of the plaintiff's incarceration from December 14, 2000, until the URC denial on June 26, 2001, the plaintiff was ineligible for a substance abuse program.

The Disciplinary Report that the plaintiff received on April 16, 2001, "cleared" in August 2001, making the plaintiff eligible for prison programs. (Coderre affidavit, Para. 62). The plaintiff then attempted to sign up for a substance abuse course, but he was put on a waiting list. (Coderre affidavit, Para. 63). While still on the waiting list, on February 16, 2002, the plaintiff received a Class A Disciplinary Report for fighting with another inmate. (Coderre affidavit, Para. 75; Exhibit DD to Coderre affidavit). He was found guilty of the disciplinary charge, which again made him ineligible for a substance abuse program for a period of four months. (Coderre affidavit, Para. 76).

In denying the URC request on June 26, 2001, Dr. Pesanti claimed that, according to Dr. Bianchi, the plaintiff had refused to take a substance abuse course in prison. (Utilization Review Report (Exhibit P to Coderre affidavit)). The plaintiff denies that he ever refused to take a substance abuse course while in prison. (Coderre affidavit, Para.

18

54). After returning to prison on December 14, 2000, the plaintiff wanted to obtain help for his problem with alcohol and illegal drugs. In fact, he told a mental health case worker on January 16, 2001, that he  hoped to be sentenced to a drug treatment program.(Coderre affidavit, Para. 38; Exhibit J to Coderre affidavit). Such a desire would be consistent with the plaintiff's actions in the periods in which he was not incarcerated, when he voluntarily entered treatment programs to attempt to kick his drug habit. (Coderre affidavit, Para. 8, 12).

When an inmate refuses health services, CMHC requires the inmate to sign a form acknowledging the refusal and releasing CMHC from responsibility. (Coderre affidavit, Para. 55). If a substance abuse course was part of the prescribed treatment for HCV and the plaintiff was refusing to take such a course, he would have been required to sign a refusal form. But he never was asked to sign a refusal form, and his prison medical records do not contain such a form. (Id.)

Dr. Pesanti formulated a policy that denied medical care to the plaintiff until he completed a substance abuse course. But the plaintiff was ineligible for such a course, first because of his pretrial status and later because of disciplinary infractions and because there was a waiting list for courses.  In effect, the denial of medical care was part of the punishment the plaintiff received for the disciplinary infractions. Such an effect certainly is proscribed by the Eighth Amendment's ban on cruel and unusual punishment. It is no

defense for Dr. Pesanti or the other defendants to say that it is custodial staff who decide

when an inmate is eligible for a substance abuse course. See <u>Weeks v. Chaboudy</u>, 984

F.2d 185, 189 (6th Cir. 1993) (prison doctor's failure to allow paralyzed inmate to reside

in area where wheelchairs were allowed cannot be excused by a claim of reliance upon

others, including security personnel). If Dr. Pesanti did not have the authority to get the

plaintiff into a substance abuse course, he should not have made completion of such a

course a prerequisite to the plaintiff receiving medical care.

Dr. Edward Blanchette has been involved in decisions regarding the medical

treatment provided to the plaintiff since at least March 24, 2000, when he requested that

blood work be performed. Even though that blood work showed a "markedly" elevated

ALT level of 529, Dr. Blanchette failed to refer the plaintiff for HCV treatment. (Coderre

affidavit, Para. 30).

There is another way in which Dr. Blanchette may have been involved in the

violation of the plaintiff's constitutional rights. According to a July 7, 2000, memo from

Dr. Pesanti, infectious disease physicians in the state's prisons were involved in

formulated the CMHC guidelines under which the plaintiff was denied HCV treatment.

(Exhibit R to Coderre affidvait). Dr. Blanchette is an infectious disease physician.

(Defendant Edward Blanchette's Responses to Plaintiff's Requests for Admissions

(Exhibit LL to Coderre affidavit), P. 1, No. 2). That leads to the reasonable inference that

Dr. Blanchette had a role in drafting the guidelines that resulted in violation of the plaintiff's constitutional rights.

The defendants take the condescending position that the plaintiff actually benefitted by the two-year delay in initiating HCV treatment. (Blanchette affidavit, Para. 32; defendants' memorandum, P. 25). Their theory is based upon the fact that the Interferon used to treat HCV has been improved since June 2001. (Blanchette affidavit, Para. 33). By not treating the plaintiff in 2001, the defendants argue, they saved him from the possible side effects of the medication and increased the chances that the virus will be cleared from his system. (Blanchette affidavit, Para. 31). The defendants' position is akin to arguing that they are not required to provide treatment for an inmate with cancer because there will be a cure for cancer someday. By not offering radiation or chemotherapy to the cancer-afflicted inmate, they are saving him from the debilitating side-effects of those forms of treatment.

