

FILED

2004 JUN 24 P 12: 34

U.S. DISTRICT COURT
HARTFORD. CT.

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

GERALD CODERRE                    :
    *Plaintiff*                         :    CIVIL NO. 3:02CV1096 (RNC)(DFM)


V.

DR. EDWARD PESANTI, ET AL.
    *Defendants*                      :    JUNE 23, 2004

## AFFIDAVIT OF GERALD CODERRE

1.   I am older than the age of 18, and I understand and believe in the obligations of an oath.

2.   I am the plaintiff in the above-entitled action.

3.   I am an inmate sentenced to the custody of the Connecticut Department of Correction ("DOC") and currently housed at Enfield Correctional Institution.

4.   After dropping out of high school, I began working as a truck driver at the age of 19. From 1985 to 1995, I drove tractor-trailers for various companies.

5.   I began to smoke marijuana at the age of 16.

6.   I never used heroin until the 1990s.

7.   At the age of 30, I was arrested for the first time and incarcerated on February 23, 1996. Since that time, I have been in and out of DOC custody.

1

8.   In the late 1990s, I twice voluntarily entered an in-patient detoxification program called Meridian Hill. In 1998, I received heroin detoxification treatment.

9.   On June 3, 1997, I began served a 30-day prison sentence.

10.   During this period of incarceration from June 3 to July 2, 1997, blood work was done at Gates Correctional Institution in Niantic that showed elevated liver enzyme levels. My AST level was 117, and my ALT level was 295. (Exhibit A, Corning Clinical Laboratories Report dated June 10, 1997). I was not told about the elevated liver enzymes.

11.   On March 18, 1998, I began a one-week period of incarceration. During that time, I was not informed of the elevated enzyme levels from my previous period of incarceration.

12.   In May 1998, I voluntarily enrolled into a program at a methadone maintenance clinic.

13.   Upon the advice of clinic personnel, I submitted to blood tests at Danbury Hospital. In June 1998, those tests revealed elevated liver enzyme levels, specifically an AST of 161 and an ALT of 456, and I was diagnosed as having the Hepatitis C virus ("HCV").  (Exhibit B, Danbury Hospital Outpatient Report).

14.   I was instructed to return to Danbury Hospital in three months for follow-up monitoring and the possible initiation of Interferon therapy for HCV.

2

15.   Before I could return to the hospital for the follow-up appointment, I was incarcerated on September 21, 1998.

16.   I immediately alerted the staff at the Bridgeport Correctional Center about the HCV diagnosis. Blood was drawn for tests, but I was never told of the results of those tests.

17.   On January 15, 1999, I was transferred to Robinson Correctional Institution ("Robinson") in Enfield.

18.   On February 4, 1999, I wrote a request to the HIV counselor at Robinson for a test, and I alerted the medical staff to the June 1998 diagnosis of HCV. (Exhibit C, Inmate Request Form dated February 4, 1999).

19.   During my time at Robinson in 1999, defendant Dr. Germain Bianchi informed me that HCV treatment could not be provided because insufficient time remained on my sentence.

20.   Although my DOC medical records mention that blood work was performed, no routine chemistry reports exist for the period October 1998 until August 20, 1999, when I was granted Transitional Supervision ("TS"), an early release program administered by the DOC.

21.   During my time on TS from August 20 to September 23, 1999, I was required to report once a week and to submit to urine tests. Those tests were negative for the

3

presence of alcohol or illegal drugs.

22. On September 23, 1999, I was returned to incarceration without prejudice because a court ruling led the DOC to conclude that I was not eligible for TS.

23. On October 6, 1999, blood tests showed elevated liver enzyme levels, specifically an AST level of 149 and an ALT level of 359. (Exhibit D, University of Connecticut Health System Routine Chemistry report). I was not informed of the results of those tests.

24. On November 10, 1999, I was released on TS and allowed to live at my brother's house.

25. From that time until December 24, 1999, I reported every week to a TS officer. I was required to submit urine samples, which tested negative for the presence of alcohol or illegal drugs.

26. On January 3, 2000, I was returned to prison after I failed to report for appointments with my TS officer.

27. At an intake health screening on January 3, 2000, I told a nurse that I had used one dose of heroin the previous day.