Endorsement of the defendants' theory would require accepting the proposition that the plaintiff benefitted by having fatigue, joint pain, pain over both kidneys, severe headaches, muscle aches in his back and legs, difficulty urinating and blood in his urine. These are among the medical problems the plaintiff experienced in the months following the URC denial. (Coderre affidavit, Para. 77-79). The defendants admit that these types of problems could be associated with chronic liver disease. (Dr. Pesanti's Responses to

Plaintiff's Requests for Admissions (Exhibit Q to Coderre affidavit), P. 3, No. 8; Dr.

Bianchi's Responses to Plaintiff Requests for Admissions (Exhibit Y to Coderre

affidavit), P. 4, No. 15; Dr. Blanchette's Responses to Plaintiff's Requests for

Admissions (Exhibit LL to Coderre affidavit), P. 4, No. 12).The questions whether the

medical problems listed above were caused by untreated liver disease and whether some

or all of those problems could have been avoided if HCV treatment was provided earlier

are genuine issues of material fact that preclude the entry of summary judgment.

The defendants speculate that "had plaintiff received Hepatitis C treatment in June

2001, when he sought it, he may have re-infected himself, when out on parole from

September 2002 - March 2003 thus rendering the treatment all for naught." (Defendants'

memorandum, P. 26). But "[s]peculation cannot supply the place of proof." Moore v.

Chesapeake & Ohio R.R. Co., 340 U.S. 573, 578 (1951). As one court has said,

speculation is "out of place on a motion for summary judgment" because it "bespeaks the

existence of a material issue of fact." Lemelson v. Ideal Toy Corp., 286 F. Supp. 993, 997

(S.D.N.Y. 1968). It would be just as easy to speculate that successful HCV treatment

would have given the plaintiff the incentive that would have allowed him to stay off drugs

and turn his life around.

After his request to the URC for a GI consultation and liver biopsy was denied, Dr.

Bianchi took no further steps to attempt to obtain the proper treatment for the plaintiff.

22

His inactivity came despite the fact that he knew the plaintiff was unable to get into a drug program because he had been put on a waiting list. (Coderre affidavit, Para. 67; Defendant Germain Bianchi's Responses to Plaintiff's Requests for Admissions (Exhibit Y to Coderre affidavit), P.5, No. 20). Approval for the medical treatment that Dr. Bianchi said the plaintiff needed had been denied pending completion of a drug abuse course by the plaintiff. Dr. Bianchi knew about the condition that had been placed on the defendant being provided with treatment, and he also knew that the plaintiff was unable to meet the condition. Dr. Bianchi could have submitted another URC request. He could have called Dr. Pesanti to explain the problem and ask that other arrangements be made. He could have spoken with whatever members of the custodial staff were involved in the decision-making process regarding who is allowed to participate in a substance abuse course. He did none of those things. (Coderre affidavit, Para. 69). "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle, 429 U.S. at 106 (emphasis supplied). Because Dr. Bianchi failed to act to protect the plaintiff from a substantial risk of harm, he is liable for the resulting damage.

The defendants correctly point out that, according to the NIH, "those addicted to alcohol or drugs should be helped to obtain treatment for their addiction so that they might qualify for anti-HCV therapy." (Defendants' memorandum, P. 23). The defendants

did nothing to help the plaintiff obtain a substance abuse course, even though they refused to provide him with medication for a potentially life-threatening condition until he had taken such a course.

It is important to note what this case does **not** involve. It does not involve a disagreement among medical professionals or between the plaintiff and medical professionals about whether the plaintiff needed HCV treatment. Dr. Bianchi made a request to the URC for a GI consultation and probable liver biopsy because he felt the plaintiff was in need of treatment. (Coderre affidavit, Para. 44). Dr. Pesanti, without ever examining the plaintiff,[5] rejected the request. No one ever said that the plaintiff did not need HCV treatment. Instead, they said he would not receive the treatment unless and until he took a substance abuse course.

## C.  THE PLAINTIFF'S CLAIMS AGAINST NURSE ENRICA WHITE ARE LEGALLY SUFFICIENT

The URC had required the plaintiff to complete a substance abuse course prior to receiving HCV treatment. But the plaintiff was unable to take such a course, first because he was ineligible due to disciplinary infractions and later because his name had been placed on a waiting list. On November 1, 2001, the plaintiff filed a Level 1 inmate

---

[5] Dr. Pesanti says he "would have reviewed or inquired about the relevant portions of the plaintiff's medical file" prior to making the decision to deny the GI consultation. (Dr. Pesanti's Responses to Plaintiff's Requests for Admissions (Exhibit Q to Coderre affidavit), P. 7, No. 25).