28. On January 7, 2000, blood work was performed. It showed elevated liver enzyme levels, specifically an AST level of 115 and an ALT level of 211. (Exhibit E, University of Connecticut Health System, Routine Chemistry report).

29.  On March 20, 2000, Diane Carter, a nurse at Gates Correctional Institution in Niantic informed me about the tests showing elevated liver enzymes dating back to 1997. She asked if I would like a consultation for a liver biopsy and possible treatment for HCV. (Exhibit F, Clinical Record).

30.  Blood work ordered by defendant Dr. Edward Blanchette and taken on March 24, 2000, showed an AST level of 204 and an ALT level of 529. (Exhibit G, University of Connecticut Routine Chemistry report). Despite these high levels, Dr. Blanchette failed to refer me for HCV treatment.

31.  Blood work taken on April 5, 2000, showed an AST level of 130 and an ALT level of 355. (Exhibit H, University of Connecticut Routine Chemistry report).

32.  An entry in my Clinical Record dated July 16, 2000, indicates that I met the DOC protocol for evaluation at the University of Connecticut Health Center. The entry indicates that my ALT level was "markedly" elevated. (Exhibit I, Clinical Record).

33.  In October 2000, Nurse Carter told me that I did not meet the criteria for HCV treatment because I do not have enough time remaining on my sentence.

34.  On November 9, 2000, I was discharged from prison at the conclusion of my sentence.

35.  I was arrested on new charges on December 14, 2000, and was held in lieu of bond as a pretrial detainee. I was sentenced on the new charges on May 1, 2001. I

5

remained in DOC custody continuously from December 14, 2000, to September 13, 2002.

36.   While on pretrial status from December 14, 2000, to May 1, 2001, I was housed at the Bridgeport Correctional Center ("Bridgeport"). Although Narcotics Anonymous and Alcoholics Anonymous group sessions were held at Bridgeport, substance abuse courses were not available.

37.   During my time in Bridgeport from December 14, 2000, to May 3, 2001, my AST and ALT levels were not monitored, despite the fact that I had alerted medical staff to the HCV diagnosis.

38.   On January 16, 2001, prior to being sentenced, a mental health case worker met with me at my request. I told the case worker that I wanted to get help for my drug problem and that I hoped to be sentenced to a drug treatment program. (Exhibit J, Clinical Record).

39.   In January 2001, I began to feel aches in my knees and other joints. For some months prior to that, I had often felt fatigued. At the time, I did not know that these problems could be symptoms of liver damage caused by Hepatitis C.

40.   On April 16, 2001, I received a Class A Disciplinary Report accusing me of assaulting another inmate. (Exhibit K, Disciplinary Report dated April 16, 2001). I pleaded guilty to the disciplinary charge.

41.   The guilty plea made me ineligible for substance abuse programs for a period

6

of 120 days. (Exhibit L, Osborn Correctional Institution Inmate Handbook, P. 25, Sec.

3.4).

42.   After being transferred back to Robinson on June 6, 2001, I requested

treatment for HCV.  (Exhibit M, Inmate Request Form dated June 11, 2001).

43.   Blood work ordered by Dr. Bianchi and taken on June 18, 2001, showed an

AST level of 178 and an ALT level of 217. (Exhibit N, University of Connecticut Health

System Routine Chemistry report).

44.   On  June 25, 2001, Dr. Bianchi sent a request to the Utilization Review

Committee ("URC") of Correctional Managed Health Care ("CMHC"), asking that I be

sent to a gastroenterology ("GI") clinic at the University of Connecticut Health Center for

an evaluation and probable liver biopsy. (Exhibit O, Request for Consultation dated June

25, 2001).Dr. Bianchi said that I needed HCV treatment but that the URC rarely approved

requests for such treatment. He told me that Dr. Pesanti does not approve HCV treatment

because it costs too much.

45.   On June 26, 2001, the URC denied the request for a GI consultation. (Exhibit

P, Utilization Review Report dated June 26, 2001).

46.   The decision to deny the request was made by defendant Dr. Edward Pesanti,

the medical director of CMHC. (Exhibit Q, Defendant Edward Pesanti's Responses to

Plaintiff's Requests for Admissions, P. 2, No. 4).