24

grievance in which he stated he was unable to get into a substance abuse course. (Coderre affidavit, Para. 64). In the grievance, the plaintiff asked that HCV treatment be begun and explained that he had been put on the waiting list. (Exhibit W to Coderre affidavit). The grievance was denied by defendant Enrica White, a nursing supervisor, who again told the plaintiff that he had to complete a substance abuse course before he could be considered for treatment. (Id.).

The defendants claim that the plaintiff's allegations against defendant White are legally insufficient. (Defendants' memorandum, P. 27). They cite Graham v. Wright, 2003 U.S. Dist. LEXIS 16106 (S.D.N.Y. 2003).[6] But the Graham case is easily distinguishable. In Graham, the court dismissed the plaintiff's individual capacity claims against a defendant named Keane. Defendant Keane denied a grievance the plaintiff filed at the Woodbourne correctional facility. The grievance complained about treatment the plaintiff had received from medical personnel prior to his transfer to Woodbourne, and it also asked for monetary damages. Keane notified the plaintiff that monetary damages were not part of the grievance procedure. In dismissing the allegations against Keane, the court said that it "fail[ed] to see how Keane could have responded to and/or remedied these allegations within the framework of the grievance process," given the fact that the plaintiff was complaining about past deficiencies at other prisons and was seeking a

---

[6] This decision is attached to the defendants' memorandum.

remedy that was not available.

In the instant case, the plaintiff was complaining about a current problem and a remedy was readily available. He was asking to be allowed to take a substance abuse course, so he could qualify for HCV treatment. Fashioning a remedy would not have required Nurse White to overrule the URC or make a medical diagnosis, actions that were beyond her authority or her qualifications. She could have simply contacting the person in charge of determining which inmates are allowed to take substance abuse courses. She could have informed that person that the plaintiff needed to be moved up from the waiting list and allowed to take the course because it was part of the required treatment for HCV. At the very least, she could have called the URC to explain about the problem the plaintiff had encountered. She admits that she did not do so. (Enrica White's Responses to Plaintiff's Request for Admissions (Exhibit Z to Coderre affidavit), P. 2, No. 5, 6).

To maintain an action against a defendant under 42 U.S.C. § 1983, a plaintiff must present evidence of the defendant's personal involvement in the deprivation of a right guaranteed to the plaintiff by the Constitution or by federal law. See Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994). A prisoner states a cognizable claim for an Eighth Amendment violation if he alleges "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle, 429 U.S. at 106. The Second

Circuit has held that a defendant has the requisite personal involvement for § 1983 liability where:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)

"Personal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise responds to a prisoner's complaint." Johnson, 234 F. Supp. 2d at 365. Nurse White was a supervisory official, and CMHC had assigned her the task of responding to grievances regarding medical care. She had personal involvement in the violation of the plaintiff's constitutional rights in at least two of the five ways cited by the Second Circuit in Colon. First, she was informed of the violation of the plaintiff's constitutional rights through the plaintiff's grievance but she failed to remedy the wrong. Second, she exhibited deliberate indifference to the rights of the plaintiff by failing to act on information indicating that unconstitutional acts were occurring.

27

### D.  THE PLAINTIFF ACKNOWLEDGES THAT HIS CONSPIRACY CLAIM IS LEGALLY INSUFFICIENT

The defendants argue that the plaintiff's claim of a conspiracy among the defendants to violate his civil rights is legally insufficient because it is vague and conclusory. (Defendants' memorandum, P. 29). After reviewing the authorities cited by the defendants, the plaintiff acknowledges that his conspiracy claim is legally insufficient. But for the reasons cited in the preceding sections, summary judgment should not enter in favor of any of the individual defendants because the plaintiff has alleged sufficient personal involvement of each of the defendants in the violation of his constitutional rights.

### E.  <u>THE DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY BECAUSE THE CONSTITUTIONAL RIGHT TO REASONABLY ADEQUATE MEDICAL TREATMENT WAS CLEARLY ESTABLISHED</u>

"Qualified immunity is the doctrine that shields government officials performing discretionary functions from being held liable for civil damages arising from their actions which do 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " <u>P.C. v. McLaughlin</u>, 913 F.2d at 1033, 1039 (2d Cir. 1990) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). The Second Circuit has held that a defendant is entitled to qualified immunity when "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the

28

defendant to believe that his action did not violate such law." Poe v. Leonard, 282 F.3d

123, 132-33 (2d Cir. 2002) (quoting Tierney v. Davidson, 133 F.3d 189, 196 (2d Cir.