7

47.  Dr. Pesanti was the author of the CMHC guidelines under which the request was denied. (Exhibit Q; P. 1, No. 1).

48.  The guidelines, which were promulgated by Dr. Pesanti on July 7, 2000, limited treatment to "inmates who were not using cocaine or IV drugs for at least 6 months prior to the current incarceration or who have very long sentences (> 5 years)." (Exhibit R, memo from Dr. Edward Pesanti dated July 7, 2000, and attached CMHC Guidelines for Management of Chronic Hepatitis C Infection, P. 1).

49.  In an appendix to the guidelines, a National Institutes of Health ("NIH") consensus statement regarding management of Hepatitis C was excerpted. The excerpt conflicted with the guidelines in that it said HCV treatment was not recommended for patients who were currently drinking excessive amount of alcohol or injecting illegal drugs. The excerpt said treatment should be delayed until those behaviors had been discontinued for at least six months. (Exhibit R, Guidelines for Management of Chronic Hepatitis C Infection, P. 3).

50.  Prior to July 7, 2000, CMHC had not altered its HCV treatment guidelines for about two years. (Exhibit R, memo from Dr. Edward Pesanti).

51.  The previous guidelines, dated October 1998, did not contain the provision barring treatment unless an inmate had not used cocaine or IV drugs for at least six months prior to incarceration. (Exhibit S, CMHC Guidelines for Management of Chronic

8

Hepatitis C Infection dated October 1998).

52. In February 2002, CMHC again revised its guidelines. The revision eliminated the provision barring treatment unless an inmate had not used illegal drugs for at least six months prior to incarceration. (Exhibit T, CMHC Guidelines for Management of Chronic Hepatitis C Infection dated February 2002).

53. The stated reason for the URC denial on June 26, 2001, was that I was required to complete a substance abuse course prior to being considered for treatment. Dr. Pesanti claimed that, according to Dr. Bianchi, I had refused a substance abuse course in prison. (Exhibit P).

54. I have never refused a substance abuse course in prison.

55. When an inmate refuses health services, CMHC requires the inmate to sign a form acknowledging the refusal and releasing CMHC from responsibility. I was never asked to sign a form stating that I had refused a substance abuse course, and my prison medical records do not contain such a form.

56. At the time of the URC denial on June 26, 2001, I was not eligible to take a substance abuse course because 120 days had not passed since I was found guilty of the Disciplinary Report dated April 16, 2001.

9

57.   At the time of the URC denial on June 26, 2001, I had been clean and sober for more than six months. I had not had a drink of alcohol or used illicit drugs during the entire period of my incarceration, which began on December 14, 2000.

58.   I have never drunk alcohol or used illicit drugs while in prison.

59.   The possession or use of alcohol or illicit drugs by an inmate is against prison rules and would subject the inmate to a Disciplinary Report for contraband and/or intoxication. (Exhibit U, Department of Correction Administration Directive 9.5; P. 7, Sec. 12. F. and P. 13, Sec. 12. Q.).

60.   I have never received a Disciplinary Report accusing me of possessing or using alcohol or illicit drugs.

61.   I repeatedly wrote requests to Defendant Nurse Enrica White, asking for information about HCV and the CMHC protocol for treatment. My requests were denied. (Exhibit V, Inmate Request Forms dated November 27, 2001, and April 24, 2002).

62.   In August 2001, the Disciplinary Report I had received in April 2001 "cleared," making me eligible for prison programs. I then signed up for a substance abuse course.

63.   In September 2001, I was notified that my name had been placed on a waiting list for a substance abuse course.

10

70.    At some point in 2001, a new form of Interferon called Pegylated Interferon was approved by the Food and Drug Administration for treatment of HCV.

71.    None of the defendants, or anyone else in Correctional Managed Health Care, ever suggested to me that treatment should be delayed until Pegylated Interferon was approved or other advances were made in HCV treatment. Instead, the only reason given for not providing treatment was that I had not completed a substance abuse program.

72.    In December 2001, defendant Dr. Blanchette ordered blood work. A specimen collected on December 6, 2001, showed an AST level of 92 and an ALT level of 160. (Exhibit AA, University of Connecticut Health System Routine Chemistry Report).