1998)).

The defendants argue that the "plaintiff cannot point to any clearly established law

violated by the defendants which would take this case out of the protection of qualified

immunity." (Defendants' memorandum, P. 32). On the contrary, the plaintiff can point to

Estelle, a case decided twenty-five years before the actions that gave rise to the instant

suit. If the defendants' argument is meant to imply they know of no published decision

the facts of which mirror those of the instant case, their search for such a decision is

misplaced. In Hope v. Perez, 536 U.S. 730 (2002), the United States Supreme Court

rejected the notion that in order to meet the "clearly established law" test the facts of

previous cases must be "materially similar" to the plaintiff's claims. The Court held that

"general statements of the law are not inherently incapable of giving fair and clear

warning, and in other instances a general constitutional rule already identified in the

decisional law may apply with obvious clarity to the specific conduct in question, even

though 'the very action in question has [not] previously been held unlawful.' " Id. at 741

(quoting United States v. Lanier, 520 U.S. 259, 270-71 (1997)).

The Second Circuit has stated that "in ascertaining whether the right was clearly

established with respect to a given situation, a court must consider 'not what a lawyer

29

would learn or intuit from researching case law, but what a reasonable person in [the

government actor's] position should know' about the appropriateness of his conduct

under federal law." <u>Johnson v. Newburgh Enlarged School District</u>, 239 F.3d 246, 251

(2d Cir. 2001) (quoting <u>Young v. County of Fulton</u>, 160 F.3d 899, 903 (2d Cir. 1998)). In

the instant case, a reasonable person in the position of the defendants should have known

that the plaintiff's right to be free from cruel and unusual punishment was violated when

he was denied medical care until he took a substance abuse course and then deprived of

the opportunity to take such a course. The lack of a published decision with the same

facts does not entitle the defendants to qualified immunity. As the Second Circuit has

stated:

> [T]he absence of legal precedent addressing an identical factual scenario does
> not necessarily yield a conclusion that the law is not clearly established. Indeed, it
> stands to reason that in many instances "the absence of a reported case with similar
> facts demonstrates nothing more than widespread compliance with" the well-
> recognized application of the right at issue on the part of government actors.

<u>Johnson</u>, 239 F.3d at 251. (Internal citations omitted).

### F. THE DEFENDANTS HAVE NOT ARGUED THAT THEY ARE ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFF'S EQUAL PROTECTION CLAIM

In addition to arguing that his right to be free from cruel and unusual punishment

has been violated, the plaintiff also has claimed violation of his right to equal protection.

(Amended Complaint, Para. 61).

30

The Fourteenth Amendment to the United States Constitution declares that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. The equal protection clause "is essentially a direction that all persons similarly situated be treated alike." City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 439 (1985). A plaintiff can plead intentional discrimination that violates the equal protection clause in at least the following three ways:

> First, a plaintiff can point to a law or policy that expressly classifies persons on the basis of various protected categories. Second, a plaintiff can identify a facially neutral law or policy that has been applied in an unlawfully discriminatory manner. Finally, a plaintiff can also "allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus."

McKenna v. Wright, 2002 U.S. Dist. LEXIS 3489 (S.D.N.Y. 2002) (internal citations omitted) (Attached).

Since the plaintiff is proceeding pro se, the Court is required to read his papers liberally and interpret them to raise the strongest arguments they suggest. See Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994). A liberal reading of the amended complaint suggests that the plaintiff has made an argument that the CMHC guidelines that resulted in denial of HCV treatment on June 26, 2001, were applied in an unlawfully discriminatory manner or were motivated by discriminatory animus. The defendants have not made an argument that they are entitled to judgment as a matter of law on the equal protection claim and, therefore, that claim should survive the defendants' motion for summary judgment.

31

## III.  **CONCLUSION**

For the foregoing reasons, the plaintiff respectfully requests that the Court deny the

defendants' motion for summary judgment.

THE PLAINTIFF


_____

Gerald Coderre, Pro Se
Inmate #245210
Enfield Correctional Institution
289 Shaker Road
P.O. Box 1500
Enfield, CT 06082

Although not appearing herein, the undersigned
assisted in the preparation of this memorandum of law:


Richard P. Cahill, Esq.
Schulman & Associates
Inmates' Legal Assistance Program
78 Oak Street, P.O. Box 260237
Hartford, CT 06126-0237
Tel: (860) 246-1118
Fax: (860) 246-1119

## CERTIFICATION

I hereby certify that a copy of the foregoing was mailed, postage prepaid, on this 24th day of June, 2004, to:

Ann E. Lynch
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105

Gerald Coderre