73.    A blood specimen collected on December 12, 2001, showed an AST level of 91 and an ALT level of 164. (Exhibit BB, University of Connecticut Health Systems, Routine Chemistry report).

74.    In a deposition on October 29, 2003, I incorrectly said that Dr. Blanchette ordered blood work in December 2000, rather than December 2001. I later corrected my response. (Exhibit CC, Correction Sheet).

75.    On February 26, 2002, while still on the waiting list for a substance abuse course, I received a Class A Disciplinary Report for fighting with another inmate. (Exhibit DD, Disciplinary Report dated February 16, 2002.

76.  I pleaded guilty to the disciplinary charge. The guilty plea made me ineligible for prison programs, including substance abuse courses, for a 120-day period. (Exhibit K).

77.  Beginning approximately in March 2002, I experienced pain over both kidneys. I complained to the medical unit (Exhibit EE, Inmate Request Form dated April 25, 2002), to Dr. Pesanti (Exhibit FF, Inmate Request Form dated April 10, 2002) and to Dr. Bianchi (Exhibit GG, Inmate Request Form dated April 24, 2002).

78.  I also complained about severe headaches and from muscle aches in my back and legs. (Exhibit HH, Inmate Request Form dated April 30, 2002).

79.  I was having difficulty urinating, my urine was a dark color and tests showed that there was blood in the urine. (Exhibit II, Utilization Review Request dated May 3, 2002).

80.  After referral to a GI specialist and a urologist failed to find the cause of my symptoms, the URC on July 3, 2002, finally approved a request for a liver biopsy. (Exhibit JJ, Utilization Review Committee report dated July 3, 2002).

81.  In June 2002, the Disciplinary Report I had received on February 16, 2002, "cleared," making me again eligible for programming.

82.  I signed up for a substance abuse course, but I was again put on a waiting list.

83.  A liver biopsy finally was performed on September 9, 2002. The diagnosis

following the biopsy was "[c]hronic hepatitis, active, severe." (Exhibit KK, Surgical Pathology Report).

84. Problems such as severe headaches, joint pain, muscle aches, chronic fatigue and urinary difficulties can be symptoms of chronic liver disease associated with HCV. (Exhibit Q; P. 3, No. 8; Exhibit LL, Dr. Edward Blanchette's Responses to Plaintiff's Requests for Admissions, P. 4, No. 12).

85. I was sent for the GI consultation and liver biopsy despite the fact that I had not completed a substance abuse course in prison because I was still on the waiting list.

86. On September 13, 2002, four days after the biopsy was performed and before HCV treatment could begin, I was released on parole to a halfway house.

87. While at the halfway house, I sought treatment at Danbury Hospital. I was seen at the hospital on November 7, 2002. Follow-up appointments on December 5, 2002, and January 20, 2003, were canceled because of inclement weather. I missed on appointment scheduled for March 13, 2003. (Exhibit MM, Danbury Hospital Progress Report).

88. On March 24, 2003, I was returned to prison on new charges and a violation of parole. I have remained incarcerated since that time.

89. On July 25, 2003, I began treatment with Pegysys Pegalated Interferon for my HCV. At the time my treatment began, I had not taken a substance abuse course in prison.

90. I began a substance abuse course on September 18, 2003.

14

I, Gerald Coderre, do hereby swear that the contents of the foregoing affidavit are true and accurate to the best of my knowledge and belief.

Gerald Coderre

Subscribed and sworn to before me this 23 day of June, 2004.

~~Notary Public~~
Commissioner of the Superior Court

THE PLAINTIFF

Gerald Coderre
Inmate #245210
Enfield Correctional Institution
289 Shaker Road
P.O. Box 1500
Enfield, CT 06082

15

Although not appearing herein, the undersigned assisted in the preparation of this affidavit:

_Richard P. Cahill_

Richard P. Cahill, Esq.
Schulman & Associates
Inmates' Legal Assistance Program
78 Oak Street
P.O. Box 260237
Hartford, CT 06126-0237
Tel: (860) 246-1118
Fax: (860) 246-1119

## CERTIFICATION

I hereby certify that a copy of the foregoing was mailed to the following counsel and pro se parties of record on this *14th* day of June, 2004:

Ann E. Lynch, Esq.
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105

_Gerald Coderre_

Gerald Coderre

16