* Copyright 2004 SHEPARD'S - 1 Citing reference

**Johnson v. Wright, 2004 U.S. Dist. LEXIS 7543 (S.D.N.Y. May 3, 2004)**

**SHEPARD'S(R) Signal: Citing Refs. With Analysis Available**
Restrictions: *Unrestricted*
FOCUS Terms: *None*
Print Format: *FULL*
Citing Ref. Signals: *Hidden*

**PRIOR HISTORY** (1 citing case)

*Johnson v. Wright*, 234 F. Supp. 2d 352, 2002 U.S. Dist. LEXIS 23462 (S.D.N.Y. 2002)

   ***Summary judgment granted by***
   ***Citation you entered***
   ***Johnson v. Wright, 2004 U.S. Dist. LEXIS 7543 (S.D.N.Y. May 3, 2004)***

JAMES JOHNSON, Plaintiff, -v.- LESTER N. WRIGHT, M.D.,Assoc. Commissioner; GLENN S. GOORD, Commissioner, DOCS; CARL J. KOENIGSMANN,M.D., Fac. Health Ser. Dir.; ALBERT PAOLANO, M.D.; WILLIAM SMITH, M.D., GreatMeadow Corr. Fac.; GEORGE B. DUNCAN, Supt. Great Meadow Corr. Facility; and JOHNE. CUNNINGHAM, JR., M.D., Defendants.
01 Civ. 2122 (GWG)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OFNEW YORK

2004 U.S. Dist. LEXIS 7543

May 3, 2004, Decided
May 4, 2004, Filed

PRIOR HISTORY: *Johnson v. Wright, 234 F. Supp. 2d 352, 2002 U.S. Dist. LEXIS 23462 (S.D.N.Y., 2002)*

DISPOSITION: Defendants' motion for summary judgment granted.

CASE SUMMARY:

PROCEDURAL POSTURE: Plaintiff inmate sued defendants, the chief medical officer, the health services director, a former superintendent, and the Commissioner of the New York State Department of Correctional Services (Commissioner), under *42 U.S.C.S. § 1983,* alleging that defendants were deliberately indifferent to his serious medical needs and thus violated his constitutional rights under the Eighth Amendment. Defendants moved for summary judgment.

OVERVIEW: The inmate suffered from chronic hepatitis C and received Interferon Therapy. When problems arose, the inmate's Gastroenterology specialist recommended that he receive Rebetron Therapy. Pursuant to the New York State Department of Correctional Services' (DOCS) practice guideline concerning hepatitis C, the chief medical officer denied the request because the inmate had tested positive for marijuana usage within the previous year. The court determined that defendants were entitled to summary judgment as to the inmate's deliberate indifference claim. The inmate could not show that defendants had been deliberately indifferent to his medical needs, because there existed a medical justification for denying him Rebetron Therapy based on his drug use. There were valid medical reasons justifying the denial of Rebetron Therapy to active substance abusers. While the inmate presented medical evidence suggesting that he could properly have received Rebetron Therapy, he did not rebut defendants' evidence that their treatment of him was consistent with the DOCS practice guideline and

that the guideline was based on medical evidence that was apparently reliable at the time.

OUTCOME: The magistrate judge granted defendants' summary judgment motion and closed the case.

CORE TERMS: guideline, hepatitis, deliberate indifference, patient, inmate, summary judgment, ribavirin, substance abuse, marijuana, annexed, interferon, rebetron, prisoner, treating, therapy, doctor, prison, drug use, recommended, medication, subjective, prong, checklist, recommendation, declaration, alcohol, medical evidence, disease, chronic, drug test

LexisNexis(R) Headnotes

Civil Procedure: Summary Judgment: Summary Judgment Standard
[HN1] In considering the defendants' motion for summary judgment, the court accepts as true the plaintiff's version of the facts where supported by admissible evidence and draws all factual inferences in the plaintiff's favor.

Civil Procedure: Summary Judgment: Summary Judgment Standard
[HN2] A district court may grant summary judgment only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Fed. R. Civ. P. 56(c).* A genuine issue is one that may reasonably be resolved in favor of either party. A fact is material if it might affect the outcome of the suit under the governing law. Thus, a genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

Civil Procedure: Summary Judgment: Summary Judgment Standard

[HN3] In the summary judgment context, when determining whether a genuine issue of material fact exists, all factual inferences must be drawn and all ambiguities resolved in favor of the nonmoving party. However, conclusory allegations, conjecture, and speculation are insufficient to create a genuine issue of fact.

Civil Procedure: Summary Judgment: Burdens of Production & Proof

[HN4] In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy its burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim. A defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to his case.

Constitutional Law: Civil Rights Enforcement: Prisoners: Medical Treatment

[HN5] To establish a violation of the Eighth Amendment arising out of inadequate medical treatment, a prisoner is required to prove deliberate indifference to his serious medical needs. The deliberate indifference standard consists of both an objective and a subjective prong.

Constitutional Law: Civil Rights Enforcement: Prisoners: Medical Treatment

[HN6] In the context of an Eighth Amendment claim arising out of inadequate medical treatment, under the objective prong of the deliberate indifference standard, the alleged medical need must be "sufficiently serious." A "sufficiently serious" medical need is a condition of urgency, one that may produce death, degeneration, or extreme pain.

Constitutional Law: Civil Rights Enforcement: Prisoners: Medical Treatment

[HN7] In the context of an Eighth Amendment claim arising out of inadequate medical treatment, under the subjective component of the deliberate indifference standard, the prisoner must show that the defendant officials acted with a sufficiently culpable state of mind in depriving the prisoner of adequate medical treatment. The subjective element of deliberate indifference entails something more than mere negligence but something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result. In order to be found "sufficiently culpable," the official must know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Constitutional Law: Civil Rights Enforcement: Prisoners: Medical Treatment

[HN8] In the context of an Eighth Amendment claim arising out of inadequate medical treatment, while the medical care received by the prisoner must be adequate, a prisoner is not entitled to receive treatment by every medical alternative. A difference of opinion between a prisoner and medical personnel regarding medical treatment does not rise to the level of a constitutional violation. Nor can deliberate indifference arise simply because an inmate prefers an alternative treatment or feels that he did not get the level of medical attention that he desired. Nonetheless, prison officials are more than merely negligent if they deliberately defy the express instructions of a prisoner's doctors. If a defendant consciously chose to disregard a nurse or doctor's directions in the face of medical risks, then he may well have exhibited the necessary deliberate indifference. Indeed, in some instances even prison doctors may be held liable for the failure to provide medical care recommended by other doctors.

Constitutional Law: Civil Rights Enforcement: Prisoners: Medical Treatment

[HN9] In the context of the Eighth Amendment, not every physician will treat every ailment in exactly the same manner, and disagreements over medications, diagnostic techniques, forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a *42 U.S.C.S. § 1983* claim.

Constitutional Law: Civil Rights Enforcement: Prisoners: Medical Treatment

[HN10] Courts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care.

COUNSEL: [*1] For Plaintiff: Catherine C. Montjar, Esq., Susanna M. Buergel, Esq., Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY.

For Defendants: Daniel Schulze, Esq., Assistant Attorney General, New York, NY.

JUDGES: GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE.

OPINIONBY: GABRIEL W. GORENSTEIN

OPINION: OPINION AND ORDER

GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE

In this action under *42 U.S.C. § 1983*, plaintiff James Johnson claims that defendants Lester N. Wright, M.D., Carl J. Koenigsmann, M.D., George B. Duncan, and Glenn S. Goord were deliberately indifferent to his serious medical needs and thus violated his constitutional rights under the *Eighth Amendment*. Defendants have moved for summary judgment pursuant to *Fed. R. Civ. P. 56* . The parties have consented to disposition of this matter by a United States Magistrate Judge pursuant to *28 U.S.C. § 636(c)*. For the reasons stated below, defendants' motion is granted.

## I. INTRODUCTION

In *Johnson v. Wright, 234 F. Supp. 2d 352, 368 (S.D.N.Y. 2002)* ("Johnson I"), familiarity with which is assumed, [*2] this Court granted in part and denied in part defendants' motion to dismiss Johnson's pro se amended complaint for failure to state a claim under *Fed. R. Civ. P. 12(b)(6)*. As to the instant defendants -- Wright, Koenigsmann, Duncan, and Goord -- the motion was denied. Id. Although Johnson was proceeding pro se at that time, the Court subsequently placed this case on the Pro Se Office's list of cases for which volunteer counsel had been requested. See Order, filed December 30, 2002 (Docket # 38), at 2. Thereafter, the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP agreed to provide representation, for which the Court expresses its gratitude. The Court has benefitted greatly from the excellent briefing provided by both sides in this matter.

### A. Factual Background

[HN1] In considering the defendants' motion for summary judgment, the Court accepts as true Johnson's version of the facts where supported by admissible evidence and draws all factual inferences in Johnson's favor. See, e.g., *McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999)*.

### 1. The Parties

Johnson is an inmate in the custody[*3] of the New York State Department of Correctional Services ("DOCS") and is currently incarcerated at the Great Meadow Correctional Facility ("Great Meadow") in Comstock, New York. Defendants' *Rule 56.1* Statement, filed October 27, 2003 (Docket # 51) ("Def. 56.1"), P 1; Plaintiff's Response to Defendants' *Rule 56.1* Statement of Undisputed Facts, filed November 26, 2003 (Docket # 57) ("Pl. 56.1") (collectively with Def. 56.1, the "Parties 56.1"), P 1. Prior to his incarceration at Great Meadow, Johnson was incarcerated at the Green Haven Correctional Facility ("Green Haven") in Stormville,

New York from February 28, 1997 through November 9, 1999. Parties 56.1 PP 1, 18.

Defendant Lester N. Wright, M.D. is a Deputy Commissioner and the Chief Medical Officer of DOCS and has held these positions throughout the time period of the incidents alleged in Johnson's amended complaint. Id. P 2. Defendant Carl J. Koenigsmann, M.D. is the Health Services Director at Green Haven and has held this position since March 1999. Id. P 4. Defendant George B. Duncan is the former Superintendent of Great Meadow and held this position from May 14, 1999 through early 2003. Id. P 5. He is now retired. [*4] Id. Defendant Glenn S. Goord is the Commissioner of DOCS and has held this position throughout the time period of the incidents alleged in the amended complaint. Id. P 3.

### 2. Johnson's Disease: Hepatitis C

Johnson suffers from chronic hepatitis C. Id. P 6. He was diagnosed with the disease in May 1997. Id. PP 7, 19. At that time, a liver biopsy was performed on Johnson and it was determined that his disease was in advanced Stage III with bridging fibrosis of the liver. Id.

Hepatitis C is spread primarily through contact with infected blood. Nat'l Digestive Diseases Info. Clearinghouse, Chronic Hepatitis C: Current Disease Management, dated February 2003 (annexed as Ex. D to Declaration of Daniel Schulze in Support of Defendants' Motion for Summary Judgment, filed October 27, 2003 (Docket # 52) ("Schulze Decl.")), at 2. One of the routes for this disease is through intravenous drug use. Id.; Deposition of Efsevia Albanis, September 25, 2003 ("Albanis Dep.") (annexed as Ex. C to Declaration of Catherine C. Montjar in Opposition to Defendants' Motion for Summary Judgment, filed November 26, 2003 (Docket # 58) ("Montjar Decl.")), at 61. Johnson has admitted[*5] to using intravenous drugs, including heroin, prior to his incarceration in 1982. Parties 56.*1 P 9*.

Chronic hepatitis C is an extremely slow-progressing disease: researchers currently estimate that it takes at least 10 to 20 years for a person inflicted with chronic hepatitis C to develop cirrhosis. *Id. P 10*. However, the progression of a patient infected with chronic hepatitis C from advanced Stage III with bridging fibrosis -- of which Johnson was diagnosed in May 1997 -- to Stage IV, cirrhosis, can take as little as several years. Expert Report of Efsevia Albanis, M.D., dated August 29, 2003 ("Albanis Report") (annexed as Ex. B to Schulze Decl.), at 3.

At least 20% of patients with chronic hepatitis C will eventually develop cirrhosis. Pl. 56.*1 P 10*. After 20 to 40 years, a smaller percentage of those patients will develop liver cancer. Id. While the response rate depends on the type of treatment, generally less than 45% of patients with chronic hepatitis C will respond to therapy. *Id. P 11*.

### 3. The DOCS Hepatitis C Practice Guideline

On March 31, 1999, DOCS issued a practice guideline concerning hepatitis C. [*6]Parties 56.*1 P 13*; see Hepatitis C Primary Care Practice Guideline, dated March 31, 1999 ("DOCS Practice Guideline" or "Guideline") (annexed as Ex. G to Schulze Decl.). The Guideline purports to be "an approach to the current management of hepatitis C disease which is consistent with community standards of care and is appropriate in our corrections settings." DOCS Practice Guideline at 1. It notes that "the treatment plans recommended in this document are not necessarily all inclusive. This guideline represents the current state of knowledge regarding treatment agents for the management of hepatitis C." Id. One such treatment agent, interferon-alpha therapy ("Interferon Therapy"), is discussed in the Guideline. See id. at 2-5. It provides that Interferon Therapy "should be considered in accordance with the following criteria," one of which is: "10. No evidence of active substance abuse (drug and/or alcohol) during the past 2 years (check urine toxicology screen if drug use is suspected)." Id. at 2-3.

Attached to the DOCS Practice Guideline is a document entitled "Hepatitis C Treatment Referral Checklist." See Hepatitis C Treatment Referral Checklist, [*7]undated ("DOCS Hepatitis C Checklist") (annexed to the DOCS Practice Guideline). According to the Guideline, completing this checklist "will assist the clinician in evaluating the inmate for possible treatment." DOCS Practice Guideline at 2. The checklist lists 7 items under "Inclusion Criteria" and 11 items under "Exclusion Criteria." DOCS Hepatitis C Checklist. One of the items under "Exclusion Criteria" is "Active alcohol or other substance abuse within past two years." Id. Next to each item are three boxes labeled "Yes," "No," and "Comments." Id. The checklist states at the bottom: "The above inmate has met all the inclusion criteria and does not have any of the exclusion criteria (exceptions may be HIV or psychiatric disease)." Id. Directly underneath this statement are signature and date lines for the inmate's primary care provider to fill out. Id.

Two of the supporting references listed in the DOCS Practice Guideline are a 1997 statement prepared by the National Institutes of Health and a 1997 guideline issued by the Federal Bureau of Prisons. See DOCS Practice Guideline at 5 (citing Nat'l Insts. of Health, Consensus Development Statement: Management of [*8] Hepatitis C, dated March 24-26, 1997 ("NIH Report") (annexed as Ex. I to Schulze Decl.); Fed. Bureau of Prisons, Treatment Guidelines for Viral Hepatitis, dated September 1, 1997 ("BOP Report") (annexed as Ex. J to Schulze Decl.)).

### 4. Johnson's Treatment

During Johnson's incarceration at Green Haven, his treating physician was Tom Scales, M.D. Parties 56.*1 P 20*. In addition, Johnson regularly visited with an outside Gastroenterology specialist, "Dr. Antonelle," in regard to his treatment for hepatitis C. Id.

In February 1998, Johnson began receiving Interferon Therapy, three million units three times a week. *Id. P 21*. On May 26, 1998, Johnson was given a urine toxicology screen and tested positive for marijuana usage. *Id. P 22*.

Johnson initially responded positively to Interferon Therapy. *Id. P 23*. In December 1998, however, Dr. Antonelle noted that Johnson's liver enzyme counts were increasing. Pl. 56.*1 P 23*. Lab tests performed in January 1999 showed that Johnson's viral load was increasing and, once again, that his liver enzyme counts were increasing. Id. On February 2, 1999, Dr. [*9] Antonelle recommended that the drug Ribavirin be added to Johnson's Interferon Therapy. Parties 56.*1 P 23*. This combination treatment is commonly referred to as "Rebetron Therapy." Id. On February 4, 1999, Dr. Scales indicated that Johnson would be started on Rebetron Therapy "as soon as approval can be obtained." *Id. P 24*. Dr. Scales also noted that he would "anticipate a new set of" tests "to evaluate for any developing anemia." Pl. 56.*1 P 24*. On either May 19 or May 24, 1999, Dr. Antonelle reiterated his recommendation that Johnson be started on Rebetron Therapy. Parties 56.*1 P 24*. On May 24, 1999, a note was made in Johnson's medical file indicating that a request for Ribavirin would be made to the central pharmacy. *Id. P 25*. Subsequently, Dr. Koenigsmann passed along to Dr. Wright's office a request by Dr. Scales that Johnson receive Ribavirin. Declaration of Carl Koenigsmann in Support of Defendant's [sic] Motion for Summary Judgement, filed October 27, 2003 (Docket # 53) ("Koenigsmann Decl."), P 3.

On June 1, 1999, Dr. Wright denied the request for Ribavirin "due to drug use within the past year. [*10] " Parties 56.*1 P 27*; see Medical Records, certified April 16, 2003 ("Medical Records") (annexed in part as Ex. C to Schulze Decl., in part as Ex. D to Montjar Decl., and in part as Ex. A to Reply Declaration of Daniel Schulze in Support of Defendants' Motion for Summary

Judgement, filed December 19, 2003 (Docket # 60)), at MED 0099. The denial was sent to Dr. Koenigsmann, who passed it along to Dr. Scales. Koenigsmann Decl. P 3. On August 17, 1999, after having been informed of the Ribavirin denial apparently by Dr. Scales, Dr. Antonelle issued another recommendation concerning Johnson's treatment. See Medical Records at MED 0105. In that recommendation, Dr. Antonelle noted that the "request for ribavirin was refused because of bad urine test for marijuana" but that he did "not feel that this should preclude [a prescription for] ribavirin." Id. Dr. Antonelle indicated that Johnson "had initially responded to [Interferon but had] relapsed" and that he "would again request approval for ribavirin." Id. "In [the] interim," Dr. Antonelle increased Johnson's Interferon prescription. Id.

On November 9, 1999, Johnson was transferred to Great Meadow. Parties [*11]56.1 P 31. On January 21, 2000, William Smith, M.D., Johnson's new treating physician at Great Meadow, noted that Johnson had been denied Ribavirin and that he would call Dr. Wright to obtain approval for it. See Medical Records at MED 0210. As of March 10, 2000, Dr. Smith had not received an "update" from Dr. Wright. Id. at MED 0208.

On June 15, 2000, Johnson filed an "Inmate Grievance Complaint," in which he requested that DOCS's drug-use policy be retracted and that he be permitted to begin Rebetron Therapy immediately. Id. at MED 0285. The next day, Johnson wrote a letter to Dr. Wright asking him for approval to commence Rebetron Therapy. See id. at MED 0281-82. Johnson sent a copy of this letter to Commissioner Goord. See id. at MED 0280.

At some point between June 19 and July 24, 2000, Dr. Wright approved Johnson for Rebetron Therapy. See id. at MED 0277. On July 24, 2000, the necessary medications were ordered. Id. On July 25, 2000, Dr. Wright wrote to Johnson and stated that he had been approved for Rebetron Therapy and that the treatment would commence in the near future. Id. at MED 0279. From August 2000 until February 2002, [*12] Johnson received Rebetron Therapy. Parties 56.1 P 35. Johnson did not respond to it. Id. P 36.

B. Procedural History

Johnson filed the original complaint in this action on March 13, 2001. Complaint, filed March 13, 2001 (Docket # 2). Johnson's complaint under 42 U.S.C. § 1983 alleged that the defendants deprived him of his civil rights under the *Eighth Amendment* due to their deliberate indifference in providing him with medical treatment. See id. After the defendants moved to dismiss that complaint, Johnson sought and obtained leave to file an amended complaint. See Order, filed November 9,

2001 (Docket # 17). Johnson filed his amended complaint on December 9, 2001. Amended Complaint, filed December 9, 2001 (Docket # 19). Defendants then moved to dismiss the amended complaint pursuant to *Fed. R. Civ. P. 12(b)(6)* . Notice of Motion to Dismiss, filed April 16, 2002 (Docket # 28).

On December 6, 2002, the Court granted in part and denied in part defendants' motion. *Johnson I, 234 F. Supp. 2d at 368*. The Court granted the motion as to certain defendants for their[*13] lack of personal involvement in the alleged civil rights violation. *Id. at 365*. As for the remaining defendants -- Dr. Koenigsmann, Duncan, Dr. Wright, and Commissioner Goord -- the Court held that the amended complaint stated a claim for deliberate indifference, that Johnson adequately alleged their personal involvement, and that they were not entitled to qualified immunity. *Id. at 359-62, 364-68*.

On February 27, 2003, the Court ordered that discovery proceed but be limited to the following two topics: (1) "Whether it was reasonable for defendants to believe in [1998-2000] that it was medically justifiable to treat [Johnson's] Hepatitis C with Interferon rather than Rebetron Therapy"; and (2) "Whether being treated with Interferon rather than Rebetron Therapy in [1998-2000] caused any injury to [Johnson]." Memorandum Endorsement, filed February 27, 2003 (Docket # 42). On May 5, 2003, counsel from Paul, Weiss, Rifkind, Wharton & Garrison LLP noticed their appearance on behalf of Johnson.

Defendants have now moved for summary judgment under *Fed. R. Civ. P. 56*. See Notice of Motion for Summary Judgment,[*14] filed October 27, 2003 (Docket # 49). Defendants argue that Johnson's claim of deliberate indifference fails because he has not demonstrated that the alleged delay in treating him with Rebetron Therapy caused him any injury and thus could not have constituted deliberate indifference. See Defendants' Memorandum of Law in Support of Motion for Summary Judgement, filed October 27, 2003 (Docket # 50) ("Def. Mem."), at 8-13. In the alternative, they argue that the initial refusal to treat Johnson with Rebetron Therapy was justified by a medical reason. See *id. at 17-22*. Finally, defendants argue that they are entitled to qualified immunity and that the claim must be dismissed as against Dr. Koenigsmann, Duncan, and Commissioner Goord for their lack of personal involvement. See *id. at 13-17, 22-24*.

II. SUMMARY JUDGMENT STANDARD

[HN2] A district court may grant summary judgment only if "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*[*15] ; see *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. A genuine issue is one that "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. A fact is material if it "might affect the outcome of the suit under the governing law." *Id. at 248*. Thus, a genuine issue of material fact exists "if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002)* (quoting *Anderson, 477 U.S. at 248*). [HN3] When determining whether a genuine issue of material fact exists, all factual inferences must be drawn and all ambiguities resolved in favor of the nonmoving party. See, e.g., *Savino v. City of New York, 331 F.3d 63, 71 (2d Cir. 2003)* (citing *Anderson, 477 U.S. at 255*); *McPherson, 174 F.3d at 280*. However, "conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998)*[*16] (citation omitted); accord *Harlen Assocs. v. Incorporated Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001)*.

[HN4] "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy [its] burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Vann v. City of New York, 72 F.3d 1040, 1048 (2d Cir. 1995)* (citing *Celotex, 477 U.S. at 322-23*). "A defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to [his] case." *Allen v. Cuomo, 100 F.3d 253, 258 (2d Cir. 1996)* (citing *Anderson, 477 U.S. at 247-48*); accord *Nebraska v. Wyoming, 507 U.S. 584, 590, 123 L. Ed. 2d 317, 113 S. Ct. 1689 (1993)*; *Chase Manhattan Bank v. Am. Nat'l Bank & Trust Co. of Chi., 93 F.3d 1064, 1072 (2d Cir. 1996)*.

## III. DELIBERATE INDIFFERENCE STANDARD

[HN5] To establish a violation of the *Eighth Amendment* arising out of inadequate medical treatment, a prisoner is required[*17] to prove "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble, 429 U.S. 97, 104, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976)*. The deliberate indifference standard consists of both an objective and a subjective prong. *Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994)*, cert. denied, *513 U.S. 1154 (1995)*.

[HN6] Under the objective prong, the alleged medical need must be "sufficiently serious." Id. (internal quotation marks and citation omitted). A "sufficiently serious" medical need is "a condition of urgency, one that may produce death, degeneration, or extreme pain." Id. (internal quotation marks and citation omitted).

[HN7] Under the subjective component, the prisoner must show that the defendant officials acted with a "sufficiently culpable state of mind" in depriving the prisoner of adequate medical treatment. *Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)*. "The subjective element of deliberate indifference 'entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" Id. (alterations[*18] in original) (quoting *Farmer v. Brennan, 511 U.S. 825, 835, 128 L. Ed. 2d 811, 114 S. Ct. 1970 (1994)*); see *Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003)* (likening the necessary state of mind to "the equivalent of criminal recklessness" (internal quotation marks and citation omitted));*Hemmings v. Gorczyk, 134 F.3d 104, 108 (2d Cir. 1998)* (per curiam) (same). In order to be found "sufficiently culpable," the official must "know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer, 511 U.S. at 837*.

[HN8] While the medical care received by the prisoner must be adequate, a prisoner is not entitled to receive treatment by every medical alternative. See generally *Estelle, 429 U.S. at 105-07* . A difference of opinion between a prisoner and medical personnel regarding medical treatment does not rise to the level of a constitutional violation. *Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998)*. Nor can deliberate indifference[*19] arise simply because an inmate prefers an alternative treatment or feels that he did not get the level of medical attention that he desired. See *Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986)*. Nonetheless, "prison officials are more than merely negligent if they deliberately defy the express instructions of a prisoner's doctors." *Gill v. Mooney, 824 F.2d 192, 196 (2d Cir. 1987)* (citation omitted); see *Zentmyer v. Kendall County, 220 F.3d 805, 812 (7th Cir. 2000)* (prison officials may not "substitute their judgments for a medical professional's prescription"). "If a defendant consciously chose to disregard a nurse or doctor's directions in the face of medical risks, then he may well have exhibited the necessary deliberate indifference." *Zentmyer, 220 F.3d at 812*. Indeed, in some instances even prison doctors may be held liable for the failure to provide medical care recommended by

other doctors. See, e.g., *Woods v. Goord, 2002 U.S. Dist. LEXIS 7157, 2002 WL 731691, at *4-*5 (S.D.N.Y. Apr. 23, 2002)* (although inmate obtained regular medical care, claim for deliberate indifference stated where he alleged that prison[*20] doctors had delayed in complying with and/or had ignored the directives of specialists over several years).

## IV. DISCUSSION

In Johnson I, the defendants argued that Johnson could not show that they had been deliberately indifferent to his medical needs because there existed a medical justification for denying him Rebetron Therapy based on his drug use. See *234 F. Supp. 2d at 368*. The Court rejected this argument because it relied on evidence dehors the record and thus could not be considered on a motion to dismiss. Id. Defendants have now supplied this evidence in proper fashion. Because this evidence provides a sufficient basis for granting them summary judgment, it is unnecessary to reach their alternative arguments.

### A. The Denial and the DOCS Practice Guideline

It is true, as Johnson contends, see Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, filed November 26, 2003 (Docket # 56) ("Pl. Mem."), at 22, that all of Johnson's treating physicians, both inside the prison (Dr. Scales and Dr. Smith) and outside the prison (Dr. Antonelle), recommended that he be treated with Rebetron Therapy. See[*21] , e.g., Medical Records at MED 0103-05, 0210. However, as Johnson correctly recognizes, the mere fact that his treating physicians recommended Rebetron Therapy does not mean that the Constitution required that he receive it. See Pl. Mem. at 20 (noting that situations arise where the proper treatment "contradicts the express instructions of a prisoner's treating physician"). It is therefore necessary to look at the specific circumstances surrounding the denial.

When Dr. Wright denied Johnson's request for Ribavirin on June 1, 1999, he indicated that the reason for his denial was "drug use within the past year." Medical Records at MED 0099. Indeed, on May 26, 1998, Johnson had tested positive for marijuana usage based on a urine toxicology screen. Parties 56.*1 P 22*. Although this drug test was not precisely "within the past year," it is clear that Dr. Wright's denial was based on this drug test. See also Medical Records at MED 0107 (notation from Dr. Scales that Johnson "was denied Ribavirin because of DOCS -- Drug Use Policy").

According to the DOCS Practice Guideline, a consideration in determining whether an inmate should be approved for hepatitis C treatment[*22] is whether there is "evidence of active substance abuse (drug and/or alcohol) during the past 2 years." DOCS Practice Guideline at 3. The checklist accompanying the Guideline, upon which the inmate's primary care provider must certify that the inmate "does not have any of the exclusion criteria," states in even stronger terms that "substance abuse within past two years" is one of the "Exclusion Criteria." DOCS Hepatitis C Checklist.

While Johnson argues that "one positive test for marijuana does not indicate that a patient infected with Hepatitis C is a drug abuser who should not be treated," Pl. Mem. at 9, this argument does not address the logically precedent issue of whether Johnson's condition fit within the language of the DOCS Practice Guideline. Johnson has put forth no evidence disputing that a positive drug test is "evidence of active substance abuse" within the meaning of the Guideline. Indeed, the Guideline itself notes that one way to test for "active substance abuse" is to "check urine toxicology screen," DOCS Practice Guideline at 3 -- precisely what was done in Johnson's case. Moreover, even Johnson's own expert agrees that a positive urine test is "evidence of active [*23]substance abuse." Albanis Dep. at 124. Thus, it is clear that the single positive drug test was "evidence of active substance abuse" within the meaning of the DOCS Practice Guideline.

### B. Whether the Application of the Guideline Was Deliberately Indifferent

The mere fact that the defendants denied Johnson medication based on an application of the DOCS Practice Guideline, however, does not end the deliberate indifference analysis. For example, if Johnson had evidence from which a reasonable jury could conclude that the defendants subjectively knew of an excessive risk to his health or safety in their following the Guideline, such evidence would presumably constitute proof of the "subjective" prong of the deliberative indifference standard. See generally *Farmer, 511 U.S. at 837*.

Johnson's argument for demonstrating the existence of the subjective prong consists largely of his contention that no medical evidence exists in support of the Guideline's exclusion criterion. See, e.g., Pl. Mem. at 4 ("There is no medical evidence that marijuana use affects a patient's ability to tolerate ribavirin."). One of Johnson's main contentions is that the active abuse [*24]of drugs -- whether it be marijuana or some other illicit drug -- is not inconsistent with the administration of Rebetron Therapy. See, e.g., id. at 4-5, 20. While accepting Johnson's contention would not necessarily be

dispositive of this case, the Court will begin its analysis by examining the medical evidence on this point.

Defendants have submitted an expert declaration from Mark A. Korsten, M.D., the Associate Chief of Medical Program and Chief of Gastroenterology at the Bronx VA Medical Center and Professor of Medicine at the Mount Sinai School of Medicine. Expert Declaration of Mark A. Korsten, M.D. in Support of Defendant's [sic] Motion for Summary Judgement, filed October 27, 2003 (Docket # 54) ("Korsten Decl."), P 1. In it, Dr. Korsten concludes that "there were valid reasons to withhold Rebetron therapy from [Johnson] in 1999." Id. P 2. According to Dr. Korsten, "the standard of care during 1998-1999 was not to treat patients infected with [hepatitis C] if there was evidence of drug or alcohol abuse. The reason for this reluctance to treat actively abusing patients was that such behavior would compromise a patient's ability to adhere to a rather unpleasant [*25]and arduous therapeutic regimen." Letter from Dr. Korsten to Schulze, dated August 28, 2003 ("Korsten Ltr.") (annexed as Ex. A to Korsten Decl.), at 4.

Indeed, Johnson's own expert expounded on why it is dangerous to miss appointments when being treated with Rebetron. See Albanis Dep. at 42-46. She testified that "people who are actively abusing drugs will have a hard time being compliant with their medication and with follow-up appointments, which are very important . . . when they're being treated with medications that can affect their blood count, their various blood counts. So they'd be noncompliant patients and put themselves at risk if they wouldn't follow up with the prescribing physician." Id. at 44-45. Case law discussing the DOCS Practice Guideline also recognizes the risks associated with coterminous drug use and Rebetron Therapy. In Graham v. Wright, the court noted that the DOCS Practice Guideline "appears to be highly rational in light of the fact that severe side effects, including death, may result from treatment of the patient with [Rebetron], and that active substance abuse . . . can cause life threatening consequences to a patient following the treatment[*26] regimen." 2003 U.S. Dist. LEXIS 16106, 2003 WL 22126764, at *2 n.5 (S.D.N.Y. Sept. 12, 2003).

Of course, it is not for this Court to decide whether this medical view is correct. Instead, the issue is whether there is any disputed issue of fact as to whether the defendants reasonably could have harbored the belief that the view embodied in the Guideline was correct. This is because if they held such a belief, it would be impossible for a jury to conclude that they had the subjective intent necessary to show deliberate indifference to Johnson's medical needs. Thus, the issue is not the arguments that may now be made regarding the

wisdom of the Guideline but rather what apparent basis it had at the time.

The undisputed evidence in this case reflects that the factor listed in the DOCS Practice Guideline was supported by -- and, indeed, was based upon -- reports prepared by medical professionals. One of those reports, the NIH Report, states that "treatment of patients who are drinking significant amounts of alcohol or who are actively using illicit drugs should be delayed until these habits are discontinued for at least 6 months. Such patients are at risk for the potential toxic effects of alcohol and[*27] other drugs and also present problems with compliance. Treatment for addiction should be provided prior to treatment for hepatitis C." NIH Report at D0294; see also Albanis Dep. at 109 ("Q. Doctor, is it fair to say that the [DOCS Practice Guideline is] based on the [NIH Report] at the time? A. Yes. Q. Including the reference to illicit drug use that we looked at, correct? A. Yes."). Another report referred to in the Guideline, the BOP Report, states in almost identical terms to the Guideline that treatment "should be considered in accordance with the following criteria," one of which is: "(10) No evidence of active substance abuse during past 2 years (check urine toxicology screen if drug use suspected)." BOP Report at 18-19.

It is thus clear that there were valid medical reasons justifying the denial of Rebetron Therapy to active substance abusers. While Johnson has presented medical evidence suggesting that he could properly have received Rebetron Therapy, he has not rebutted defendants' evidence that their treatment of Johnson was consistent with the DOCS Practice Guideline and that the Guideline was based on medical evidence that was apparently reliable at the time. [*28]

Johnson's other main argument is that the DOCS Practice Guideline does not indicate that a person who abuses illicit drugs is per se disqualified from receiving treatment for hepatitis C. See Pl. Mem. at 20-22. Rather, the Guideline establishes this only as one of 14 "considerations for treatment." DOCS Practice Guideline at 2. Johnson thus urges that denying him Rebetron Therapy solely based on this factor and without any individualized examination of him demonstrates that the defendants acted with a sufficiently culpable state of mind. See Pl. Mem. at 20-22.

While the Guideline itself may have established only factors, defendants have presented evidence that DOCS's medical authorities required that they be followed. See Report from Dr. Wright to Regional Medical Directors and Facility Health Service Directors, dated December 3, 1998 ("Wright Report") (annexed as Ex. F to Schulze Decl.), at 1 ("I am aware that some specialists in the

community may be treating cases that do not meet our criteria, but we will be following recommendations that are based on federal guidelines and are consistent with guidelines being used by the Federal Bureau of Prisons and several other[*29] state DOCS systems."); id. at 2 ("There must be no evidence of active substance (alcohol or drug) use during the past two years (negative random test results are evidence of no use)."). This requirement was supported by some medical opinions available at the time. See Korsten Ltr. at 4; see also Albanis Dep. at 45-46, 70-71 (citing articles on both sides of the issue).

Of course, under the subjective prong of the deliberate indifference analysis, the issue is whether the defendant prison officials knew that their use of the factor as a complete bar to Rebetron Therapy presented an excessive risk to Johnson's health or safety. See *Farmer, 511 U.S. at 837*; see also *Hernandez, 341 F.3d at 144* (requiring a showing of criminal recklessness); *Hemmings, 134 F.3d at 108* (same). That all of Johnson's treating doctors may have disagreed with this policy is of no moment because, although they may have felt that substance abuse was not a contraindication for treatment, other medical personnel did maintain that opinion, as is reflected in the DOCS Practice Guideline and the medical references cited in it. As case law notes, [HN9] "not[*30] every physician will treat every ailment in exactly the same manner," *Douglas v. Stanwick, 93 F. Supp. 2d 320, 325 (W.D.N.Y. 2000)*, and "disagreements over medications, diagnostic techniques . . ., forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a *Section 1983* claim," *Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001)*; see *Pabon v. Goord, 2003 U.S. Dist. LEXIS 5359, 2003 WL 1787268, at *7 (S.D.N.Y. Mar. 28, 2003)* ("Determinations of medical providers concerning the care and safety of patients are given a 'presumption of correctness.'" (quoting *Perez v. County of Westchester, 83 F. Supp. 2d 435, 440 (S.D.N.Y.)*, aff'd mem., *242 F.3d 367 (2d Cir. 2000)*)); see also *Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989)* (plaintiff's showing of nothing more than a difference of medical opinion as to one course of treatment over another was insufficient to establish deliberate indifference); *Sires v. Berman, 834 F.2d 9, 13 (1st Cir. 1987)* ("Where the dispute concerns not the absence of help, but the[*31] choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, [a court] will not second guess the doctors." (citations omitted)).

Johnson makes much of the fact that no defendant ever examined him. Pl. Mem. at 18. He notes that the NIH Report states that "treatment for Hepatitis C 'should be made on an individual basis' except where 'treatment is clearly recommended.'" Id. at 21 (quoting NIH Report at

D0293). He thus argues that the defendants were deliberately indifferent by refusing to comply with the recommendations of his treating physicians, all of whom individually treated him and recommended that he be prescribed Rebetron. See id. at 18-22.

This circumstance is also insufficient to permit a reasonable jury to find deliberate indifference. Neither the DOCS Practice Guideline nor the medical evidence that supports it require that medical personnel physically examine an inmate in order to determine whether that particular inmate's drug use should act as a bar to Rebetron Therapy. While Johnson characterizes Dr. Wright's denial as being "blind[]," id. at 20, in fact he based his[*32] denial on the specific fact that Johnson had tested positive for marijuana within the past year. See Medical Records at MED 0099. The cases cited by Johnson for the proposition that an official must comply with a treating physician's recommendation, see Pl. Mem. at 19-20 (citing *Williams v. Fisher, 2003 U.S. Dist. LEXIS 16442, 2003 WL 22170610 (S.D.N.Y. Sept. 18, 2003)*; *Rhames v. Fed. Bureau of Prisons, 2002 U.S. Dist. LEXIS 10133, 2002 WL 1268005 (S.D.N.Y. June 6, 2002)*; *Woods v. Goord, 2002 U.S. Dist. LEXIS 7157, 2002 WL 731691 (S.D.N.Y. Apr. 23, 2002)*), are inapposite inasmuch as there was no valid medical justification in those cases for the defendant official's refusal to provide treatment. n1

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n1 In a similar vein, Johnson argues that risks inherent in prescribing Rebetron to an individual actively abusing drugs -- namely, issues of compliance with the Rebetron treatment program -- were not present in his case. See Pl. Mem. at 20. For the reasons already described, however, this argument is insufficient to show deliberate indifference. Moreover, it is noteworthy that the record contains evidence to the contrary. See Medical Records at MED 0034, MED 0132, MED 0166, MED 0204, MED 0226 (reflecting that Johnson at times either missed appointments or refused to take his Interferon prescription).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*33]

Johnson further argues that the defendants' justification for denying him Rebetron "are belied by the fact that they continued to treat him with interferon subsequent to the positive marijuana test." Pl. Mem. at 20; see also Albanis Report at 2 ("If [Johnson's] positive test for marijuana was a medically justified contra-indication for receiving rebetron therapy, his interferon treatment should have also been stopped."). Johnson points to the fact that the DOCS Practice Guideline, the NIH Report, and the BOP Report are not specific to Rebetron Therapy but apply generally to all hepatitis C drug therapies. See Pl. Mem. at 7-8.

Defendants concede that "similar patient compliance concerns exist with both interferon monotherapy and combination Rebetron therapy" and that the DOCS Practice Guideline, the NIH Report, and the BOP Report do not apply specifically to Rebetron Therapy. Def. Mem. at 21. However, as defendants correctly note, "deciding whether to commence a new and dangerous year-long course of drug therapy is a completely different matter than deciding whether to terminate ongoing drug therapy before it has run its course." Id. Indeed, Dr. Wright noted this fact[*34] in a 1998 report to DOCS's Facility Health Service Directors and Regional Medical Directors in which he described those situations where hepatitis C medications should be used: "In those cases in which treatment is already in progress, we will not discontinue based upon the above [guidelines], but we will follow these guidelines in the future." Wright Report at 2. In addition, none of the defendants made the decision to continue Johnson on Interferon after he tested positive for marijuana. Rather, it was Dr. Antonelle, one of Johnson's treating physicians, who made the decision. See Medical Records at MED 0105.

Moreover, far from showing deliberate indifference, the fact that Johnson continued to be treated with Interferon, which he had initially responded to positively but which later failed to be as effective, further lends support to the conclusion that the defendants' decisions were reasonable. See *Clark v. Doe, 2000 U.S. Dist. LEXIS 14999, 2000 WL 1522855, at *2 (E.D. Pa. Oct. 13, 2000)* [HN10] ("Courts have consistently rejected *Eighth Amendment* claims where an inmate has received some level of medical care." (citation omitted)); see also *Pabon, 2003 U.S. Dist. LEXIS 5359, 2003 WL 1787268, at *11* (granting[*35] defendant prison officials' motion for summary judgment after considering the fact that, during the alleged unconstitutional delay in treatment, the plaintiff prisoner was seen by numerous physicians and continued receiving medication).

In the end, Johnson offers no competent evidence of any non-medical motivation for denying him Rebetron Therapy, such as financial concerns, punishment, or retaliation. Nor is there any evidence that the 18-month delay or denial was the product of an intentional disregard for Johnson's health or safety. Indeed, Johnson was approved for Rebetron Therapy two years after his positive drug test for marijuana -- the same time period spelled out in the DOCS Practice Guideline.

Because the Court concludes that there is no genuine issue as to any material fact on the subjective prong of deliberate indifference analysis, the Court need not reach the defendants' alternative argument that Johnson's claim fails on the objective prong. Nor need the Court reach defendants' arguments on qualified immunity or lack of personal involvement.

Conclusion

Defendants' motion for summary judgment (Docket # 49) is granted. The Clerk of the Court is requested to[*36] enter judgment in favor of the defendants and to close this case.

Dated: May 3, 2004

New York, New York

GABRIEL W. GORENSTEIN

United States Magistrate Judge

HAROLD VERLEY, Plaintiff, -against- GLENN S. GOORD, et. al, Defendant.

02 Civ. 1182 (PKC) (DF)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2004 U.S. Dist. LEXIS 857

January 22, 2004, Decided

PRIOR HISTORY: *Verley v. Goord, 2003 U.S. Dist. LEXIS 15065 (S.D.N.Y., Aug. 29, 2003)*

DISPOSITION: [*1] Recommended that defendants' motions to dismiss be granted in part and denied in part and that plaintiff's motion to amend his complaint also be granted in part and denied in part.

CASE SUMMARY:

PROCEDURAL POSTURE: In a *42 U.S.C.S. § 1983* case, pro se plaintiff, a prisoner, maintained that defendants, a prison, and various prison officials and doctors, violated his constitutional rights under, inter alia, the Eighth and Fourteenth Amendments. Most defendants moved to dismiss the complaint. The prisoner also moved for leave to amend his complaint. The matter was referred to a magistrate.

OVERVIEW: The magistrate held that, to the extent that the prisoner was suing any of the defendants for monetary relief in their official capacities, his suit was barred by the Eleventh Amendment. While the Eleventh Amendment did not bar the prisoner's claim against the officials for prospective relief, his claims for such relief were, nonetheless, subject to dismissal as moot, as the prisoner was no longer incarcerated at the prison. The prisoner had also alleged that the prison's Hepatitis C treatment policies were discriminatory. Although the magistrate recommended that the prisoner's Section 504 of the Rehabilitation Act, *29 U.S.C.S. § 794*(a), claim be dismissed with prejudice because that statute simply could not afford the prisoner relief, the magistrate also recommended that the prisoner's equal protection and Title II of the Americans with Disabilities Act of 1990 claims be dismissed without prejudice to seek further leave to amend, should the prisoner be able to allege standing and plead the element of intentional discrimination that was lacking from those claims. Lastly, there was an issue as to whether the health service agencies were state agencies entitled to immunity.

OUTCOME: The magistrate recommended that the motions to dismiss be granted in part and denied in part and that the prisoner's motion to amend also be granted in part and denied in part. For example, she recommended that defendants' motion to dismiss any claim under Section 504 of the Rehabilitation Act should be granted, and the prisoner's motion to amend any such claim should be denied as futile.

CORE TERMS: deliberate indifference, inmate, recommend, motion to dismiss, prison, motion to amend, prisoner, amend, doctor, pro se, grievance, qualified immunity, involvement, pleaded, biopsy, moot, exhausted, plead, medical care, medical information, statute of limitations, discriminatory, exhaustion, incarcerated, transferred, equal protection claim, constitutional rights, injunctive relief, supervisory, injunctive

LexisNexis(R) Headnotes

Civil Procedure: Pleading & Practice: Filing of Complaint
Civil Procedure: Joinder of Claims & Parties: Self-Representing Parties
[HN1] Where a pro se plaintiff is incarcerated at the time a suit is commenced, the date on the pleading itself is generally considered the filing date.

Civil Procedure: Pleading & Practice: Defenses, Objections & Demurrers: Failure to State a Cause of Action
[HN2] In deciding a motion under *Fed. R. Civ. P. 12(b)(6)*, a court accepts all factual allegations in the complaint as true and draws inferences from those allegations in the light most favorable to the plaintiff.

Civil Procedure: Pleading & Practice: Defenses, Objections & Demurrers: Failure to State a Cause of Action
[HN3] The issue on a *Fed. R. Civ. P. 12(b)(6)* motion is not whether the plaintiff will ultimately prevail, but whether his claim, as pleaded, is sufficient to afford him the opportunity to proceed on the evidence.

Civil Procedure: Pleading & Practice: Defenses, Objections & Demurrers: Failure to State a Cause of Action

Civil Procedure: Joinder of Claims & Parties: Self-Representing Parties

[HN4] A claim may not be dismissed under *Fed. R. Civ. P. 12(b)(6)* unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Further, where a plaintiff is proceeding pro se, a court must construe the pleadings liberally and must interpret them to raise the strongest arguments that they suggest.

Civil Procedure: Pleading & Practice: Defenses, Objections & Demurrers: Failure to State a Cause of Action

Civil Procedure: Joinder of Claims & Parties: Self-Representing Parties

[HN5] In general, a court may not look outside the pleadings on a *Fed. R. Civ. P. 12(b)(6)* motion to dismiss. However, the mandate to read the papers of pro se litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum.

Civil Procedure: Pleading & Practice: Pleadings: Amended Pleadings

Civil Procedure: Pleading & Practice: Defenses, Objections & Demurrers: Failure to State a Cause of Action

Civil Procedure: Joinder of Claims & Parties: Self-Representing Parties

[HN6] A court should not dismiss a pro se complaint under *Fed. R. Civ. P. 12(b)(6)* without granting leave to amend at least once, where a liberal  reading of the complaint gives any indication that a valid claim might be stated.

Civil Procedure: Pleading & Practice: Pleadings: Amended Pleadings

[HN7] *Fed. R. Civ. P. 15(a)* governs the amendment of complaints and provides that leave to amend a pleading shall be freely given when justice so requires.

Civil Procedure: Pleading & Practice: Pleadings: Amended Pleadings

[HN8] A motion to amend should be denied if there is an apparent or declared reason - such as undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of an amendment, or futility of amendment.

Civil Procedure: Pleading & Practice: Pleadings: Amended Pleadings

Civil Procedure: Joinder of Claims & Parties: Misjoinder of Parties

[HN9] Although *Fed. R. Civ. P. 21* governs the addition of new defendants, in deciding whether to allow joinder under Rule 21, a court is guided by the same standard of liberality afforded to motions to amend pleadings under *Fed. R. Civ. P. 15*.

Civil Procedure: Pleading & Practice: Pleadings: Amended Pleadings

[HN10] An amendment is considered futile when the proposed new claim would not withstand a motion to dismiss, either for failure to state a cause of action, or on another ground. Thus, if a proposed amendment would be subject to "immediate dismissal" on some ground, a court will not permit the amendment. If, however, the party seeking to amend has at least colorable grounds for relief, justice requires that its motion be granted.

Governments: Legislation: Statutes of Limitations: Time Limitations

Constitutional Law: Civil Rights Enforcement: Prisoners: Medical Treatment

[HN11] New York's three-year statute of limitations period for personal injury actions applies to *42 U.S.C.S. § 1983* actions filed in New York state.

Governments: Legislation: Statutes of Limitations: Time Limitations

[HN12] An action accrues, for statute of limitation purposes, when a plaintiff knew, or had reason to know, of the injury forming the basis of the action. This inquiry focuses on the date of the complained-of act, not the point at which the consequences of the act become painful.

Constitutional Law: Civil Rights Enforcement: Civil Rights Act of 1871: Coverage

Governments: Legislation: Statutes of Limitations: Tolling

[HN13] In New York, the governing three-year statute of limitations for a *42 U.S.C.S. § 1983* case may be tolled where a party has alleged a "continuing violation" of constitutional rights, the last act of which occurred within the filing period.

Constitutional Law: Civil Rights Enforcement: Immunity: State Consent & Waiver of Immunity

[HN14] The Eleventh Amendment bars suit in federal court by a citizen of a state against a state or its agencies, unless the state has waived immunity to suit or Congress has abrogated the state's immunity.

Constitutional Law: Civil Rights Enforcement: Immunity: Public Officials

[HN15] Where a state official is sued for damages in his official capacity, such suit is deemed to be one against the state, and is barred by the Eleventh Amendment.

Constitutional Law: Civil Rights Enforcement: Civil Rights Act of 1871: Coverage
Constitutional Law: Civil Rights Enforcement: Immunity: State Consent & Waiver of Immunity
[HN16] *42 U.S.C.S. § 1983* is not intended to abrogate the states' immunity.

Constitutional Law: Civil Rights Enforcement: Immunity: Public Officials
Constitutional Law: Civil Rights Enforcement: Immunity: State Consent & Waiver of Immunity
[HN17] The Eleventh Amendment does not bar suits against state officials in their official capacities where those suits seek prospective injunctive or declaratory relief. Moreover, the Eleventh Amendment does not bar actions against state officials in their individual capacities, although such actions may, of course, still be subject to dismissal on some other basis.

Civil Procedure: Justiciability: Case or Controversy
Constitutional Law: The Judiciary: Case or Controversy: Mootness
[HN18] For a federal court to retain jurisdiction over a case, an actual controversy must exist at all stages of review, not merely at the time the complaint is filed.

Civil Procedure: Justiciability: Mootness
Constitutional Law: The Judiciary: Case or Controversy: Mootness
Constitutional Law: Civil Rights Enforcement: Prisoners
[HN19] A case is deemed moot where the problem sought to be remedied has ceased, or where there is no reasonable expectation that the wrong will be repeated. Under this reasoning, a transfer from a prison facility moots an action for injunctive and declaratory relief against the transferring facility because the inmate is no longer located there. A transfer, however, does not moot a prisoner's action for monetary damages for harm suffered during the prior incarceration.

Constitutional Law: Civil Rights Enforcement: Civil Rights Act of 1871: Coverage
[HN20] To succeed on a claim for violation of civil rights under *42 U.S.C.S. § 1983,* a plaintiff must show that state officials, acting under color of state law, deprived him of a right guaranteed to him by the Constitution.

Constitutional Law: Civil Rights Enforcement: Civil Rights Act of 1871: Coverage

Constitutional Law: Civil Rights Enforcement: Immunity: Public Officials
[HN21] To state a cognizable claim for monetary damages under *42 U.S.C.S. § 1983,* a plaintiff must allege the personal involvement of the defendants in the deprivation of constitutionally protected rights.

Constitutional Law: Cruel & Unusual Punishment
Constitutional Law: Civil Rights Enforcement: Prisoners: Medical Treatment
[HN22] The Eighth Amendment protects against cruel and unusual punishment of prison inmates, and has been construed to include protection against the denial of adequate medical care.

Constitutional Law: Cruel & Unusual Punishment
Constitutional Law: Civil Rights Enforcement: Civil Rights Act of 1871: Prison Officials
Constitutional Law: Civil Rights Enforcement: Prisoners: Medical Treatment
[HN23] Prison officials violate the Eighth Amendment right when they are deliberately indifferent to an inmate's medical needs. The standard for determining whether officials have been deliberately indifferent includes both objective and subjective components.

Constitutional Law: Cruel & Unusual Punishment
Constitutional Law: Substantive Due Process: Scope of Protection
[HN24] The Fourteenth Amendment makes the Eighth Amendment applicable to the states.

Constitutional Law: Cruel & Unusual Punishment
Constitutional Law: Civil Rights Enforcement: Prisoners: Medical Treatment
[HN25] In the context of an Eighth Amendment, a plaintiff's medical need, in objective terms, must be serious. This standard contemplates a condition of urgency that may produce death, degeneration or extreme pain. Such a serious medical need arises where the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.

Constitutional Law: Cruel & Unusual Punishment
Constitutional Law: Civil Rights Enforcement: Prisoners: Medical Treatment
[HN26] There is no dispute that Hepatitis C qualifies as a sufficiently serious medical condition for the purposes of an Eighth Amendment analysis.

Constitutional Law: Cruel & Unusual Punishment
Constitutional Law: Civil Rights Enforcement: Civil Rights Act of 1871: Prison Officials
Constitutional Law: Civil Rights Enforcement: Prisoners: Medical Treatment

[HN27] Under the second prong of the Eighth amendment analysis, the facts must give rise to an inference that the persons charged with providing medical care knew of that serious medical need and intentionally disregarded it. To satisfy this second prong of the standard, the defendant prison official must have acted with a sufficiently culpable state of mind - that is, the official must have known of and disregarded an excessive risk to inmate health or safety. Thus, the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harms exists, and he must also draw the inference.

Constitutional Law: Cruel & Unusual Punishment
Constitutional Law: Civil Rights Enforcement: Civil Rights Act of 1871: Prison Officials
Constitutional Law: Civil Rights Enforcement: Prisoners: Medical Treatment
[HN28] Allegations of differences of opinion between a prisoner and prison officials concerning the appropriate response and treatment of a medical complaint, or allegations of medical malpractice, generally do not satisfy the second prong of the standard for determining whether officials have been deliberately indifferent.

Constitutional Law: Cruel & Unusual Punishment
Constitutional Law: Civil Rights Enforcement: Prisoners: Medical Treatment
[HN29] Medical decisions may constitute indifference for purposes of the Eighth Amendment where they are contrary to accepted medical standards, in that the doctor based his decision on something other than sound medical judgment.

Constitutional Law: Cruel & Unusual Punishment
Constitutional Law: Civil Rights Enforcement: Civil Rights Act of 1871: Prison Officials
Constitutional Law: Civil Rights Enforcement: Prisoners: Medical Treatment
[HN30] An inmate's opinion that an X-ray or MRI should have been taken is a classic example of the type of medical judgment that is ordinarily given judicial deference, and does not form the basis of a deliberate indifference claim.

Constitutional Law: Cruel & Unusual Punishment
Constitutional Law: Civil Rights Enforcement: Civil Rights Act of 1871: Prison Officials
[HN31] The Eighth Amendment does not require empathy, as long as prison officials provide an adequate level of care.

Constitutional Law: Civil Rights Enforcement: Civil Rights Act of 1871: Coverage
[HN32] Verbal harassment, without any accompanying injury, does not constitute a violation of any federally protected right and is not actionable under *42 U.S.C.S. § 1983.*

Constitutional Law: Civil Rights Enforcement: Civil Rights Act of 1871: Coverage
Constitutional Law: Civil Rights Enforcement: Immunity: Public Officials
[HN33] It is well-settled that the personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under *42 U.S.C.S. § 1983.* In other words, a plaintiff must allege a tangible connection between the defendants' alleged unconstitutional acts and the injuries suffered.

Constitutional Law: Civil Rights Enforcement: Immunity: Public Officials
[HN34] While the mere fact that an official holds a supervisory position is, standing alone, insufficient to establish that official's liability for the acts of his subordinates, there are several ways in which a supervisory official may be found personally liable for violating a plaintiff's constitutionally protected rights. The supervisory official may be deemed to have personal involvement where he: (1) directly participated in the infraction; (2) failed to remedy the wrong even after learning of a violation through a report or appeal; (3) created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue; (4) acted in a grossly negligent manner in managing subordinates who caused the unlawful condition or event; or (5) demonstrated deliberate indifference to the constitutional rights of the plaintiff by failing to act on information demonstrating that unconstitutional practices were taking place.

Constitutional Law: Civil Rights Enforcement: Immunity: Public Officials
Constitutional Law: Civil Rights Enforcement: Civil Rights Act of 1871: Conspiracy
[HN35] For purposes of *42 U.S.C.S. § 1983* liability, it is not enough to allege that officials failed to carry out the duties of their office without defining these duties or how each defendant failed to meet them.

Constitutional Law: Civil Rights Enforcement: Civil Rights Act of 1871: Coverage
Constitutional Law: Civil Rights Enforcement: Immunity: Public Officials
[HN36] The doctrine of qualified immunity protects prison officials from personal liability for damages under *42 U.S.C.S. § 1983* when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

Constitutional Law: Civil Rights Enforcement: Immunity: Public Officials

Constitutional Law: Civil Rights Enforcement: Prisoners: Medical Treatment
[HN37] A prisoner's right to adequate medical treatment is a clearly established constitutional right. Where a right is clearly established, however, a state official is still entitled to qualified immunity if it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act. Objective reasonableness is established if the only conclusion a reasonable jury could reach is that reasonable officers would disagree on the constitutionality of the official's actions.

Civil Procedure: Pleading & Practice: Defenses, Objections & Demurrers: Failure to State a Cause of Action
Civil Procedure: Summary Judgment: Summary Judgment Standard
Constitutional Law: Civil Rights Enforcement: Immunity: Public Officials
[HN38] A qualified immunity defense is typically addressed at the summary judgment stage because it usually depends on the facts of the case, making dismissal at the pleading stage generally inappropriate. A motion to dismiss will only be granted if the complaint fails to allege the violation of a clearly established right.

Civil Procedure: Pleading & Practice: Defenses, Objections & Demurrers: Failure to State a Cause of Action
Constitutional Law: Civil Rights Enforcement: Immunity: Public Officials
[HN39] Where a motion to dismiss is granted based on a failure to state a claim, the qualified immunity argument need not be reached.

Constitutional Law: Substantive Due Process: Scope of Protection
Constitutional Law: Civil Rights Enforcement: Prisoners
[HN40] Prison inmates retain a constitutional right to privacy concerning medical information about them.

Constitutional Law: Substantive Due Process: Scope of Protection
Constitutional Law: Civil Rights Enforcement: Civil Rights Act of 1871: Prison Officials
[HN41] Prison officials may impinge on a prisoner's right to privacy only to the extent that their actions are reasonably related to legitimate penological interests.

Civil Procedure: Justiciability: Standing
Constitutional Law: The Judiciary: Case or Controversy: Standing
[HN42] To invoke a court's authority, a party must demonstrate standing by showing that he personally has suffered some actual or threatened injury as a result of

the putatively illegal conduct of the defendant. A plaintiff must have standing at the time the lawsuit was filed.

Constitutional Law: Equal Protection: Scope of Protection
[HN43] The Equal Protection Clause directs that all persons similarly circumstanced shall be treated alike.

Constitutional Law: Equal Protection: Scope of Protection
[HN44] To state a claim for an equal protection violation, a party must allege that a government actor purposely discriminated against him because of membership in a specific class. A facially neutral policy violates equal protection if it is motivated by discriminatory animus and its application results in a discriminatory effect.

Constitutional Law: Equal Protection: Scope of Protection
[HN45] Equal protection is not violated unless a policy was enacted not "in spite" of its adverse effect on a certain protected group but rather because it would have that effect.

Constitutional Law: Civil Rights Enforcement: Rehabilitation Act: Coverage
[HN46] See 29 U.S.C.S. § 794(a).

Constitutional Law: Civil Rights Enforcement: Rehabilitation Act: Coverage
Constitutional Law: Civil Rights Enforcement: Immunity: State Consent & Waiver of Immunity
[HN47] In the context of a suit against a state official in their official capacities, there has been no waiver of immunity from suit under Section 504 of the Rehabilitation Act, 29 U.S.C.S. § 794(a).

Constitutional Law: Civil Rights Enforcement: Rehabilitation Act: Coverage
[HN48] Section 504 of the Rehabilitation Act, 29 U.S.C.S. § 794(a), does not provide for damages suits against state officials in their individual capacities.

Civil Procedure: Dismissal of Actions: Involuntary Dismissal
[HN49] 28 U.S.C.S. § 1915A allows for a court to review a prisoner's complaint and dismiss it where, inter alia, it fails to state a claim upon which relief may be granted.

Civil Procedure: Dismissal of Actions: Involuntary Dismissal
Civil Procedure: Joinder of Claims & Parties: Self-Representing Parties

[HN50] *28 U.S.C.S. § 1915*(e)(2) allows a district court to dismiss a complaint filed in forma pauperis at any time if the court determines that the action fails to state a claim upon which relief can be granted or seeks monetary relief against a defendant that is immune from suit.

Constitutional Law: Civil Rights Enforcement: Americans With Disabilities Act: Coverage
Constitutional Law: Civil Rights Enforcement: Prisoners: Medical Treatment
[HN51] To state a claim under Title II of the Americans with Disabilities Act of 1990, a prisoner must show: (1) he is a qualified individual with a disability; (2) he is being excluded from participation in, or being denied the benefits of some service, program or activity by reason of his disability; and (3) the entity that provides the service, program or activity if a public entity.

Constitutional Law: Civil Rights Enforcement: Americans With Disabilities Act: Coverage
Constitutional Law: Civil Rights Enforcement: Immunity: State Consent & Waiver of Immunity
[HN52] The Eleventh Amendment does not serve as a bar to damages claims  brought under Title II of the Americans with Disabilities Act of 1990 (ADA) against state officials acting in their official capacities because, in enacting the ADA, Congress abrogated the states' sovereign immunity from claims under that statute. Nonetheless, the United States Court of Appeals for the Second Circuit has held that a private suit for money damages under Title II of the ADA may only be maintained where the plaintiff establishes that the violation was motivated by either discriminatory animus or ill will due to the disability.

Constitutional Law: Civil Rights Enforcement: Americans With Disabilities Act: Coverage
Constitutional Law: Civil Rights Enforcement: Immunity: Public Officials
[HN53] Title II of the Americans with Disabilities Act of 1990 does not provide for damages suits against state officials in their individual capacities.

Civil Procedure: Pleading & Practice: Service of Process: Time Limitations
[HN54] *Fed. R. Civ. P. 4(m)* provides that service must be made upon defendants within 120 days of filing a complaint.

Civil Procedure: Pleading & Practice: Defenses, Objections & Demurrers: Motions to Dismiss
Civil Procedure: Joinder of Claims & Parties: Self-Representing Parties
Civil Procedure: Pleading & Practice: Service of Process: Time Limitations

[HN55] The United States Court of Appeals for the Second Circuit has noted that *Fed. R. Civ. P. 4* is to be liberally construed to further the purpose of finding personal jurisdiction in cases in which the party has received actual notice. By the explicit terms of Rule 4(m), a court may disregard a failure to meet the 120-day limit if a plaintiff can show good cause why such service was not made. The Marshal's failure to effectuate service has been held to be good cause, where a pro se inmate, proceeding in forma pauperis, has provided all the relevant information for service. Indeed, where an incarcerated pro se plaintiff depends solely on the Marshals to effectuate service and has provided the Marshal's Service with appropriate papers, dismissal under Rule 4 is inappropriate.

Civil Procedure: Pleading & Practice: Defenses, Objections & Demurrers: Motions to Dismiss
Constitutional Law: Civil Rights Enforcement: Prisoners
Civil Procedure: Pleading & Practice: Service of Process: Time Limitations
[HN56] Before dismissing a civil rights complaint of an incarcerated plaintiff, a district court may pursue any course that it deems appropriate to effectuate service on defendants.

Constitutional Law: Civil Rights Enforcement: Immunity: State Consent & Waiver of Immunity
[HN57] The Eleventh Amendment precludes federal suit against a state agency which is merely an arm of the state, as opposed to a separate entity.

Constitutional Law: Civil Rights Enforcement: Immunity: State Consent & Waiver of Immunity
[HN58] For purposes of the Eleventh Amendment, the question of whether an entity acts as an "arm of the state" turns on the nature of the relationship between the state and the agency and such factors as the agency's corporate status, its financial independence, its ability to sue and be sued in its own name, from where the funds to pay damages will come, and the local or statewide nature and impact of its functions.

Constitutional Law: Civil Rights Enforcement: Prisoners: Prison Litigation Reform Act
[HN59] Any allegations in a prisoner's complaint which are not mentioned in prior grievances are barred by *42 U.S.C.S. § 1997e*(a).

Constitutional Law: Civil Rights Enforcement: Prisoners: Prison Litigation Reform Act
[HN60] See *42 U.S.C.S. § 1997e*(a).

Constitutional Law: Civil Rights Enforcement: Prisoners: Prison Litigation Reform Act

[HN61] The exhaustion requirement of the Prison Litigation Reform Act (PLRA) applies to all inmate suits about prison life, whether they involve general or particular episodes, and whether they allege excessive force or some other wrong. Moreover, claims for deliberate indifference to medical needs are claims with respect to prison conditions under *42 U.S.C. § 1997e* and, as such, must be exhausted under the PLRA.

Constitutional Law: Civil Rights Enforcement: Prisoners: Prison Litigation Reform Act
[HN62] The New York State Department of Correctional Services has established an Inmate Grievance Procedure to provide prisoners with an administrative forum in which to bring their grievances. *N.Y. Correct. Law § 139*; N.Y. Comp. Codes R. & Regs. tit., 7 § 701. Generally, the regulations establish a three-step inmate grievance process. First, the inmate must file a complaint with the inmate grievance resolution committee (IGRC) within 14 days of the alleged events. The IGRC must then investigate and resolve the complaint informally or following a hearing to be held within seven days. Within four days of receiving the committee's decision, the inmate may then appeal to the Superintendent of the facility. Finally, within four days of receipt of the Superintendent's decision, the inmate may appeal to the Central Office Review Committee (CORC) The CORC, in turn, must render a decision within 20 days.

Constitutional Law: Civil Rights Enforcement: Prisoners: Prison Litigation Reform Act
[HN63] A prisoner must completely exhaust the administrative remedies to the highest level for each claim he seeks to present.

Constitutional Law: Civil Rights Enforcement: Prisoners: Prison Litigation Reform Act
[HN64] Under *42 U.S.C.S. § 1997e*, all institutional remedies must be pursued even if the prisoner is ultimately time-barred from pursuing the administrative process or he is seeking a remedy that cannot be awarded in the administrative proceeding.

Civil Procedure: Pleading & Practice: Defenses, Objections & Demurrers: Failure to State a Cause of Action
Constitutional Law: Civil Rights Enforcement: Prisoners: Prison Litigation Reform Act
[HN65] Where it appears from the face of the complaint that a plaintiff prisoner concedes lack of exhaustion, or non-exhaustion of administrative remedies is otherwise apparent, a court may decide the exhaustion issue on a *Fed. R. Civ. P. 12(b)(6)* motion.

COUNSEL: For Harold Verley, PLAINTIFF: Harold Verley, Auburn Correctional Facility, Auburn, NY USA.

For Lester Wright, Carl J Koenigsmann, DEFENDANTS: Melinda Chester-Spitzer, Attorney General of the State of New York, New York, NY USA.

For Vincent Marrone, DEFENDANT: Ralph Schoene, Voute, Lohrfink, Magro & Collins, LLP, Elliot A Cristantello, Voute', Lohrfink, Magro & Collins, LLP, White Plains, NY USA.

JUDGES: DEBRA FREEMAN, United States Magistrate Judge. HONORABLE P. KEVIN CASTEL, U.S.D.J.

OPINIONBY: Debra Freeman

OPINION: REPORT AND RECOMMENDATION

TO THE HONORABLE P. KEVIN CASTEL, U.S.D.J.:

  INTRODUCTION

  In this *42 U.S.C. § 1983* case, pro se plaintiff Harold Verley ("Verley") maintains that defendants violated his constitutional rights under, inter alia, the *Eighth* and *Fourteenth Amendments*. Verley, who suffers from Hepatitis C infection, primarily claims that defendants showed deliberate indifference to his serious medical needs during his incarceration by the New York State Department[*2] of Correctional Services ("DOCS") at the Green Haven Correctional Facility ("Green Haven"). n1 He also maintains that certain of Green Haven's Hepatitis C treatment policies are discriminatory. Verley seeks injunctive, declaratory, and monetary relief.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 At times relevant to the activity described in the Complaint, Verley was incarcerated at Green Haven. On February 18, 2003, Verley was transferred to the Fishkill Correctional Facility ("Fishkill"). On April 30, 2003, Verley was transferred once against to the Auburn Correctional Facility ("Auburn"). (Defendants Memorandum of Law in Opposition to Plaintiff's Motion for Leave to Amend the Complaint filed May 30, 2003 ("DOCS Opp. to Mot. to Amend") (Dkt. 78) at 2 n.2.)

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

All of the defendants except for two -- Drs. Lester Wright ("Wright") and Carl Koenigsmann ("Koenigsmann") - have moved to dismiss the Complaint on various grounds. In addition to opposing (in most instances) the arguments raised on the motions to dismiss, Verley has also moved, pursuant to *Rule 15(a) of the Federal Rules of Civil Procedure*[*3] , for leave to amend his Complaint. Defendants have opposed the motion for leave to amend, on the ground that the proposed amendments would be futile.

For the reasons stated below, I respectfully recommend that defendants' motions to dismiss be granted in part and denied in part and that Verley's motion to amend also be granted in part and denied in part.

BACKGROUND

A. Factual Background

In February 1997, while incarcerated at Green Haven, Verley was diagnosed with Hepatitis C. (See Complaint dated Dec. 26, 2001 ("Compl.") (Dkt.3) PP 7, 22.) Following this diagnosis, Verley's medical provider recommended that Verley undergo a liver biopsy to ascertain the level of liver scarring and fibrosis, if any (id. P 22), and further recommended that, once the biopsy was performed as a prerequisite to treatment, Verley be treated with a combination Interferon/Ribavirin drug therapy (id. P 23).

Verley alleges that despite these recommendations, for nearly two years, he was repeatedly and unjustly denied the liver biopsy, which prevented him from receiving treatment and caused severe damage to his health. (Compl. PP 23-27.) Verley claims that the failure to perform[*4] the biopsy was due to unnecessary and bureaucratic delays attributable, for the most part, to Koenigsmann, the Facility Medical Director at Green Haven, and Wright, the Associate Commissioner and Chief Medical Officer of DOCS, both of whom ignored the recommendations of Verley's medical provider. (Id. P 24.) Verley maintains that the real reasons for the delays were non-medical and included fiscal and political concerns, a reluctance to set a precedent that Hepatitis C-positive inmates would receive this sort of treatment, "administrative agendas," and a deliberate indifference to his medical condition. (Id. P 26.)

On October 6, 1998, Verley finally underwent the liver biopsy. (Compl. P 28.) Verley alleges, however, that the biopsy was not without complications. Dr. Michael Antonelle ("Antonelle"), the doctor designated to perform the surgical biopsy, was unable to obtain a proper specimen and had to transfer Verley to another area of the hospital, so that an ultrasound-guided biopsy could be performed. (Id. P 29.) According to Verley, none of the medical personnel informed him that this was going to happen or informed him of the risks involved. (Compl. P 29; Verley Affirmation[*5] in Opposition to the Defendants Partial Motion to Dismiss dated Apr. 4, 2003 ("Verley. Aff. in Opp. to Mot. to Dismiss") (Dkt. 59) P 34.)

The results of the ultrasound-guided biopsy revealed that Verley suffered from "chronic Hepatitis, consistent with Hepatitis C, grade 2, stage 2." (Compl. P 28.) On December 26, 1998, Verley's medical provider recommended that Verley begin the Interferon/Ribavirin treatment immediately. (Id. P 30.) Verley, however, was denied this treatment (id. P 31), allegedly because Wright determined that Verley did not meet the "protocol" for such treatment, despite the fact that, at that time, there was no protocol in effect governing the treatment of inmates infected with Hepatitis C (id.).

Verley subsequently commenced an Article 78 proceeding in the New York Supreme Court, County of Dutchess, challenging Wright's decision to deny him treatment. (Compl. P 32.) By Decision and Order dated May 1, 2000, Judge Judith A. Hillery found that "Dr. Wright [had] demonstrated a deliberate indifference to [Verley's] serious medical needs related to his Hepatitis C condition when he denied him access to the Interferon and/or Ribavirin therapy program. [*6] " (Id. P 34; Verley. Aff in Opp. to Mot. to Dismiss, Ex. M.) The Judge ordered that Verley be enrolled in "the Interferon/Ribavirin therapy program ... immediately." Pursuant to this Order, Verley began the Interferon/Ribavirin treatment on May 25, 2000. (Compl. P 37.)

Verley alleges, however, that the delay of more than three years in receiving this treatment resulted in numerous severe and painful complications, both physical and mental, which would not have otherwise occurred. (Compl. PP 27, 35-36, 41.) In addition, Verley claims that both during and following the course of the 48-week treatment cycle, he experienced numerous side effects, about which he was never warned, and from which he has not fully recovered. (Id. PP 38, 48.) Verley alleges that he has been denied medical care for these complications and side effects. (Id. PP 38, 42.)

In August 2001, after Verley failed to respond adequately to the Interferon/Ribavirin treatment, his medical provider recommended that he be given a new drug therapy treatment of PegInterferon/Ribavirin ("PegIntron"), as soon as the Food and Drug Administration approved it. (Compl. PP 43-44.) Verley

maintains that, although PegIntron[*7] was approved for use in mid-August, 2001, Wright and Koenigsmann denied his treatment even in October 2001, claiming that the drug therapy was not yet available. (Id. P 45.) Verley alleges that this denial of treatment was based on fiscal concerns associated with treating the high population of Hepatitis C-infected inmates with this new and expensive therapy, rather than on sound medical reasoning. (Id. PP 45, 51.) As of the filing of his Complaint, Verley had still not received this treatment. (Id. P 49.)

Verley additionally alleges that, in order to receive Hepatitis C treatment, inmates must participate in an Alcohol and Substance Abuse Treatment ("ASAT") program. (Compl. P 50.) Verley maintains, however, that this program is only available to those housed in the Unit for the Physically Disabled ("UPD"), not to those housed in the general population. (Id. P 50.) Verley claims that this practice is discriminatory. (Id.)

Finally Verley alleges that, in October or November, 2001, he complained to Dr. Steven Weinstein ("Weinstein"), an outside medical consultant at Green Haven, about back pain resulting from an old gunshot wound. (Comp. P 46.) Weinstein's determination[*8] that Verley had little or no nerve damage was allegedly based on an incomplete reading of Verley's medical chart, inadequate information about the injury, and personal animosity towards Verley. (Id. PP 46-47.) Weinstein's inaccurate diagnosis and failure to treat Verley has allegedly caused Verley additional pain and suffering. (Id. P 47.)

B. Procedural Background

Verley filed his Complaint n2 on December 26, 2001, alleging that, as a result of defendants' deliberate indifference towards his medical needs and defendants' discriminatory conduct, he has suffered serious medical and psychological problems, which defendants have continued to overlook. (Compl. P 39.) His medical problems include, inter alia, a severe progression of his Hepatitis C, neuropathy, continuous and severe back pain, kidney and bladder problems, an inability to maintain weight and nutritional balance, hearing loss, vision complications, aplastic anemia, and continuous muscle and joint pain. (Id. PP 27, 35.) Verley further maintains that he has sought spiritual counseling and that he and his family suffer from mental anguish over his condition and his inability to secure medical treatment[*9] from DOCS. (Id. P 36.) He seeks injunctive and declaratory relief, as well as compensatory and punitive damages. (Id. at 2.)

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n2 Although the Complaint was not docketed until February 14, 2002, Verley signed it on December 26, 2001, and, [HN1] where a pro se plaintiff is incarcerated at the time a suit is commenced, the date on the pleading itself is generally considered the filing date. See *Dory v. Ryan, 999 F.2d 679, 682 (2d Cir. 1993)* (pro se prisoner litigant's *§ 1983* complaint considered "filed" as of date of delivery to prison officials for transmittal to court), modified on other grounds, *25 F.3d 81 (2d Cir. 1994).*

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

Wright and Koenigsmann answered the Complaint (Dkt. 22), but the other named defendants moved to dismiss the claims against them. Defendants Glenn S. Goord ("Goord"), Charles E. Greiner ("Greiner"), Donald Stevens ("Stevens"), Dr. Thomas Rush ("Rush"), Weinstein, and Dr. Vincent Marrone ("Vincent Marrone"), represented by the New York State Attorney[*10] General's office, n3 moved to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)* on the grounds that: (1) Verley failed to state a claim against them on which relief could be granted; (2) Verley failed to allege the personal involvement of certain of these defendants in the alleged constitutional violations; (3) this Court lacks of jurisdiction over the subject matter of this action under the *Eleventh Amendment*; and (4) defendants are entitled to qualified immunity. n4 (See DOCS Mem. in Support of Mot. to Dismiss at 3.)

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n3 Dr. Phillip Marrone ("Phillip Marrone"), a named defendant, did not independently move to dismiss, although the State included a footnote in its brief stating that "upon information and belief no such individual exists." (See Memorandum in Support of Defendants' Partial Motion to Dismiss filed July 23, 2002 ("DOCS Mem. in Support of Mot. to Dismiss") (Dkt. 20) at 2 n.3.)

n4 Vincent Marrone apparently also retained separate counsel, who filed an Answer (Dkt. 19), and then, in a separate reply to Verley's opposition papers, raised a statute of limitations argument. (See Reply Affirmation of Ralph F. Schoene in Support of Motion to Dismiss on behalf of Dr. Vincent Marrone filed Apr. 22, 2003 ("Schoene Reply Aff. in Support of Mot. to Dismiss") (Dkt. 64), PP 3-4.)

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*11]

Antonelle moved to dismiss the claims against him, pursuant to *Federal Rules of Civil Procedure 12(b)(1), (2), and (6)*, arguing lack of jurisdiction, failure to state a claim, and that the claims against him are barred by the applicable statute of limitations. (See Affidavit of Laura B. Jordan in Support of an Order Dismissing Plaintiff's Claim sworn to May 17, 2002 ("Jordan Aff. in Support of Mot. to Dismiss") (Dkt. 13) P 2.)

Defendants Corrections Physicians Health Services, Inc. ("CPS"), and Prison Health Services, Inc. ("PHS") moved to dismiss the claims against them, pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, on the grounds that: (1) Verley failed to state a claim against them on which relief could be granted; (2) Verley failed to allege their personal involvement in any constitutional violations; (3) this Court lacks jurisdiction over the subject matter of this action under the *Eleventh Amendment*; and (4) Verley failed to serve CPS and PHS, so that the Court lacks personal jurisdiction. (See Defendants Correctional Physician Services, Inc. and Prison Health Services, Inc. Memorandum[*12] of Law in Support of Motion to Dismiss Pursuant to *F.R.C.P. 12(b)(6)* filed Sept. 3, 2002 ("CPS/PHS Mem. in Support of Mot. to Dismiss") (Dkt. 29) at 1.)

Verley opposed all of the motions to dismiss. (See Verley Affirmation in Opposition to the Defendants Partial Motion to Dismiss dated Apr. 4, 2003 ("Verley Aff in Opp. to Mot. to Dismiss"); Plaintiff's Memorandum of Law in Opposition to Defendant's Motion and Partial Motion to Dismiss Pursuant to *F.R.C.P. 12(b)(6)* dated Mar. 26, 2003 ("Verley Mem. in Opp. to Mot. to Dismiss") (Dkt. 59).)

In addition, on April 17, 2003, Verley submitted a motion under *Federal Rule of Civil Procedure 15(a)* for leave to amend his Complaint. (See Verley Declaration in Support of Motion to File an Amended Complaint dated Apr. 17, 2003 ("Verley Decl. in Support of Mot. to

Amend"), Proposed Amended Complaint ("Prop. Am. Compl.") dated Apr. 17, 2003 (Dkt. 69); Plaintiff's Memorandum of Law in Support of Motion to Amend dated Apr. 9, 2003 ("Verley Mem. in Support of Mot. to Amend") (Dkt. 76).) The motion to amend apparently seeks[*13] to add certain factual allegations; to remove as defendants Phillip Marrone, Goord and Rush; and to add as new defendants five additional doctors - Dr. Rosensweig (as a replacement for Phillip Marrone, who Verley seems to have initially named in error), and Drs. Richard Klyszejko ("Klyszejko"), Obinna Isudenzo ("Isudenzo"), Bharat Parikh ("Parikh") and William Sohng ("Sohng") (all of whom allegedly treated Verley at Fishkill, after his transfer from Green Haven). Defendants have opposed the motion to amend, primarily on the ground that the amendments would be futile. (See DOCS Opp. to Mot. to Amend at 6; Affirmation of Ralph F. Schoene in Opposition to Motion for Leave to Amend, filed on behalf of Vincent Marrone, sworn to May 28, 2003 ("Schoene Aff. in Opp. to Mot. to Amend") (Dkt. 77) P 6.); Affidavit of Laura B. Jordan in Opposition to Motion for Leave to Amend, filed on behalf of Antonelle, sworn to May 16, 2003 ("Jordan Aff. in Opp. to Mot. to Amend") (Dkt. 71) P 7; Affirmation of Stephen Trzcinski in Opposition to Plaintiff's Motion for Leave to File an Amended Complaint, filed on behalf of CPS and PHS, sworn to May 29, 2003 ("Trzcinski Aff. in Opp. to Mot. to Amend.") (Dkt. [*14] 79) P 11.)

## DISCUSSION

## I. LEGAL STANDARDS

### A. Motion to Dismiss

Defendants have principally moved to dismiss the Complaint against them pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. [HN2] In deciding a motion under *Rule 12(b)(6)*, the Court accepts all factual allegations in the complaint as true and "draw inferences from those allegations in the light most favorable to the plaintiff." *Jaghory v. New York State Dep't of Ed., 131 F.3d 326, 329 (2d Cir. 1997)* (citing *Albright v. Oliver, 510 U.S. 266, 268, 127 L. Ed. 2d 114, 114 S. Ct. 807 (1994))*; see *Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991)*; *Johnson v. Wright, 234 F. Supp. 2d 352, 356 (S.D.N.Y. 2002)*. [HN3] The issue is not whether the plaintiff will ultimately prevail, but whether his claim, as pleaded, is sufficient to afford him the opportunity to proceed on the evidence. See *Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir. 1998)*. [HN4] A claim may not be dismissed under *Rule 12(b)(6)* unless "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which[*15] would entitle him to relief." *Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir.*

1994) (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)).* Further, where, as here, a plaintiff is proceeding pro se, the Court must construe the pleadings liberally, *Branham v. Meachum, 77 F.3d 626, 628-29 (2d Cir. 1996),* and must "interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994);* see *Hughes v. Rowe, 449 U.S. 5, 10, 66 L. Ed. 2d 163, 101 S. Ct. 173 (1980)* (a pro se party's pleadings must be liberally construed in his favor and are held to a less stringent standard than the pleadings drafted by lawyers); *Simmons v. Abruzzo, 49 F.3d 83, 87 (2d Cir. 1995)* ("the complaint of a pro se litigant is to be liberally construed in his favor") (citing *Haines v. Kerner, 404 U.S. 519, 520, 30 L. Ed. 2d 652, 92 S. Ct. 594 (1972)).*

The mandate that a pro se plaintiff's complaint be construed liberally makes it appropriate for the Court to consider the factual allegations in the plaintiff's opposition materials to supplement the allegations[*16] in the complaint. See *Johnson v. Wright, 234 F. Supp. 2d at 356* (considering a pro se prisoner's factual allegations in briefs as supplementing his complaint); *Woods v. Goord, 2002 U.S. Dist. LEXIS 7157, No. 01 Civ. 3255 (SAS), 2002 WL 731691, at *1 n.2 (S.D.N.Y. Apr. 23, 2002)* (same); *Burgess v. Goord, 1999 U.S. Dist. LEXIS 611, No. 98 Civ. 2077 (SAS), 1999 WL 33458, at *1 n.1 (S.D.N.Y. Jan 26, 1999)* [HN5] ("In general, a court may not look outside the pleadings on a *Rule 12(b)(6)* motion to dismiss. However, the mandate to read the papers of pro se litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum.") (internal quotation marks and citations omitted); see also *Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001).* Moreover, [HN6] the Court should not dismiss a pro se complaint "without granting leave to amend at least once, where a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 795 (2d Cir. 1999)* (district court must afford a pro se plaintiff the opportunity to amend the complaint before dismissal[*17] where that amendment could result in successful pleading of claim) (quoting *Branum v. Clark, 927 F.2d 698, 705 (2d Cir. 1991)); Hemmings v. Gorczyk, 134 F.3d 104, 109 n.4 (2d Cir. 1998); Satchell v. Dilworth, 745 F.2d 781, 785 (2d Cir. 1984); Stevens v. Goord, 2002 U.S. Dist. LEXIS 8546, 99 Civ. 11669 (LMM), 2002 WL 987293, at *1 (S.D.N.Y. May 10, 2002).*

B. Motion To Amend

*Rule 15(a)* of the Federal Rules of Civil Procedure [HN7] governs the amendment of complaints, and provides that leave to amend a pleading "shall be freely given when justice so requires." n5 *Fed. R. Civ. P. 15(a).*

[HN8] A "motion to amend should be denied if there is an 'apparent or declared reason - such as undue delay, bad faith or dilatory motive ... repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of an amendment, [or] futility of amendment.'" *Dluhos v. Floating and Abandoned Vessel, 162 F.3d 63, 69 (2d Cir. 1998)* (quoting *Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962)).*

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n5 [HN9] Although *Rule 21* governs the addition of new defendants, in deciding whether to allow joinder under that Rule, the Court is guided by "the same standard of liberality afforded to motions to amend pleadings under *Rule 15* ." *Soler v. G & U, Inc., 86 F.R.D. 524, 527-28 (S.D.N.Y. 1980)* (internal quotation and citation omitted); see *Clarke v. Fonix Corp., 1999 U.S. Dist. LEXIS 2143, 98 Civ. 6116 (RPP), 1999 WL 105031, at *6 (S.D.N.Y. Mar. 1, 1999)* ("Although *Rule 21,* and not *Rule 15(a)* normally governs the addition of new parties to an action, the same standard of liberality applies under either Rule.") (internal quotation and citation omitted), aff'd, *199 F.3d 1321 (2d Cir. 1999); Sheldon v. PHH Corp., 1997 U.S. Dist. LEXIS 2217, No. 96 Civ. 1666 (LAK), 1997 WL 91280, at *3 (S.D.N.Y. Mar. 4, 1997)* ("While plaintiffs' motion [to add a new defendant] properly is considered under *Rule 21* rather than *Rule 15,* nothing material turns on this distinction ... To the extent the limited case law under *Rule 21* permits a conclusion, the standard under that rule is the same as under *Rule 15.*"), aff'd, *135 F.3d 848 (2d Cir. 1998).*

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*18]

[HN10] An amendment is considered futile when the proposed new claim would not withstand a motion to dismiss, either for failure to state a cause of action, or on another ground. See *Milanese v. Rust-oleum Corp., 244 F.3d 104, 110 (2d Cir. 2001);* see also *Avent v. Solfaro, 2003 U.S. Dist. LEXIS 9896, No. 02 Civ. 0914 (RCC) (RLE), 2003 WL 21361730, at *3 (S.D.N.Y. June 12, 2003)* (denying prisoner leave to amend where claims would be subject to dismissal as not fully exhausted);

*Whimsicality, Inc. v. Battat, 27 F. Supp. 2d 456, 465 (S.D.N.Y. 1998)* (denying leave to amend where the claim to be added would fail to state a claim upon which relief may be granted); *Chan v. Reno, 916 F. Supp. 1289, 1302 (S.D.N.Y. 1996)* (denying leave to amend where Court lacked subject matter jurisdiction over the proposed amendment). Thus, if a proposed amendment would be subject to "immediate dismissal" on some ground, the Court will not permit the amendment. See *Jones v. N.Y. State Div. of Military & Naval Affairs, 166 F.3d 45, 55 (2d Cir. 1999)*. If, however, the party seeking to amend "has at least colorable grounds for relief, justice ... requires" that[*19] its motion to be granted. *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc., 748 F.2d 774, 783 (2d Cir. 1984)* (citation omitted). As noted above, a pro se litigant, in particular, should be afforded a reasonable opportunity to amend his complaint to demonstrate the existence of a valid claim. See, e.g., *Satchell, 745 F.2d at 785* ("A pro se plaintiff who brings a civil rights action should be 'fairly freely' afforded an opportunity to amend his complaint.") (quoting *Bradley v. Coughlin, 671 F.2d 686, 690 (2d Cir. 1982)).*

Verley filed his motion to amend prior to the Court's issuance of a decision on defendants' motions to dismiss. Accordingly, to the extent the Court finds any deficiencies in the original pleading, the Court will also consider whether the proposed amendment cures the defects, and whether the amendment should thus be permitted.

## II. VERLEY'S APPARENT REQUEST TO DROP CERTAIN DEFENDANTS FROM THIS CASE

From reviewing the parties' submissions on both the motions to dismiss and amend, and from the Court's prior conferences with the parties, it appears that all agree that three defendants originally[*20] named in the caption should be dropped from the case.

### A. Phillip Marrone

In conferences with the Court, it became apparent that Phillip Marrone was likely named as a defendant in error, and that, in fact, he may not even exist. (See Transcript of Sept. 5, 2002 conference at 4; Transcript of Oct. 18, 2002 conference at 9-15; Transcript of Feb 26, 2003 conference at 19-21; see also DOCS Mem. in Support of Mot. to Dismiss at 2 n.3.) In those conferences, and from documents produced in discovery, it also became apparent that the doctor Verley had in mind when he identified Phillip Marrone was actually named Rosensweig. (Transcript of Feb 26, 2003 conference at 19; Verley Decl. in Support of Mot. to Amend. P 10.) Accordingly, the Court orally granted

Verley leave to amend his Complaint to drop Phillip Marrone as a defendant and to replace him with Rosensweig. (See Transcript of Feb. 26, 2003 telephone conference at 19-21 (the Court gives permission for that amendment "since it's merely trying to fix the name of a defendant").)

Rosensweig, however, now opposes this amendment on the ground that any claim against him would be futile under the statute of limitations.[*21] Because the Court has already decided that this amendment should be permitted, Rosensweig's arguments may be more aptly considered a motion for reconsideration or a motion to dismiss the claims against him. For the reasons discussed below, I recommend that Rosensweig's application, regardless of how it is characterized, be granted, as the applicable statute of limitations bars the claims that Verley seeks to assert against him in the Proposed Amended Complaint. (See discussion infra at 16.)

### B. Goord and Rush

Verley's original Complaint included claims against defendants Goord and Rush. (See Compl. PP 8, 15.) These defendants moved to dismiss the allegations against them for failure to state a claim. (See DOCS Mem. in Support of Mot. to Dismiss at 8, 10, 15.) Verley does not oppose the motion to dismiss as to Rush. Although his opposition brief does mention Goord (see Verley Mem. in Opp. to Mot. to Dismiss at 14), Verley's Proposed Amended Complaint drops both Goord and Rush from the caption. Further, Verley neither identifies Goord or Rush in the "parties" section of his new proposed pleading, nor asserts any claims against them in the body of that pleading. [*22] n6 It thus appears that Verley voluntarily seeks to withdraw his claims against both of these defendants. I therefore recommend that the motions to dismiss the Complaint as against Goord and Rush be granted.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n6 Although Verley mentions Rush in the body of his Proposed Amended Complaint, it is only to note that Rush, the Infectious Disease Control Physician, insisted that Verley receive a liver biopsy and the various Hepatitis C treatments. (Prop. Am. Compl. PP 23, 47.) Verley makes no claim against Rush for a violation of Verley's constitutional rights.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

## III. MOTION TO DISMISS THE CLAIMS AGAINST ANTONELLE

Antonelle argues that the Complaint should be dismissed as against him for failure to state a claim or, alternatively, based on the statute of limitations or improper service of process. (Jordan Aff in Support of Mot. to Dismiss P 2.) I respectfully recommend that Antonelle's motion be granted based on the statute of limitations.

[HN11] New York's three-year statute of limitations period for personal [*23]injury actions applies to *section 1983* actions filed in New York state. *Owens v. Okure, 488 U.S. 235, 250-51, 102 L. Ed. 2d 594, 109 S. Ct. 573(1989)*; *Cole v. Miraflor, 2001 U.S. Dist. LEXIS 1681, No. 99 Civ. 0977 (RWS), 2001 WL 138765, at *3 (S.D.N.Y. Feb. 19, 2001)*; *Pauk v. Board of Trustees, 654 F.2d 856, 866 (2d Cir. 1981)*; *Hood v. City of New York, 739 F. Supp. 196, 198 (S.D.N.Y. 1990)*. [HN12] The action accrues, for statute of limitation purposes, when a plaintiff knew, or had reason to know, of the injury forming the basis of the action. *Harris v. City of New York, 186 F.3d 243, 247 (2d Cir. 1999)* (citing cases); *Singleton v. City of New York, 632 F.2d 185, 191 (2d Cir. 1980)* (citation omitted); *Cole, 2001 U.S. Dist. LEXIS 1681, 2001 WL 138765, at *3*. This inquiry focuses on the date of the complained-of act, not the point at which the consequences of the act become painful. *Eagleston v. Guido, 41 F.3d 865, 871 (2d Cir. 1994)* (quoting *Chardon v. Fernandez, 454 U.S. 6, 8, 70 L. Ed. 2d 6, 102 S. Ct. 28 (1981))*.

Verley's Complaint is dated December 26, 2001, and this is the date on which the Court will deem the action[*24] to have been commenced. (See n.2, supra. ) Antonelle, an outside physician under contract with Green Haven, performed Verley's liver biopsy on October 6, 1998, and this is the only alleged act in which he is implicated in Verley's original Complaint. (Compl. PP 16, 28-29.) In his Proposed Amended Complaint, Verley adds no facts indicating that Antonelle had involvement in any violations alleged to have occurred after October 6, 1998, nor does Verley allege that Antonelle's action was part of a continuous and ongoing policy of deliberate indifference towards his medical needs. See, e.g, *Pino v. Ryan, 49 F.3d 51, 54 (2d Cir. 1995)* (affirming sua sponte dismissal of prisoner's deliberate indifference claim based on the statute of limitations where there was no indication that the activity at issue was part of a continuous or ongoing violation of his constitutional rights); *Cole, 2001 U.S. Dist. LEXIS 1681, 2001 WL 138765, at *6*. Thus, under the three-year statute of limitations, Verley was required to file his claim against Antonelle no later than October 6, 2001. Having filed this action after that date, Verley's claims against Antonelle are time-barred and should therefore[*25] dismissed on that ground.

## IV. MOTION TO DISMISS THE CLAIMS AGAINST VINCENT MARRONE AND ROSENSWEIG

Vincent Marrone and the proposed new defendant Rosensweig (see supra at 13), also raise statute of limitations arguments. Verley alleges that these defendants participated in delaying the liver biopsy eventually performed by Antonelle in October 1998, by inappropriately cancelling prior appointments for the biopsy. (Prop. Am. Compl. PP 25-26, 30.)

[HN13] The governing three-year statute of limitations may be tolled where a party has alleged a "continuing violation" of constitutional rights, the last act of which occurred within the filing period. See, e.g., *Cornwell v. Robinson, 23 F.3d 694, 703 (2d Cir. 1994)*; *Cole, 2001 U.S. Dist. LEXIS 1681, 2001 WL 138765, at *6*. In this case, however, Verley has pleaded no facts, in either his original or proposed pleading, to suggest that either Vincent Marrone or Rosensweig continued to have any involvement with his treatment - or to cause any delay of his treatment - past the date of the biopsy. Indeed, their alleged involvement seems to have been strictly limited to a period of months in 1997, between February, when Verley[*26] was diagnosed with Hepatitis C (see Prop. Am. Compl. P 25), and June, when, according to Verley, the last of his appointments with either of these doctors was cancelled, (id. P 30). Because these doctors' involvement consisted of isolated acts, all occurring over three years before the Complaint was filed, the doctrine of a "continuing violation" cannot be applied to toll the statute of limitations as to Verley's claims against Vincent Marrone or Rosensweig See, e.g, *Pino, 49 F.3d at 54* (to constitute a continuous or ongoing violation, plaintiff must allege that defendants were part of a violation of constitutional rights that continued into the filing period); *Doe v. Blake, 809 F. Supp. 1020, 1025 (D. Conn. 1992)* (the continuous violation doctrine does not apply to a defendant who was only implicated in isolated acts spanning a few months and which occurred prior to the limitations period).

I therefore recommend that the claims against Vincent Marrone and Rosensweig be dismissed as barred by the statute of limitations.

V. MOTION TO DISMISS THE CLAIMS AGAINST THE REMAINING DOCS DEFENDANTS (WEINSTEIN, STEVENS, AND GREINER)[*27]

Weinstein (a Green Haven doctor), Stevens (a Green Haven nurse administrator), and Greiner (the Superintendent of Green Haven at times relevant to the Complaint), have all moved to dismiss the claims against them based on *Eleventh Amendment* and qualified immunity and for failure to state a claim against them. (DOCS Mem. in Support of Mot. to Dismiss at 1-3.) These defendants' arguments regarding the purported *Eleventh Amendment* immunity from suit may be addressed collectively, while their arguments regarding the adequacy of the pleaded claims against them, as well as their purported qualified immunity, must be considered on an individual basis.

A. *Eleventh Amendment*

Verley brings his claims against Weinstein, Stevens, and Greiner for injunctive, declaratory, and monetary relief, and he has named these defendants in both their official and individual capacities. (Compl. at 2, PP 8-19.) These defendants argue that the *Eleventh Amendment* bars Verley's suit against them to the extent that he is seeking monetary damages from them in their official capacities. (DOCS Mem. in Support of Mot. to Dismiss at 21).

[HN14] The *Eleventh Amendment* bars suit in federal court by a citizen of [*28]a state against a state or its agencies, unless the state has waived immunity to suit or Congress has abrogated the state's immunity. *Huang v. Johnson*, 251 F.3d 65, 69-70 (2d Cir. 2001); *Woods v. Goord*, 2002 U.S. Dist. LEXIS 7157, No. 01 Civ. 3255 (SAS), 2002 WL 731691, at *3 (S.D.N.Y. Apr. 23, 2002) (collecting cases); *Johnson v. Bendheim*, 2001 U.S. Dist. LEXIS 9679, No. 00 Civ. 720 (JSR)(KNF), 2001 WL 799569, at *9 (S.D.N.Y. July 13, 2001) (citing *Seminole Tribe v. Florida*, 517 U.S. 44, 134 L. Ed. 2d 252, 116 S. Ct. 1114 (1996)). [HN15] Where a state official is sued for damages in his official capacity, such suit is deemed to be one against the state, and is barred by the *Eleventh Amendment. Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993); *Farid v. Smith*, 850 F.2d 917 (2d Cir. 1988).

In this case, there has been no waiver of immunity by the state, and *42 U.S.C. § 1983* [HN16] was not intended to abrogate the states' immunity. See, e.g., *Woods, 2002 U.S. Dist. LEXIS 7157, 2002 WL 731691, at *3* (citing *Quern v. Jordan*, 440 U.S. 332, 343-44, 59 L. Ed. 2d 358, 99 S. Ct. 1139 (1979); *Oyague v. State, 2000 U.S. Dist. LEXIS 12426, No. 98 Civ. 6721 (TPG), 2000 WL 1231406, at *5 (S.D.N.Y. Aug. 31, 2000))*[*29] ; *Johnson v. Bendheim*, 2001 U.S. Dist. LEXIS 9679, 2001 WL 799569, at *9. Therefore, to the extent that Verley is suing any of the defendants for monetary relief in their official capacities, Verley's suit is barred by the *Eleventh Amendment*. See *Gowins v. Greiner*, 2002 U.S. Dist. LEXIS 14098, 01 CIV. 6933 (GEL), 2002 WL 1770772, at *3-4 (S.D.N.Y. July 31, 2002)*; *Woods, 2002 U.S. Dist. LEXIS 7157, 2002 WL 731691, at *3*; *Johnson v. Bendheim, 2001 U.S. Dist. LEXIS 9679, 2001 WL 799569, at *9*.

[HN17] The *Eleventh Amendment*, however, does not bar suits against state officials in their official capacities where those suits seek prospective injunctive or declaratory relief. *Gowins, 2002 U.S. Dist. LEXIS 14098, 2002 WL 1770772, at *3* (citing *Ex parte Young*, 209 U.S. 123, 159-60, 52 L. Ed. 714, 28 S. Ct. 441 (1908)). Moreover, the *Eleventh Amendment* does not bar actions against state officials in their individual capacities, although such actions may, of course, still be subject to dismissal on some other basis. *Jing Gan*, 996 F.2d at 529; *Gowins, 2002 U.S. Dist. LEXIS 14098, 2002 WL 1770772, at *3*; *Johnson v. Bendheim, 2001 U.S. Dist. LEXIS 9679, 2001 WL 799569, at *9*. Therefore, Verley is not barred by the *Eleventh Amendment*[*30] from proceeding on his *Section 1983* claims for prospective or injunctive relief, nor is he barred from pursuing his claims for damages against the Green Haven officials in their individual capacities. n7

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n7 Verley's Proposed Amended Complaint in fact names all parties in their individual capacities, and alleges claims against them in their official capacities only for injunctive and declaratory relief. (Prop. Am. Compl. PP 6-19.)

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

B. Mootness

While the *Eleventh Amendment* does not bar Verley's claim against these Green Haven Officials for prospective relief, his claims for such relief should nonetheless be dismissed as moot because Verley is no longer incarcerated at Green Haven. n8 In February, 2003, Verley was transferred to Fishkill. (See n.1, supra;

see also Prop. Am. Compl. P 58.) Then, on April 30, 2003, 13 days after he filed his motion to amend, Verley was transferred again to Auburn. (See n.1, supra; DOCS Opp. to Mot. to Amend. 2 n.2.)

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n8 Although the issue of mootness was not raised by any party, the Court may nonetheless consider it. See *Prins v. Coughlin, 76 F.3d 504, 506 (2d Cir. 1996).*

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*31]

[HN18] For a federal court to retain jurisdiction over a case, an actual controversy must exist "at all stages of review, not merely at the time the complaint is filed." *Prins v. Coughlin, 76 F.3d 504, 506 (2d Cir. 1996)* (citing *Preiser v. Newkirk, 422 U.S. 395, 402, 45 L. Ed. 2d 272, 95 S. Ct. 2330 (1975))*. [HN19] A case is deemed moot where the problem sought to be remedied has ceased, or where there "is no reasonable expectation that the wrong will be repeated." Id. Under this reasoning, a transfer from a prison facility moots an action for injunctive and declaratory relief against the transferring facility because the inmate is no longer located there. *Id.* (where inmate was transferred from Green Haven to Clinton to a facility in Florida, his request for injunctive relief against Green Haven and Clinton was moot); *Young v. Coughlin, 866 F.2d 567, 568 n.1 (2d Cir. 1989)* (plaintiff's transfer from the facility against which he sought declaratory and injunctive relief rendered those claims moot); *Williams v. Goord, 142 F. Supp. 2d 416, 420 n.3 (S.D.N.Y. 2001)* (where inmate was transferred from Sullivan to another facility, his request[*32] for declaratory relief regarding practices at Sullivan was moot); *Graham v. Perez, 121 F. Supp. 2d 317, 325 (S.D.N.Y. 2000)* (request for injunctive relief against Fishkill was moot where prisoner was no longer incarcerated there). A transfer, however, does not moot a prisoner's action for monetary damages for harm suffered during the prior incarceration. See *Prins, 76 F.3d at 506; Young, 866 F.2d at 568 n.1.*

Verley's Complaint seeks injunctive relief that would prohibit defendants from "imposing their discriminatory program for treatment of Hepatitis C positive prisoners," prohibit defendants from disseminating medical information without prior consent of the patient, order defendants to "promulgate policies for treatment of Hepatitis C prisoners" consistent with "prevailing norms within the medical community," require defendants to begin administering Pegintron therapy for treatment of Hepatitis C, and prohibit defendants from retaliating against him. (Compl., Relief Requested PP 2, 3, 4.) Verley also seeks a judgment declaring "defendant's policy for treatment of Hepatitis C positive prisoners [to be] unconstitutional." (Compl. [*33] , Relief Requested P 1.) These requests for injunctive and declaratory relief from officials at Green Haven are now moot. n9

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n9 Verley also argues that his claim for injunctive relief is governed by the "Milburn decree" (Compl. PP 21, 59), a consent decree originally entered by Judge Robert J. Ward in 1980, governing the provision of health care at Green Haven. This decree, obtained by a class Green Haven inmates who challenged the constitutionality of Green Haven's health care services, required Green Haven to establish certain guidelines for adequate medical care. See *Woods, 2002 U.S. Dist. LEXIS 7157, 2002 WL 731691, at *12; McKenna v. Wright, 2002 U.S. Dist. LEXIS 3489, No. 01 Civ. 6571 (WK), 2002 WL 338375, at *7 n.9 (S.D.N.Y. Mar. 4, 2002); Shariff v. Artuz, 2000 U.S. Dist. LEXIS 12248, No. 99 Civ. 321 (DC), 2000 WL 1219381, at *4 n.5 (S.D.N.Y. Aug. 28, 2000).* Verley, however, cannot maintain a claim based on the Milburn decree, as he is no longer an inmate at Green Haven and has failed to show how the decree applies to him at his current location. See *McKenna, 2002 U.S. Dist. LEXIS 3489, 2002 WL 338375, at 7 n.9* (the Milburn decree could not form the basis of the claim of an inmate who was no longer incarcerated Green Haven) (citing cases).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*34]

I therefore recommend that Verley's claims against Weinstein, Stevens, and Greiner only proceed to the extent Verley seeks monetary damages from them in their individual capacities, and then only to the extent that his pleading adequately states a claim as against each of them.

C. Deliberate Indifference Claim

Defendants Weinstein, Stevens, and Greiner argue that Verley fails to state a claim under *Section 1983* for their deliberate indifference to his medical needs, and that this claim should therefore be dismissed as against each of them.

1. Legal Standards

[HN20] To succeed on a claim for violation of civil rights under *42 U.S.C. § 1983*, a plaintiff must show that "state officials, acting under color of state law, deprived [him] of a right guaranteed [to him] by the Constitution." *Rodriguez v. Phillips, 66 F.3d 470, 473 (2d Cir. 1995)*. [HN21] To state a cognizable claim for monetary damages under *42 U.S.C. § 1983*, a plaintiff must allege the personal involvement of the defendants in the deprivation of constitutionally protected rights. *Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)*[*35] (citing *Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)*); *Alfaro Motors, Inc. v. Ward, 814 F.2d 883, 886 (2d Cir. 1987)*.

[HN22] The *Eighth Amendment* protects against cruel and unusual punishment of prison inmates, and has been construed to include protection against the denial of adequate medical care. n10 *Estelle v. Gamble, 429 U.S. 97, 104, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976)*; *Woods, 2002 U.S. Dist. LEXIS 7157, 2002 WL 731691, at *3-4*. [HN23] Prison officials violate this right when they are deliberately indifferent to an inmate's medical needs. Id. The standard for determining whether officials have been deliberately indifferent includes both objective and subjective components. *Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)*; *Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994)*; *Patterson v. Lilley, 2003 U.S. Dist. LEXIS 11097, No. 02 Civ. 6056 (NRB), 2003 WL 21507345, at *3 (S.D.N.Y. June 30, 2003)*; *Vento v. Lord, 1997 U.S. Dist. LEXIS 11022, No. 96 Civ. 6169 (SS), 1997 WL 431140, at *3 (S.D.N.Y. July 31, 1997)*.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n10  [HN24] The *Fourteenth Amendment* makes the *Eighth Amendment* applicable to the states. See *McKenna, 2002 U.S. Dist. LEXIS 3489, 2002 WL 338375, at *5 n.8 (citing Estelle v. Gamble, 429 U.S. 97, 104, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976))*. Although Verley mentions other constitutional amendments in his Complaint, aside from the Eighth and *Fourteenth Amendments*, none provide the basis for a deliberate indifference claim. See *Johnson v. Wright, 234 F. Supp. 2d 352, 358 (S.D.N.Y. 2002)*; *Ruiz v. Homerighouse, 2003 U.S. Dist. LEXIS 24739,*

*No. 01 Civ. 0266E (SR), 2003 WL 21382896, at *2 n.10 (W.D.N.Y. Feb. 13, 2003)* (citing *Snider v. Dylag, 188 F.3d 51, 53 (2d Cir. 1999)*).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*36]

[HN25] First, the plaintiff's medical need, in objective terms, must be serious. *Hathaway, 37 F.3d at 66*; *Hutchinson v. Civitella, 2003 U.S. Dist. LEXIS 15417, No. 02 Civ. 2407 (CMB), 2003 WL 22056997, at *4-5 (S.D.N.Y. Sept. 4, 2003)* (citing *Flemming v. Velardi, 2003 U.S. Dist. LEXIS 13078, No. 02 Civ. 4113 (AKH), 2003 WL 21756108, at *2 (S.D.N.Y. July 30, 2003)* (citation omitted)). This standard contemplates "a condition of urgency" that may "produce death, degeneration or extreme pain." *Hathaway, 37 F.3d at 66* (citing *Nance v. Kelly, 912 F.2d 605, 607 (2d Cir. 1990)* (Pratt, J. dissenting)). Such a serious medical need arises where "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." n11 *Chance, 143 F.3d at 702* (quoting *Gutierrez v. Peters, 111 F.3d 1364, 1373 (7th Cir. 1997)*); *Woods, 2002 U.S. Dist. LEXIS 7157, 2002 WL 731691, at *4*.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n11  [HN26] There is no dispute that Hepatitis C qualifies as a sufficiently serious medical condition for the purposes of an *Eighth Amendment* analysis. See *Johnson v. Wright, 234 F. Supp. 2d at 360* (citing cases). (See also DOCS Mem. in Support of Mot. to Dismiss at 13.)

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*37]

[HN27] Second, the facts must give rise to an inference that the persons charged with providing medical care knew of that serious medical need and intentionally disregarded it. *Flemming, 2003 U.S. Dist. LEXIS 13078, 2003 WL 21756108, at *2*; *Woods, 2002 U.S. Dist. LEXIS 7157, 2002 WL 731691, at *4*; *Johnson v. Bendheim, 2001 U.S. Dist. LEXIS 9679, 2001 WL*

*799569, at *7.* To satisfy this second prong of the standard, the defendant prison official must have acted with a sufficiently culpable state of mind - that is, the official must have known of and disregarded "an excessive risk to inmate health or safety." *Chance, 143 F.3d at 702* (quoting *Farmer v. Brennan, 511 U.S. 825, 128 L. Ed. 2d 811, 114 S. Ct. 1970 (1994)).* Thus, "the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harms exists, and he must also draw the inference." Id; see also *Hathaway, 37 F.3d at 66.*

[HN28] Allegations of differences of opinion between a prisoner and prison officials concerning the appropriate response and treatment of a medical complaint, or allegations of medical malpractice, generally do not satisfy the second prong of the standard. *Demata v. New York Corr. Dep't of Health Serv., 198 F.3d 233 (Table),* [reported in full-text format at] *1999 U.S. App. LEXIS 22955, 1999 WL 753142, at *2 (2d Cir. Sept. 17 1999)*[*38] (citing *Estelle, 429 U.S. at 104; Chance, 143 F.3d at 702); Johnson v. Wright, 234 F. Supp. 2d at 361* ("Generally, where the dispute concerns not the absence of help, but the choice of a certain course of treatment ... [a court] will not second guess the doctors.") (citation omitted); *Vento, 1997 U.S. Dist. LEXIS 11022, 1997 WL 431140, at *3* ("It is well established ... that allegations of negligence, medical malpractice or claims based on difference of opinion over matters of medical judgment do not rise to an *Eighth Amendment* violation."). Conduct may only rise to the level of deliberate indifference when it involves the requisite recklessness, "i.e. an act or failure to act ... that evinces a conscious disregard of a substantial risk of serious harm." *Ramos v. Artuz, 2003 U.S. Dist. LEXIS 2261, No. 00 Civ. 0149 (LTS)(HBP), 2003 WL 342347, at *7 (S.D.N.Y. Feb. 14, 2003)* (citation and internal quotation marks omitted); *Gowins, 2002 U.S. Dist. LEXIS 14098, 2002 WL 1770772, at * 7.* [HN29] Medical decisions may also constitute indifference where they are contrary to accepted medical standards, in that the doctor based his decision on something[*39] other than sound medical judgment. See *Webb v. Jackson, 1994 U.S. Dist. LEXIS 3008, No. 92 Civ. 2149 (SS), 1994 WL 86390, at *2 (S.D.N.Y. Mar. 16, 1994),* aff'd *47 F.3d 1158 (2d Cir. 1995)* (citing *Harding v. Kuhlmann, 588 F. Supp. 1315, 1316 (S.D.N.Y. 1984),* aff'd, *762 F.2d 990 (2d Cir. 1985)).*

2. Sufficiency of the Allegations Against Weinstein

Verley's claims that Weinstein, an outside medical consultant specializing in physical medicine and rehabilitation, failed to act appropriately in response to a back injury, a medical condition separate from Verley's Hepatitis C infection. (Compl. P 46.) Weinstein argues that in his Complaint, Verley has failed to allege

sufficient facts to support this claim. (DOCS Mem. in Support of Mot. to Dismiss at 15-16.) n12 As discussed below, however, the Proposed Amended Complaint sufficiently cures any defects in this claim as originally pleaded against Weinstein.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n12 Weinstein also asserts that Verley has failed to exhaust his claim of deliberate indifference to his back injury. (DOCS Mem. in Support of Mot. to Dismiss, 17 n.9.) Verley alleges, however, that "all acts and omissions complained of herein have been fully exhausted by plaintiff." (Compl. P 54.) Thus, determination of whether this claim was exhausted will turn on issues of fact, and dismissal on this basis on a *Rule 12(b)(6)* motion would be inappropriate. See, e.g., *Brown v. Koenigsmann, 2003 U.S. Dist. LEXIS 17009, No. 01 Civ. 10013 (LMM), 2003 WL 22232884, at *3 (S.D.N.Y. Sept. 29, 2003)* ("The court cannot dismiss [plaintiff's] claim under *Fed. R. Civ. P. 12(b)(6)* for failure to exhaust available administrative remedies because there is an issue of fact as to whether [plaintiff] exhausted his administrative remedies.); *Velez v. Kulhmann, 2003 U.S. Dist. LEXIS 14684, No. 02 Civ. 6062 (AKH), 2003 WL 22004899, at *4 (S.D.N.Y. Aug. 22, 2003); Hallett v. State of New York Dep't of Corr. Servs, 109 F. Supp. 2d 190, 197 (S.D.N.Y 2000)* (denying motion to dismiss based on failure to exhaust where plaintiff alleged "that he exhausted his administrative remedies" and "defendants have provided only conclusory statements" of non-exhaustion).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*40]

Verley alleges in his original Complaint that he suffered from a back  injury as a result of a gunshot wound received in 1987, prior to his incarceration. (Verley Aff. in Opp. to Mot. to Dismiss P 44.) This wound caused Verley severe back pain, which, he alleges, Weinstein did not appropriately diagnose or treat during an appointment in October or November, 2001. (Compl. PP 46-47.) Verley also alleges that Weinstein showed some personal animosity towards him, becoming "indignant and verbally abusive" during Verley's appointment. (Compl. P 46; Verley Aff. in Opp. to Mot. to Dismiss P 45.) According to Verley, Weinstein's

awareness of, and failure to give proper treatment for, his serious back condition amounts to deliberate indifference. (Compl. PP 46-47, 53, 59.)

Assuming, for the purposes of this motion only, that Verley's back pain rises to the level of a sufficiently serious medical condition to permit an *Eighth Amendment* analysis, his claim against Weinstein -- as pleaded in the Complaint -- nonetheless fails on the second prong of the deliberate indifference standard because the Complaint does not adequately allege that Weinstein knew of and disregarded an excessive risk to Verley's[*41] safety. See, e.g., *Ramos, 2003 U.S. Dist. LEXIS 2261, 2003 WL 342347, at *8* (accepting for the purpose of the motion that a back injury constituted a serious condition, but finding that plaintiff could not satisfy the culpable state of mind prong of the deliberate indifference standard).

The essence of Verley's allegations is that, in response to his complaints of back pain, Weinstein performed a test, reviewed an X-ray, and informed Verley that there did not appear to be any damage to the larger nerves in his back. (Compl. PP 46-47.) In his opposition papers, Verley further opines that Weinstein should have taken an MRI because the X-ray that Weinstein reviewed was not recent and because only an MRI would show tissue damage. (Verley Aff. in Opp. to Mot. to Dismiss P 44; Verley Mem. in Opp. to Mot. to Dismiss at 20.)

These allegations suggest nothing more than a difference of opinion between Verley and Weinstein. Even taking into account Verley's assertions in his opposition papers, courts have specifically held that [HN30] an inmate's opinion that an X-ray or MRI should have been taken is a classic example of the type of medical judgment that is ordinarily given judicial deference, and does not form[*42] the basis of a deliberate indifference claim. *Estelle v. Gamble, 429 U.S. 97, 107, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976)* ("[A] medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment."); *Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001)* ("Thus, disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a *Section 1983* claim. Those issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the *Eighth Amendment*."); *Fulmore v. Mamis, 2001 U.S. Dist. LEXIS 4869, No. 00 Civ. 2831 (AJP), 2001 WL 417119, at *9 (S.D.N.Y. Apr. 23, 2001)* (noting that the courts have repeatedly dismissed claims based on the refusal of prison doctors to order certain testing procedures, such as a CAT scan or an MRI, because such

claims do not state a violation of the *Eighth Amendment*) (collecting cases); *Vento, 1997 U.S. Dist. LEXIS 11022, 1997 WL 431140, at *5* (failure to order an X-ray did not demonstrate deliberate indifference to medical needs); [*43] *Webb, 1994 U.S. Dist. LEXIS 3008, 1994 WL 86390, at *3* (same).

Because, in his Complaint, Verley alleged no facts indicating that Weinstein purposely failed to treat his medical condition or that the diagnosis was contrary to accepted medical standards, Verley's allegations of a failure to diagnose and treat his back ailment, as stated in the Complaint, are insufficient to state a claim. See, e.g, *Hutchinson v. New York State Corr. Officers, 2003 U.S. Dist. LEXIS 15417, No. 02 Civ. 2407 (CMB), 2003 WL 22056997, at *6-7 (S.D.N.Y. Sept. 4, 2003)* (a disagreement about defendant's response to plaintiff's medical complaints failed to state an *Eighth Amendment* claim of deliberate indifference); *McKenna v. Wright, 2002 U.S. Dist. LEXIS 3489, No. 01 Civ. 6571 (WK), 2002 WL 338375, at *7 (S.D.N.Y. Mar. 4, 2002)* (a claim did not rise to the level of deliberate indifference where plaintiff's own research and medical conclusions differed from the doctor); see also *Harding, 588 F. Supp. at 1316* (dismissing deliberate indifference claim where there was no allegation that "the treatment proscribed is contrary to applicable medical standards"); *Evering v. Rielly, 2001 U.S. Dist. LEXIS 15549, No. 98 Civ. 6718 (DAB), 2001 WL 1150318, at *10 (S.D.N.Y. Sept. 28, 2001)*[*44] (inmate is not entitled to the medical treatment of his choice, as long as he is provided treatment based on accepted medical standards) (citation omitted).

Verley's additional allegations regarding Weinstein's verbal abusiveness are also insufficient because [HN31] "the *Eighth Amendment* does not require empathy," as long as prison officials provide an adequate level of care. *Ramos, 2003 U.S. Dist. LEXIS 2261, 2003 WL 342347, at *11* ("To the extent plaintiff alleges that [the prison doctor] verbally abused him or harassed him ... these allegations fail to state a claim on which relief can be granted.") (citing cases); *Johnson v. Bendheim, 2001 U.S. Dist. LEXIS 9679, No. 00 Civ. 720 (JSR)(KNF), 2001 WL 799569, at *6 (S.D.N.Y. July 13, 2001)* [HN32] ("Verbal harassment, without any accompanying injury, does not constitute a violation of any federally protected right and is not actionable under *42 U.S.C. § 1983*.") (citing *Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir. 1986)*).

Accordingly, Verley's deliberate indifference claim against Weinstein should be subject to dismissal, unless the deficiencies in the claim can be cured by Verley's proposed[*45] amendment.

In his Proposed Amended Complaint, Verley adds a significant amount of detail to his allegations against Weinstein. (See Prop. Am. Compl. PP 50-52.) He describes in depth the excruciating pain he was experiencing when he visited Weinstein. (Id. P 50.) Although Verley again alleges that Weinstein conducted a test from which he determined that there was little or no large nerve damage (id. P 51), and that Weinstein reviewed old X-rays but did not take an MRI (id.), this time Verley adds that, by the time he was seen by Weinstein, certain of his prior tests and MRIs did show nerve damage (id. P 52). Verley also now alleges that, in deliberately disregarding these prior tests, Weinstein's report "noted his personal feelings contrary to sound medical information and patient concerns." (Id. P 52.)

In proposing to plead, in this way, that Weinstein's medical determinations were "contrary to sound medical information" (Prop. Am. Compl. P 52), Verley now suggests more than a mere difference in opinion. See, e.g., *Chance v. Armstrong, 143 F.3d at 703* (allegations that prison doctors had sufficiently culpable state of mind went beyond[*46] mere differences of opinion; whether their actions were sound medical judgment, negligence, or deliberate indifference depended on the facts of the case and complaint would not be dismissed at the pleading stage); *Gowins, 2002 U.S. Dist. LEXIS 14098, 2002 WL 1770772, at *8* (where plaintiff alleged that doctor knew of possible harm but ignored it out of spite, allegations of deliberate indifference were enough to survive motion to dismiss); *Woods, 2002 U.S. Dist. LEXIS 7157, 2002 WL 731691, at *5* (claim cannot be dismissed where inmate may be able to prove that the doctor purposely chose a less efficacious treatment plan); *Webb, 1994 U.S. Dist. LEXIS 3008, 1994 WL 86390, at *2* (medical decisions may constitute deliberate indifference where they are contrary to accepted medical standards); cf *Harding, 588 F. Supp. at 1316* (dismissing deliberate indifference claim where there was no allegation that "the treatment proscribed is contrary to applicable medical standards").

Therefore, I recommend that Verley's original claim against Weinstein for deliberate indifference be dismissed, but I also recommend that his motion to amend this claim be granted, to the extent that the Proposed Amended Complaint seeks[*47] monetary damages from Weinstein in his individual capacity.

3. Sufficiency of the Allegations Against Stevens n13

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n13 Verley's Proposed Amended Complaint does not list either Stevens or Greiner in its caption, but it does identify them in the "parties" section. (See Prop. Am. Compl. PP 9-10.) Furthermore, the body of the Proposed Amended Complaint makes specific allegations against Stevens. (Prop. Am. Compl. PP 36-37.) Under these circumstances, it does not appear that Verley intended to drop his claims against these defendants and the Court should therefore reach the merits of their motion to dismiss. See *Woods, 2002 U.S. Dist. LEXIS 7157, 2002 WL 731691, at *1 n.2* (liberally construing a pro se complaint and treating a party left off the caption, but mentioned in the body of the complaint, as a named defendant).

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

The only allegation in the Complaint against Stevens involves his receipt of an e-mail from Wright, the Associate Commissioner and Chief Medical Officer of DOCS (and presumably Steven's superior), [*48] informing Stevens that Verley was not to receive the Interferon/Ribavarin treatment. (Compl. P 31.) Stevens argues that this allegation, even if true, does not sufficiently allege his personal involvement in any violation of constitutional rights. (DOCS Mem. in Support of Mot. to Dismiss at 12.) Stevens is correct that the claim against him, as pleaded, is inadequate, and, in this instance, Verley's proposed amendment does not remedy the inadequacy.

[HN33] It is well-settled that the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under *§ 1983*." *Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)* (internal quotations marks and citation omitted). In other words, a plaintiff must allege a tangible connection between the defendants' alleged unconstitutional acts and the injuries suffered. *Gowins, 2002 U.S. Dist. LEXIS 14098, 2002 WL 1770772, at *6* (citing *Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986)); Johnson v. Bendheim, 2001 U.S. Dist. LEXIS 9679, 2001 WL 799569, at *5*.

With respect to Stevens, Verley appears to be alleging that, because the decision not to give him the Interferon/Ribavarin treatment amounted[*49] to deliberate indifference to his medical needs, the fact that Stevens followed Wright's instruction in this regard implicates Stevens in the violation. Even after drawing all inferences in Verley's favor, however, this allegation

is insufficient to support a claim that Stevens was personally involved in the claimed wrongdoing.

There is no allegation in the Complaint as originally pleaded that Stevens ever personally examined Verley, had any basis for evaluating the appropriateness of Wright's alleged decision, or even had knowledge about the appropriateness of Wright's directive. In addition, there is no allegation that Stevens was in a position to challenge Wright's purported instruction or to take corrective action. See, e.g., *Ramos, 2003 U.S. Dist. LEXIS 2261, 2003 WL 342347, at *12* (a health care administrator, who had no supervisory authority over the doctors involved in the alleged constitutional violations, was not in a position to take corrective action and could not be held responsible for the acts of those doctors); see also *Demata v. New York Corr. Dep't of Health Serv., 198 F.3d 233 (Table), [reported in full-text format at] 1999 U.S. App. LEXIS 22955, 1999 WL 753142, at *2 (2d Cir. Sept. 17 1999)* (finding that[*50] plaintiff had not shown that a nurse administrator was personally responsible for any delay or denial of treatment and that the nurse was in no position to remedy any violations of others, even if he knew of such violations); *Pabon v. Goord, 2003 U.S. Dist. LEXIS 5359, No. 99 Civ. 5869 (THK), 2003 WL 1787268, at *17 (S.D.N.Y. Mar. 28, 2003)* (dismissing the complaint as to the nurse administrator because any failing did not amount to deliberate indifference).

Nor does the Proposed Amended Complaint cure the deficiency in the claim against Stevens. Although the proposed pleading does add the allegation that "at all relevant times, Stevens had knowledge actual and constructive, that Verley was being denied treatment with deliberate indifference and discriminately" (Prop. Am. Compl. P 37), it still fails to allege that Stevens was in a position to alter Wright's instruction. See, e.g., *Demata, 1999 U.S. App. LEXIS 22955, 1999 WL 753142, at *2*; *Ramos, 2003 U.S. Dist. LEXIS 2261, 2003 WL 342347, at *12* ; *Pabon, 2003 U.S. Dist. LEXIS 5359, 2003 WL 17887268, at *17*.

For this reason, I recommend that the deliberate indifference claim against Stevens be dismissed and Verley's motion to amend this claim be denied. Because it is unclear, [*51] however, whether Verley might be able to allege that Stevens was in a position to take corrective steps and nonetheless failed to do so, I further recommend that the motion to amend be denied without prejudice to Verley's seeking leave to file a Second Amended Complaint that pleads the requisite facts to state a claim against Stevens.

4. Sufficiency of the Allegations Against Greiner

Greiner was the Superintendent of Green Haven at times relevant to the allegations in the Complaint. (Compl. P 10.) Verley does not allege - either in his original Complaint, his opposition papers, or his Proposed Amended Complaint - that Greiner was directly involved in his denial of medical care. Rather, Verley appears to be implicating Greiner because of Greiner's position of authority in the prison, and, more precisely, because of his alleged overall responsibility for ensuring that inmates were provided with constitutionally adequate health care. (See Compl. P 10; Prop. Am. Compl. P 9.) Verley, however, does not go far enough in alleging facts that could support a claim against Greiner for supervisory liability.

[HN34] While the mere fact that an official holds a supervisory position is, [*52] standing alone, insufficient to establish that official's liability for the acts of his subordinates, there are several ways in which a supervisory official may be found personally liable for violating a plaintiff's constitutionally protected rights. See *Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)*; *Wright v. Smith, 21 F.3d at 501*. The supervisory official may be deemed to have personal involvement where he: (1) directly participated in the infraction; (2) failed to remedy the wrong even after learning of a violation through a report or appeal; (3) created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue; (4) acted in a grossly negligent manner in managing subordinates who caused the unlawful condition or event; or (5) demonstrated deliberate indifference to the constitutional rights of the plaintiff by failing to act on information demonstrating that unconstitutional practices were taking place. Id.; *Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 254 (2d Cir. 2001)*.

In his original Complaint and opposition papers, Verley merely recites boilerplate allegations[*53] of supervisory liability, without alleging any facts to show Greiner's personal involvement in the particular alleged violations. (See Compl. PP 60, 64; Verley Aff. in Opp. to Mot. to Dismiss P 47.) In fact, in his allegations regarding supervisory liability, Verley never even specifically names Greiner (See Compl. P 64 (alleging that "defendant[s]' policy, custom, and/or practice of delaying Hepatitis C positive inmates with treatment of Interferon and/or Ribavirin, the only medication available for treatment of Hepatitis C ... constitutes a deliberate indifference to plaintiffs' medical need.").) Similarly, in his opposition papers, Verley outlines the factors for supervisory liability and alleges that defendants' actions fit within these categories, but never makes any specific charges about Greiner. (See Verley Aff. in Opp. to Mot. to Dismiss P 47.). While Verley does mention that he filed grievances regarding the

alleged violations, he does not allege that Greiner was aware of the grievances or personally took any action in response to them. (Verley Aff. in Opp. to Mot. to Dismiss P 47 n.2.) Finally, in his Proposed Amended Complaint, Verley mentions Greiner only[*54] in the "parties" section (see Prop. Am. Compl. P 9), with no specific facts in the body of the proposed pleading to support a claim against him based on supervisory liability.

Even reading Verley's allegations, as a whole, in the light most favorable to him, they are insufficient to show Greiner's personal involvement in the alleged violations. *Alfaro Motors, Inc. v. Ward, 814 F.2d 883, 886-87 (2d Cir. 1987)* (dismissing the complaint against supervisory defendants because of a failure to allege how the defendants were personally involved in the alleged violations); *Williams v. Fisher, 2003 U.S. Dist. LEXIS 16442, No. 02 Civ. 4558 (LMM), 2003 WL 22170610, at *9 (S.D.N.Y. Sept. 18, 2003)* (conclusory allegations which fail to show how defendant prison Superintendent was personally involved in, or aware of, the alleged constitutional violation, are insufficient to support a claim for deliberate indifference); *Thomas v. Coombe, 1998 U.S. Dist. LEXIS 10519, No. 95 Civ. 10342 (HB), 1998 WL 391143, at *5 (S.D.N.Y. July 13, 1998)* [HN35] ("It is not enough to allege that officials failed to carry out the duties of their office or without defining these duties or how each defendant failed to meet them. [*55] "); *Vento v. Lord, 1997 U.S. Dist. LEXIS 11022, No. 96 Civ. 6169 (SS), 1997 WL 431140, at *5-6 (S.D.N.Y. July 31, 1997)* (because the claim against certain defendants, as alleged, could only be supported under a theory of respondeat superior or vicarious liability, which are not applicable to *Section 1983* actions, the claims were dismissed).

I therefore recommend that the deliberate indifference claim against Greiner be dismissed and Verley's motion to amend this claim be denied. I further recommend, however, that because Verley may be able to remedy the defects in this claim, the motion to amend be denied without prejudice to Verley's seeking leave to file a Second Amended Complaint specifying the basis upon which Greiner should be held liable on a supervisory basis.

D. Qualified Immunity

Weinstein, Stevens, and Greiner argue that they are also protected from suit under the doctrine of qualified immunity. (DOCS Mem. in Support of Mot. to Dismiss at 19-21.) [HN36] This doctrine "protects prison officials from personal liability [for damages] under *§ 1983* when their 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have[*56] known.'" *Horne v. Coughlin, 155 F.3d 26, 29 (2d Cir. 1998)* (quoting *Harlow v. Fitzgerald, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982))*; *Rodriguez v. Phillips, 66 F.3d 470, 475 (2d Cir. 1995)*.

[HN37] A prisoner's right to adequate medical treatment is a clearly established constitutional right. See, e.g, *Burgess v. Goord, 1999 U.S. Dist. LEXIS 611, No. 98 Civ. 2077 (SAS), 1999 WL 33458, at *6 (S.D.N.Y. Jan 26, 1999)* ("It is clearly established that inadequate medical care can give rise to an *Eighth Amendment constitutional* violation where prison officials are deliberately indifferent to an inmate's serious medical needs.") (citing *Thomas, 1998 U.S. Dist. LEXIS 10519, 1998 WL 391143, at *5*). Where a right is clearly established, however, a state official is still entitled to qualified immunity if "it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Cerrone v. Brown, 246 F.3d 194, 199 (2d Cir. 2001)* (internal quotation marks and citation omitted). Objective reasonableness is established if "the only conclusion a reasonable jury could reach is that reasonable officers would disagree on[*57] the constitutionality" of the official's actions. *Id. at 203*.

[HN38] A qualified immunity defense, however, is typically addressed at the summary judgment stage because it usually depends on the facts of the case, making dismissal at the pleading stage generally inappropriate. *King v. Simpson, 189 F.3d 284, 289 (2d Cir. 1999)*; *Woods, 2002 U.S. Dist. LEXIS 7157, 2002 WL 731691, at * 10*. A motion to dismiss will only be granted if the complaint fails to allege the violation of a clearly established right. *Woods, 2002 U.S. Dist. LEXIS 7157, 2002 WL 731691, at * 10* (quoting *Hardy v. Jefferson Community Coll., 260 F.3d 671, 677 (6th Cir. 2001))*.

As discussed above (see supra at 27-29), Verley's Proposed Amended Complaint states a claim against Weinstein for a violation of his constitutional right to adequate medical care. Moreover, at this stage in the litigation, it cannot be said as a matter of law that Weinstein's actions were "objectively reasonable" under the circumstances. See *Woods, 2002 U.S. Dist. LEXIS 7157, 2002 WL 731691 at *10* (denying a motion to dismiss based on a qualified immunity defense in a deliberate indifference case where plaintiff had stated a claim[*58] for the violation against the defendants); *Amaker v. Haponik, 2000 U.S. Dist. LEXIS 4091, No. 98 Civ. 2663 (JGK), 2000 WL 343772, at *6 (S.D.N.Y. Mar. 31, 2000)* (holding that the complaint should not be dismissed on qualified immunity grounds where "the facts [were] not sufficiently developed at this stage in the proceedings to conclude that a reasonable officer would

not have concluded that defendants' actions were unlawful"); *Burgess*, 1999 U.S. Dist. LEXIS 611, 1999 WL 33458, at *5-6 (S.D.N.Y. Jan 26, 1999) (although defendants argued that it was objectively reasonable for them to believe their actions were lawful, "dismissal on the basis of qualified immunity would be premature" where plaintiff had adequately pleaded a claim). Accordingly, I recommend that the motion to dismiss the deliberate indifference claims against Weinstein on the basis of qualified immunity be denied.

As for defendants Stevens and Greiner, there is no need for the Court even to reach the qualified immunity issue. As discussed above (see supra at 29-34), neither Verley's original Complaint nor his Proposed Amended Complaint has stated a claim for deliberate indifference against these defendants, and I have therefore recommended[*59] that the claims against them be dismissed without prejudice. Under the circumstances, the Court need not decide the issue of whether these defendants are entitled to qualified immunity. See *Peterson v. Tomaselli*, 2003 U.S. Dist. LEXIS 17006, No. 02 Civ. 6325 (DC), 2003 WL 22213125, at *8 (S.D.N.Y. Sept. 29, 2003) [HN39] (where motion to dismiss is granted based on failure to state a claim, the qualified immunity argument need not be reached); *Salahuddin v. Mead*, 2002 U.S. Dist. LEXIS 15827, No. 95 Civ. 8581 (MBM), 2002 WL 1968329 (S.D.N.Y. Aug. 26, 2002) (not reaching the issue of qualified immunity where plaintiff had not even made out a prima facie case of a violation) (citing *Kerman v. City of New York*, 261 F.3d 229, 235 (2d Cir. 2001) ("When determining whether qualified immunity protects an official, we must first determined whether plaintiff has presented facts which, if proven, demonstrate that the defendant violated a constitutional right.") (internal quotation marks and citation omitted).

E. Privacy Claim

In his Fourth and Fifth causes of action, Verley maintains that defendants violated his right to privacy or confidentiality under the *Fourteenth Amendment*. (Compl. PP 61-62.) Weinstein, [*60] Stevens, and Greiner argue that this claim must be dismissed because the Complaint alleges the violation in only cursory fashion, without factual support. (DOCS Mem. in Support of Mot. to Dismiss at 14 n.8.) Indeed, Verley has not specified how these, or any of the defendants, were personally involved in the alleged privacy violation. For this reason, this claim is defective.

The *Due Process Clause of the Fourteenth Amendment* protects inmates such as Verley from the unwanted disclosure of "information relating to the status of [their] health." *Gowins v. Greiner*, 2002 U.S. Dist. LEXIS 14098, 01 Civ. 6933 (GEL), 2002 WL 1770772, at * 9 (S.D.N.Y. July 31, 2002) (quoting *Doe v. City of New York*, 15 F.3d 264, 267 (2d Cir. 1994)); *Clarkson v. Coughlin*, 898 F. Supp. 1019, 1041 (S.D.N.Y. 1995) [HN40] ("Prison inmates retain a constitutional right to privacy concerning medical information about them.") (citing cases). [HN41] Prison officials may "impinge on that right only to the extent that their actions are 'reasonably related to legitimate penological interests.'" *Gowins*, 2002 U.S. Dist. LEXIS 14098, 2002 WL 1770772, at * 9 (quoting *Powell v. Schriver*, 175 F.3d 107, 112 (2d Cir. 1999));[*61] see *Taylor v. Macomber*, 1999 U.S. Dist. LEXIS 8016, No. 97 Civ. 4127 (DAB), 1999 WL 349696, at *2-3 (S.D.N.Y May 26, 1999) ("Plaintiff's right to privacy in keeping his medical records confidential must be balanced against the government's interest in disclosing the records.").

Verley's opposition papers flesh out the nature of the alleged invasion of his privacy. He claims that before enrolling in the ASAT program, a prerequisite to Hepatitis C treatment, an inmate must submit private medical information, which is then disseminated to non-medical personnel, such as counselors and security staff. (Verley Mem. in Opp. to Mot. to Dismiss at 25.) Thus, Verley does not seem to challenge the ASAT requirement itself, the legitimacy of which this Court has previously upheld. See *Graham v. Wright*, 2003 U.S. Dist. LEXIS 16106, No. 01 Civ. 9613 (NRB)(HBP), 2003 WL 22126764, at *2 n.5 (S.D.N.Y. Sept. 12, 2003) (Hepatitis treatment guidelines requiring an inmate to complete an ASAT program successfully are "highly rational in light of the fact that severe side effects, including death, may result from the treatment of the patient with [combination Interferon/Ribavirin therapy] ... and that active substance abuse, [*62] including alcohol abuse, can cause life threatening consequences to a patient following the treatment regime"). Nor does he appear to challenge the need for medical information to be disclosed to healthcare providers in connection with the health-related ASAT program. Rather, Verley appears to focus his claim on the alleged disclosure of his private information to those - including security staff - who did not have an obvious need to know his medical history. While there may be a legitimate penological reason for such disclosure, defendants have not articulated that reason in response to Verley's submissions.

Verley has not, however, specified how, upon his enrollment in the ASAT program, Weinstein (who allegedly failed to treat only his back ailment), Stevens, or Greiner participated in improperly disseminating, or overseeing the dissemination of, his private medical information. Thus, while it may be possible for Verley to state a claim for invasion of privacy based on the alleged dissemination of his confidential medical information by

particular prison personnel, he has not done so with respect to any of these defendants. I therefore recommend that the motion to dismiss this[*63] claim be granted without prejudice. n14

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n14 Verley's Proposed Amended Complaint also seems to claim that Verley should not have had to disclose confidential medical information in connection with filing unsuccessful grievances regarding his denial of medical care. (See Prop. Am. Compl. P 57.) In order to exhaust his deliberate indifference claims, however, Verley was required to pursue administrative procedures for submitting grievances (see infra at 53-55), and having chosen to do so, Verley cannot now be heard to complain that his disclosure of information relating to those grievances should not have been made. Cf. *Gowins, 2002 U.S. Dist. LEXIS 14098, 2002 WL 1770772, at * 3* (where inmate places his medical condition in issue by filing grievance relating to his medical care, he cannot complain of relevant disclosure made by the implicated doctor in response to the grievance). Therefore, to the extent Verley seeks leave to amend his Complaint to add a privacy claim relating to the grievance process itself, his motion to amend should be denied.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*64]

F. Equal Protection/Discrimination Claims

Verley's Complaint alleges a *Section 1983* violation based on a purported deprivation of his rights under the *Equal Protection Clause of the Fourteenth Amendment.* (Compl. PP 50, 61, 63; Verley Aff. in Opp. to Mot. to Dismiss P 46.) Verley also appears to allege discrimination claims under *Section 504 of the Rehabilitation Act* and/or *Title II of the American with Disabilities Act.* (Compl. PP 3, 63; Verley Aff. in Opp. to Mot. to Dismiss P 46.) Verley's equal protection claim and any other discrimination claim(s) all appear to be premised on the fact that, although the ASAT program is a prerequisite for receiving Hepatitis C treatment, that program is only available to those who are housed in the UPD, not to the general population. (Compl. P 50.) In addition to seeking damages, Verley requests prospective

relief on these claims, either prohibiting defendants from "imposing their discriminatory program for treatment of Hepatitis C positive prisoners or [requiring defendants to] allow equal access to all prisoners to [the ASAT] program." (Compl. at 22, Relief Requested P 2.)

Because of his transfer out of Green Haven, however, Verley's[*65] requests for declaratory or injunctive relief are moot (see supra at 19-20), so that the only equal protection/discrimination claims that he can possibly maintain are claims for damages against the individual defendants. Moreover, from Verley's own submissions, it appears that he was, in fact, able to participate in the ASAT program, and thus was not denied Hepatitis C treatment because he was arbitrarily excluded from that program. If this is the case, then Verley lacks standing to assert any of these claims. Finally, Verley's claims would fail in any event for the reasons set forth below.

1. Standing

As a preliminary matter, Verley fails to plead that he was actually denied access to the ASAT program, and that he was thus denied Hepatitis C treatment on that basis. On its face, Verley's Complaint does not allege that Verley was housed in the general population, or that he was denied medical treatment specifically because of his inability to enroll in the ASAT program. His supporting documents, in fact, suggest that he did participate in the ASAT program. (See Verley Aff. in Opp. to Mot. to Dismiss, Ex. O (copy of October 2000 agreement for Verley's participation[*66] in the ASAT program).) Moreover, Verley's invasion of privacy claim, as previously discussed, turns on his allegation that he was required to disclose personal medical information when enrolling in the ASAT program. (See supra at 36-38.) Further, although the Complaint alleges that Verley's access to Interferon/Ribavirin treatment was delayed by prison officials for various reasons (see Compl. PP 24, 26, 31, 33, 51), the Complaint nowhere lists a failure to complete the ASAT program as one of those reasons, and Verley concedes that he eventually received that treatment (see id. P 37). n15 Finally, Verley's Proposed Amended Complaint, while suggesting that he was not housed in the UPD (see Prop. Am. Compl. P 56), again fails to plead that, as a result, Verley was denied entry into the ASAT program, and thus was denied the Interferon/Ribavirin treatment.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n15 The Complaint does allege that Wright denied Verley treatment in early 1999 because Verley did

not meet the "'Protocol' for such." (Compl. P 31 n.2.) Verley, however, never explains what he means by this purported "protocol."

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*67]

[HN42] To invoke the Court's authority, a party must demonstrate standing by showing that "he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 329-30 (2d Cir. 1997) (finding no standing where the plaintiff did not actually suffer any concrete injury as a result of the allegedly unconstitutional program) (citing *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 70 L. Ed. 2d 700, 102 S. Ct. 752 (1982)). A plaintiff must have standing at the time the lawsuit was filed. See *Disabled in Action of Metro. N.Y v. Trump Int'l Hotel & Tower*, 2003 U.S. Dist. LEXIS 5145, 01 Civ. 5518 (MBM), 2003 WL 1751785, at *6-7 (S.D.N.Y. Apr. 2, 2003) (discussing the elements of standing) (citations omitted).

Here, because it appears that Verley was actually able to enter and complete the ASAT program and receive the treatment for which this program was a prerequisite, it appears that he cannot have suffered any injury as a result of the housing guidelines imposed for participation, and that he lacks standing to bring a claim for[*68] discrimination. See, e.g., *Graham*, 2003 U.S. Dist. LEXIS 16106, 2003 WL 22126764, at *2 (plaintiff lacked standing to challenge the Hepatitis C Guidelines mandating ASAT participation because plaintiff had in fact successfully completed the program); see also *Davidson v. Mann*, 129 F.3d 700, 701 (2d Cir. 1997) (affirming dismissal where plaintiff failed to allege an injury resulting from a DOCS directive); *Shabazz v. Cuomo*, 1998 U.S. Dist. LEXIS 2552, 93 Civ. 7692 (DLC); 1998 WL 102050, at *2 (S.D.N.Y. Mar. 5, 1998) (plaintiff lacked standing to challenge DOCS policy where policy did not result in injury to the plaintiff).

2. Equal Protection

Even if Verley could demonstrate that he has standing to assert his equal protection claim, that claim, as pleaded, should nonetheless be dismissed as insufficient.

[HN43] "The *Equal Protection Clause* directs that 'all persons similarly circumstanced shall be treated alike.'"

*McKenna v. Wright*, 2002 U.S. Dist. LEXIS 3489, No. 01 Civ. 6571 (WK), 2002 WL 338375, at *11 (S.D.N.Y. Mar. 4, 2002) (quoting *Plyler v. Doe*, 457 U.S. 202, 216, 72 L. Ed. 2d 786, 102 S. Ct. 2382 (1982)). [HN44] To state a claim for an equal protection violation, a party must allege that a government[*69] actor purposely discriminated against him because of membership in a specific class. *Hayden v. County of Nasseau*, 180 F.3d 42, 48 (2d Cir. 1999); *Lee v. New York Dep't of Corr. Servs*, 1999 U.S. Dist. LEXIS 13214, No. 97 Civ. 7112 (DAB), 1999 WL 673339, at * 12 (S.D.N.Y. Aug. 20, 1999). A facially neutral policy violates equal protection if it is motivated by discriminatory animus and its application results in a discriminatory effect. *Id.; Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265, 50 L. Ed. 2d 450, 97 S. Ct. 555 (1977); *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 2000).

Here, Verley has not alleged purposeful discrimination on the part of Weinstein, Stevens, or Greiner. First, a policy requiring inmates to complete a program to ensure that they will be drug-free before beginning intensive treatment for a serious medical condition is facially neutral. Second, Verley has not alleged that, in deciding to allow only those housed in the UPD access to the ASAT program, defendants (assuming they had any role in creating the policy at issue) intended to discriminate against general population inmates [*70]in the treatment of Hepatitis C.

[HN45] "Equal protection is not violated unless the [policy] was enacted not 'in spite' of its adverse effect on [a certain protected group] but rather because it would have that effect." *Johnson v. Wing*, 178 F.3d 611, 615 (2d Cir. 1999) (emphasis in original) (quoting *Personnel Adm'r v. Feeney*, 442 U.S. 256, 272-74, 60 L. Ed. 2d 870, 99 S. Ct. 2282 (1979)), cert. denied, *528 U.S. 1162, 145 L. Ed. 2d 1085, 120 S. Ct. 1177 (2000)*); see also *Hayden*, 180 F.3d at 50-51 (affirming dismissal of equal protection claim where plaintiff insufficiently alleged that officials had acted because of a desire to adversely affect plaintiffs); *McKenna*, 2002 U.S. Dist. LEXIS 3489, 2002 WL 338375, at *11 (inmate failed to state an equal protection claim based on Hepatitis C Guidelines which allow more favorable treatment for some groups of inmates than others because plaintiff had not shown that any affects of the provisions reflected purposeful discrimination); *Lee, 1999 U.S. Dist. LEXIS 13214, 1999 WL 673339, at *12* (dismissing equal protection claim where plaintiff failed to set forth any allegations indicating that DOCS officials had a discriminatory purpose behind their[*71] actions). Verley has not alleged any discriminatory reason for requiring that the ASAT program be a prerequisite for Hepatitis C treatment, nor any discriminatory reason why the ASAT

program was purportedly made available only to those housed in UPD. Nor does Verley's Proposed Amended Complaint plead that defendants engaged in purposeful discrimination.

I therefore recommend that Verley's equal protection claim be dismissed, and, I further recommend that his motion to amend this claim be denied as well because the purported amendment would also be unable to survive a motion to dismiss as pleaded. I recommend, however, that the motion to amend this claim be denied without prejudice to Verley's seeking further leave to amend, should he be able to allege intentional discrimination.

### 3. The Rehabilitation Act

*Section 504 of the Rehabilitation Act* states: [HN46] "No otherwise qualified individual with a disability ... shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *29 U.S.C. § 794 (a)*. Under[*72] a liberal construction of the Complaint, Verley's claim under this section seems to be based on the same activity underlying his equal protection claim. (Compl. PP 3, 63.) Regardless of whether Verley has standing to assert this claim, and regardless of whether he can specify intentional discrimination by each defendant, *Section 504* cannot afford him any relief. n16

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n16 The defendants acknowledge the Rehabilitation Act claim, and simply argue that it should be dismissed because the "Rehabilitation Act does not apply to the state." (DOCS Mem. in Support of Mot. to Dismiss at 2 n.3.)

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

For the reasons discussed above in connection with *Section 1983* claims (see supra at 17-18), Verley is barred by the *Eleventh Amendment* from asserting damages claims under the Rehabilitation Act against defendants in their official capacities, *Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn, 280 F.3d 98, 114 (2d Cir. 2001)* [HN47] (there has been no waiver of

immunity from suit under the *section 504* of the Rehabilitation[*73] Act); *Gowins v. Greiner, 2002 U.S. Dist. LEXIS 14098, 01 Civ. 6933 (GEL), 2002 WL 1770772, at *4 (S.D.N.Y. July 31, 2002)*. Further, as also discussed above (see supra at 19-20), any claim for injunctive or declaratory relief is moot because Verley is no longer incarcerated at Green Haven. Finally, *Section 504 of the Rehabilitation Act* [HN48] does not provide for damages suits against state officials in their individual capacities. *Garcia, 280 F.3d at 108* ("Insofar as [plaintiff] is suing the individual [state-employed] defendants in their individual capacities, neither *Title II of the ADA* nor *§ 504 of the Rehabilitation Act* provides for individual capacity suits against state officials.")

Thus, Verley has no available relief under *Section 504 of the Rehabilitation Act*. Accordingly, defendants' motion to dismiss any such claim should be granted, and Verley's motion to amend any such claim should be denied as futile.

### 4. The American With Disabilities Act

In their motion to dismiss, Weinstein, Stevens, and Greiner nowhere address Verley's apparent attempt to plead a violation of *Title II of the ADA*, which also seems to be based on the same activity underlying his equal[*74] protection claim. (Verley Aff. in Opp. to Mot. to Dismiss P 46.) n17 Because any such claim is facially deficient, however, I recommend that it be dismissed sua sponte without prejudice. See *28 U.S.C. § 1915A* [HN49] (allowing for the Court to review a prisoner's complaint and dismiss it where, inter alia, it fails to state a claim upon which relief may be granted); *28 U.S.C. § 1915(e)(2)* ( [HN50] allowing a district court to dismiss complaint filed in forma pauperis at any time if the court determines that the action fails to state a claim upon which relief can be granted or seeks monetary relief against a defendant that is immune from suit); see generally *Fominas v. McCarthy, 165 F.3d 13 (Table),* [reported in full-text format at] *1998 U.S. App. LEXIS 29431, 1998 WL 802054, at *1 (2d Cir. Nov. 13, 1998)*; *Preston v. New York, 223 F. Supp. 2d 452, 462 (S.D.N.Y. 2002)*.

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n17 [HN51] To state a claim under *Title II of the ADA*, a prisoner must show: "(1) he is a 'qualified individual with a disability'; (2) he is being excluded from participation in, or being denied the benefits of some service, program or activity by reason of his disability; and (3) the entity that provides the service,

*program or activity if a public entity." Woods v. Goord, 2002 U.S. Dist. LEXIS 7157, No. 01 Civ. 3255 (SAS), 2002 WL 731691, at * 11 (S.D.N.Y. Apr. 23, 2002)* (citing *Shariff v. Artuz, 2000 U.S. Dist. LEXIS 12248, No. 99 Civ. 321 (DC), 2000 WL 1219381, at *4 (S.D.N.Y. Aug. 28, 2000))*; see also *42 U.S.C. § 12132.*

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*75]

[HN52] The *Eleventh Amendment* does not serve as a bar to damages claims brought under *Title II of the ADA* against state officials acting in their official capacities because, in enacting the ADA, Congress abrogated the states' sovereign immunity from claims under that statute. *Garcia, 280 F.3d at 110-11.* Nonetheless, the Second Circuit has held that a private suit for money damages under *Title II of the ADA* may only be maintained where the plaintiff establishes that the violation was motivated by either discriminatory animus or ill will due to the disability. *Id. at 111-12*; *Gowins, 2002 U.S. Dist. LEXIS 14098, 2002 WL 1770772, at *5.* As described above in the equal protection analysis (see supra at 42-43), Verley has failed to allege such motivation by any of the defendants. Moreover, as also discussed above (see supra at 19-20), any claim by Verley for prospective relief is moot because of his transfer. Finally, as with *Section 504 of the Rehabilitation Act*, *Title II of the ADA* [HN53] does not provide for damages suits against state officials in their individual capacities. *Garcia, 280 F.3d at 108* ("Insofar as [plaintiff] is suing the individual[*76] [state-employed] defendants in their individual capacities, neither *Title II of the ADA* nor *§ 504 of the Rehabilitation Act* provides for individual capacity suits against state officials.") (citations omitted); *Lee, 1999 U.S. Dist. LEXIS 13214, 1999 WL 673339, at *13 n.14* ("To the extent that Plaintiff includes the individual Defendants in the ADA claim ... those claims are dismissed for lack of individual liability.")

Therefore, as pleaded, Verley's ADA claim is defective. Further, Verley's Proposed Amended Complaint does not address the deficiency in this claim, and thus the claim cannot be saved by that proposed amendment. Nonetheless, because Verley is proceeding pro se, because neither defendants nor the Court has previously identified the defect in his pleading of this claim, and because Verley may be able to remedy the defect upon repleading, I recommend that this claim be dismissed without prejudice.

In sum, although I recommend that Verley's Rehabilitation Act claim be dismissed with prejudice because that statute simply cannot afford him relief, I recommend that his equal protection and ADA claims be dismissed without prejudice to seek further leave to amend, should Verley be[*77] able to allege standing and plead the element of intentional discrimination that is now lacking from both of those claims.

## VI. MOTION TO DISMISS THE CLAIMS AGAINST CPS AND PHS

CPS and PSH are health maintenance organizations that must pre-approve inmate medical consultations provided outside the correctional facility. (Compl. PP 18-19; Verly Aff. in Opp. to Mot. to Dismiss PP 42-43.) Verley claims that these organizations were responsible for denying him certain medical care; specifically, he alleges that they were partially to blame for the delays in his receiving both the Interferon/Ribavirin and the PegIntron treatments, the latter of which he still seeks. (Compl. PP 45, 51; Verly Aff. in Opp. to Mot. to Dismiss PP 42-43.) CPS and PHS seek dismissal on the grounds that the claims against them are barred by the *Eleventh Amendment*, that Verley has failed to allege their personal involvement in the claimed violations, and that they were never properly served. (CPS/PHS Mem. in Support of Mot. to Dismiss at 1). None of these arguments, however, warrant dismissal of these claims at this time.

### A. Service

Because this Court lacks jurisdiction over defendants[*78] that have not been served with process, the Court will first consider the issue of service. CPS and PHS assert that they were never served with the Complaint, and point to the Court docket for confirmation of that fact. (CPS/PHS Mem. in Support of Mot. to Dismiss at 6.) Indeed, the docket indicates that, although Verley, proceeding in forma pauperis, requested that the U.S. Marshal effectuate service on CPS and PHS, the Marshals' efforts were unsuccessful. (Dkt. 43, noting return of unexecuted service as to CPS and PHS.) It further appears that Verley's time to serve these defendants with the Complaint has long expired under *Federal Rule of Civil Procedure 4(m)*, which [HN54] provides that service must be made upon defendants within 120 days of filing the complaint. See *Fed. R. Civ. P. 4(m)*; see also letter to Verley from the Court, dated April 10, 2002 (advising Verley that, under *Rule 4(m)*, he was required to serve all defendants by June 14, 2002).

Nonetheless, CPS and PHS's motion to dismiss on the ground of lack of service should be denied. First, the Court has no reason to doubt Verley's assurances [*79]that he has made diligent efforts to serve these defendants, by providing the Marshals with all relevant information in his possession to aid with service. (See Transcript of Aug. 5, 2002 conference at 19.) Second, it is apparent that CPS and PHS have had actual notice of Verley's Complaint for quite some time. Counsel for CPS and PHS has participated in conferences with the Court consistently since September 5, 2002, and the motion papers filed by these defendants demonstrate their full awareness of the claims raised against them.

[HN55] The Second Circuit has noted that *Rule 4* is to be liberally construed "to further the purpose of finding personal jurisdiction in cases in which the party has received actual notice." *Romandette v. Weetabix Co., 807 F.2d 309, 311 (2d Cir. 1986)* (citing *Grammenos v. Lemos, 457 F.2d 1067, 1070 (2d Cir. 1972)).* By the explicit terms of *Rule 4(m)*, the Court may disregard a failure to meet the 120-day limit if the plaintiff can show good cause why such service was not made. The Marshal's failure to effectuate service has been held to be good cause, where a pro se inmate, proceeding in forma pauperis, has provided [*80]all the relevant information for service. *Ismaa'Iyl Furqaan Muhammad v. Coughlin, 1994 U.S. Dist. LEXIS 2175, No. 89 Civ. 5088 (PKL), 1994 WL 68168, at *2 (S.D.N.Y. Mar. 1, 1994).* Indeed, "where an incarcerated pro se plaintiff depends solely on the Marshals to effectuate service and has provided the Marshal's Service with appropriate papers, dismissal under *Rule 4* ... is inappropriate." *Id. 1994 U.S. Dist. LEXIS 2175, at *3* (citations omitted); see also *Duncan v. Timo, 2000 U.S. Dist. LEXIS 3560, No. 99 Civ. 0978 (LAK)(FM), 2000 WL 124823, at *1 (S.D.N.Y. Feb. 2, 2000)* (declining to dismiss pro se prisoner's complaint despite a delay in service); *Carney v. Davis, 1991 U.S. Dist. LEXIS 10254, No. 90 Civ. 2591 (JSM), 1991 WL 150537, at *3 (S.D.N.Y. June 26, 1991)* (same); *Williams v. Allen, 616 F. Supp. 653, 655-56 (E.D.N.Y. 1985)* (declining to dismiss pro se prisoner's complaint despite a three-and-one-half year delay in service). Moreover, as CPS and PHS have fully participated in this case almost from the beginning of the litigation, they can point to no prejudice that they would suffer by the Court's declining to dismiss the case against them based on lack of service. See, e.g, *Muhammad, 1994 U.S. Dist. LEXIS 2175, 1994 WL 68168, at *4*[*81] .

Under the circumstances presented here, I recommend that CPS and PHS be directed to furnish the Court with proper information as to how they may be served, and that the Court provide this information to the Marshal's service with a request that service be made. See *Valentin v. Dinkins, 121 F.3d 72, 76 (2d Cir. 1997)*   [HN56]

(before dismissing a civil rights complaint of an incarcerated plaintiff, the "district court may pursue any course that it deems appropriate" to effectuate service on defendants); *Bryant v. New York State Dep't of Corr. Servs. Albany, 2001 U.S. Dist. LEXIS 2785, No. 00 Civ. 3728 (RMB)(FM), 2001 WL 263315, at *1 (S.D.N.Y. Mar. 16, 2001)* (where inmate submitted information for service, and Marshals were unable to serve because the address was incorrect, the court did not dismiss the case but ordered that the defendant provide the correct information and service be effectuated following receipt of this information). n18

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n18 I further recommend that, if CPS and PHS now opt to waive such service, they be permitted to so notify the Court, in lieu of providing the information as to how they may be served.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - -

[*82]

B. *Eleventh Amendment*

As discussed above (see supra at 17-18), the *Eleventh Amendment* bars suit in federal court by a citizen of a state against a state or its agencies, unless the state has waived immunity to suit, or Congress has abrogated the state's immunity. *Huang v. Johnson, 251 F.3d 65, 69-70 (2d Cir. 2001); Woods v. Goord, 2002 U.S. Dist. LEXIS 7157, No. 01 Civ. 3255 (SAS), 2002 WL 731691, at *3 (S.D.N.Y. Apr. 23, 2002)* (collecting cases); (JSR)(*Johnson v. Bendheim, 2001 U.S. Dist. LEXIS 9679, No. 00 Civ. 720 KNF), 2001 WL 799569, at *9 (S.D.N.Y. July 13, 2001)* (citing *Seminole Tribe of Florida v. Florida, 517 U.S. 44, 134 L. Ed. 2d 252, 116 S. Ct. 1114 (1996)).* Thus, if CPS and PHS are accurately characterized as state agencies, such that the real party in interest is the state, they cannot be sued under *Section 1983* for deliberate indifference to Verley's medical needs. See *Posr v. Court Officer Shield 207, 180 F.3d 409, 414 (2d Cir. 1999)* (an arm of the state is immune from suit); *Herzog Contracting Corp v. Niagra Frontier Transp. Auth., 84 Civ. 1135E, 1987 WL 4796,* at *1-2 (S.D.N.Y. Apr. 20, 1987)  [HN57] (the *Eleventh Amendment*[*83] precludes federal suit against a state agency which is merely an arm of the state, as opposed to a separate entity); see also *Gowins, 2002 U.S. Dist.*

LEXIS 14098, 2002 WL 1770772, at *5 (plaintiff could not sue a state agency, such as DOCS, for any relief under *Section 1983*).

Although at least one judge of this Court has found CPS to be a state agency and thus immune from suit, see *Woods, 2002 U.S. Dist. LEXIS 7157, 2002 WL 731691, at *3* ("The *Eleventh Amendment* bars plaintiff's claims against DOCS and CPS because they are state agencies."), CPS and PHS have submitted insufficient information at this time for this Court to make an independent determination on this issue. [HN58] The question of whether an entity acts as an "arm of the state" turns on the nature of the relationship between the state and the agency and such factors as the agency's corporate status, its financial independence, its ability to sue and be sued in its own name, from where the funds to pay damages will come, and the local or statewide nature and impact of its functions. See *Lipofsky v. Steingut, 86 F.3d 15, 16-17 (2d Cir. 1996)*; *Ettinger v. State Univ. of N.Y. State College of Optometry, 1998 U.S. Dist. LEXIS 2289, No. 95 Civ. 9893 (RWS), 1998 WL 91089, at *8 (S.D.N.Y. Mar. 2, 1998)*[*84] ; *Herzog Contracting Corp, 1987 WL 4796,* at *2. No party has offered the Court any guidance on this question. For this reason, I recommend that the motion of CPS and PHS to dismiss Verley's claims against them on the basis of their purported *Eleventh Amendment* immunity be denied, without prejudice to the right of CPS and PHS to file a motion for summary judgment, if these defendants are able to demonstrate that they are not independent entities that merely contract with the state, but, in fact, are state agencies. n19

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n19 In seeking to dismiss Verley's claims against them, CPS and PHS do not actually argue that they are state agencies and thus completely immune from suit for *Section 1983* violations, but rather argue that they cannot be sued in their "official" capacities under the *Eleventh Amendment.* (CPS/PHS Mem. in Support of Mot. to Dismiss at 6.) In his Complaint, Verley purports to sue these defendants in their "individual" capacities (see Complaint PP 18-19), and in his Proposed Amended Complaint, he purports to sue them in their "corporate" capacities (see Prop. Am. Compl. P 18). Yet while the distinction between "individual" and "official" capacity makes sense for a prison officer or other staff member, it does not equally make sense for organizations like CPS and PHS. See *Woods, 2002 U.S. Dist. LEXIS 7157, 2002 WL 731691, at 3 n.7.* The necessary *Eleventh*

*Amendment* inquiry, as discussed above, is whether these defendants are state agencies, or instead are separate, independent entities.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*85]

C. Sufficiency of Allegations

CPS and PHS argue that the claims against them are insufficient because of Verley's purported failure to allege specific facts describing their direct involvement in the alleged constitutional violations. (CPS/PHS Mem. in Support of Mot. to Dismiss at 4.)

Verley, however, alleges that these entities made determinations that denied him medical treatment, and that these determinations were based not on a sound medical evaluation, but rather on the high cost of the treatment involved. (Compl. P 51.) In this regard, Verley's opposition papers cite the contract between PHS and DOCS, alleging that PHS seeks to minimize costs because, in Verley's words: if "treatment costs are under a certain figure annually, treatment costs falls solely upon D.O.C.S. However if said costs run above a certain figure, financial costs are upon P.H.S." (Verley Aff. in Opp. to Mot. to Dismiss PP 42-43.) Further, Verley's Proposed Amended Complaint adds that "various consultations submitted on [Verley's] behalf to see [a] specialist have been denied by CPS/PHS on a financial basis and not [based on] sound medical reasoning." (Prop. Amend. Compl. P 54.) The proposed[*86] amendment also specifically implicates CPS and PHS in Verley's deliberate indifference claim based on their alleged failure to pay for medical treatment because of financial concerns. (Prop. Amend. Compl. P 81.)

Reading these allegations liberally, they sufficiently allege CPS and PHS's involvement in events giving rise to a deliberate indifference claim. In short, Verley has alleged that these defendants directly participated in a violation of his rights by denying him adequate medical care based on financial concerns, rather than on medical judgment. If demonstrated to be true, such an ulterior motive could show that these defendants were deliberately indifferent to Verley's serious medical needs. See, e.g, *Chance v. Armstrong, 143 F.3d 698, 704 (2d Cir. 1998)* (where plaintiff alleged that two doctors recommended a less expensive treatment not on the basis of medical views, but solely because of monetary incentives, such allegation of an ulterior motive was sufficient to state a claim for deliberate indifference).

The motion by CPS and PHS to dismiss the deliberate indifference claims against them should therefore be denied, and the motion to amend any such claims[*87] should be granted. n20

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n20 At this time, I recommend that the Court decline to review the evidentiary record that has been presented thus far, to determine whether Verley's claims against CPS and PHS are in fact capable of being proven. Although CPS and PHS have submitted an affidavit from their former medical director, attesting to their lack of involvement in any denial of PegIntron treatment (see Schoene Reply Aff. in Support of Mot. to Dismiss, Exhibit A, Affidavit of Arvind K. Wadhwa, sworn to Apr. 23, 2003), the instant motion is directed to Verley's pleading, and it would be inappropriate for the Court to convert the motion to dismiss into one for summary judgment without first informing Verley that the Court would be considering evidence extrinsic to the Complaint, and without affording him an opportunity to respond with his own evidentiary submission. See *Fed. R. Civ. P. 12(b)*. CPS and PHS should, however, be afforded the opportunity to present their evidence in the context of a later summary judgment motion.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*88]

## VII. REMAINING ISSUES RAISED BY VERLEY'S MOTION TO AMEND

### A. New Allegation Against Koenigsmann

Verley's Proposed Amended Complaint includes the new allegation that Koenigsmann wrongfully "conspired" to have Verley transferred out of Green Haven. (Prop. Am. Compl. P 58.) It is unclear whether Verley has intended this allegation to constitute a new claim against Koenigsmann, or simply to provide further factual support for his existing claim that Koenigsmann has engaged in a pattern of activity designed to deny him adequate medical care. If the latter, his motion to amend may be more appropriately characterized as a motion

under *Fed. R. Civ. P. 15(d)* to supplement his Complaint "to plead events which have happened since the date of [the Complaint]." *Marcucci v. New York Dist. Council of Carpenters Welfare Fund, 2001 U.S. Dist. LEXIS 20923, No. 97 Civ. 7406 (LBS), 2001 WL 1622213, at *2 n.3 (S.D.N.Y. Dec. 17, 2001)* (internal quotations omitted) (citing *Flaherty v. Lang, 199 F.3d 607, 614 n.3 (2d Cir.1999)*). Either way, however, Verley does not plead that he exhausted his administrative remedies with respect to this new[*89] allegation of wrongdoing. See *Petty v. Goord, 2002 U.S. Dist. LEXIS 21197, No. 00 Civ. 803 (MBM), 2002 WL 31458240, (S.D.N.Y. Nov. 4, 2002)* [HN59] (any "allegations in the complaint which are not mentioned in prior grievances are barred by *section 1997e(a)*").

All claims of misconduct regarding prison conditions must be exhausted before they can be raised in this Court. The Prison Litigation Reform Act ("PLRA") [HN60] provides that "no action shall be brought with respect to prison conditions under *section 1983* of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *42 U.S.C. § 1997e(a)*. The Supreme Court has held that [HN61] this exhaustion requirement "applies to all inmate suits about prison life, whether they involve general or particular episodes, and whether they allege excessive force or some other wrong." See *Porter v. Nussle, 534 U.S. 516, 532, 152 L. Ed. 2d 12, 122 S. Ct. 983 (2002)*. Moreover, claims for deliberate indifference to medical needs are claims "with respect to prison conditions" under *1997e* and, as such, must be exhausted under the PLRA. [*90] See *Cruz v. Jordan, 80 F. Supp. 2d 109, 116 (S.D.N.Y. 1999)* (collecting cases and explicitly holding that "plaintiff's claim concerning defendants' deliberate indifference with respect to his medical needs is an action 'with respect to prison conditions.'").

[HN62] DOCS has established an Inmate Grievance Procedure ("IGP") to provide prisoners with an administrative forum in which to bring their grievances. See *N.Y. Correct. Law § 139; N.Y. Compl. Codes R. & Regs. tit. 7 § 701*. Generally, the regulations establish a three-step inmate grievance process. First, the inmate must file a complaint with the inmate grievance resolution committee ("IGRC") within 14 days of the alleged events. The IGRC must then investigate and resolve the complaint informally or following a hearing to be held within seven days. Within four days of receiving the committee's decision, the inmate may then appeal to the Superintendent of the facility. Finally, within four days of receipt of the Superintendent's decision, the inmate may appeal to the Central Office Review Committee ("CORC") The CORC, in turn, must

render a decision within 20 days. Id.; see *Cruz, 80 F. Supp. 2d at 117.*[*91]

[HN63] A prisoner must completely exhaust the administrative remedies to the highest level for each claim he seeks to present. See *Santiago v. Meinsen, 89 F. Supp. 2d 435, 440 (S.D.N.Y. 2000).* [HN64] Under *Section 1997e*, all institutional remedies must be pursued even if the prisoner is ultimately time-barred from pursuing the administrative process or he is seeking a remedy that cannot be awarded in the administrative proceeding. See id; see also *Booth v. Churner, 532 U.S. 731, 736-37, 149 L. Ed. 2d 958, 121 S. Ct. 1819 (2001)* (requiring an inmate to exhaust claims through all available proceedings, even those that could not provide the relief sought); *Cruz, 80 F. Supp. 2d at 117* (even though monetary damages sought by the plaintiff were not available in the administrative proceeding, the exhaustion remedy remained applicable).

Because dismissal on the basis of failure to exhaust is mandatory, Verley's claims can only proceed in this Court if, as to each claim, he has exhausted all available administrative remedies, including all appellate remedies provided within the DOCS system. See *Porter, 534 U.S. at 523* (citing *Booth, 532 U.S. at 739*);[*92] see *Woods, 2002 U.S. Dist. LEXIS 7157, 2002 WL 731691, at *11*; *Mendez v. Artuz, 2002 U.S. Dist. LEXIS 3263, No. 01 Civ. 4157 (GEL), 2002 WL 313796, at *1 (S.D.N.Y. Feb. 27, 2002)*; see also *Avent v. Solfaro, 2003 U.S. Dist. LEXIS 9896, No. 02 Civ. 0914 (RCC) (RLE), 2003 WL 21361730, at *3 (S.D.N.Y. June 12, 2003)* (denying inmate leave to amend where claims would be subject to dismissal as not fully exhausted). [HN65] Where it appears from the face of the complaint that a plaintiff concedes lack of exhaustion, or non-exhaustion is otherwise apparent, a court may decide the exhaustion issue on a *Rule 12(b)(6)* motion. See *Rivera v. Pataki, 2003 U.S. Dist. LEXIS 11266, No. 01 Civ. 5179 (MBM), 2003 WL 21511939, at *4 (S.D.N.Y. July 31, 2003)*; *McCoy v. Goord, 255 F. Supp. 2d 233, 250-52 (S.D.N.Y. 2003)*. As Verley has not pleaded exhaustion of his new charge against Koenigsmann, I recommend that his motion to amend his Complaint to add that charge be denied without prejudice.

B. Claims Against New Defendants

By his Proposed Amended Complaint, Verley also seeks to add as defendants four doctors who allegedly treated him after he was transferred to Fishkill - Drs. Klyszejko, Isudenzo, Parikh, and Sohng. n21 (See[*93] Prop. Am. Compl. PP 15-17.) However, this amendment also should not be permitted at this juncture because Verley has not pleaded that his claims against these doctors have been fully exhausted.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n21 Sohng is not listed in the caption or the "parties" section of the Proposed Amended Complaint, but he is mentioned several times throughout that proposed pleading as having played a role in the alleged constitutional violations. (Prop. Am. Compl. PP 71-72, 88.) Liberally construing the proposed pleading, the Court will assume that Verley intended to add Sohng as a defendant, together with the other named defendants who treated Verley at Fishkill. See *Woods, 2002 U.S. Dist. LEXIS 7157, 2002 WL 731691, at *1 n.2* (liberally construing a pro se complaint and treating a party left off the caption but mentioned in the body of the complaint as a named defendant).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

Defendants maintain that, although Verley filed grievances against Klyszejko, Isudenzo, Parikh, and Sohng, he did not appeal the denial of those grievances up to the CORC[*94] level. (DOCS Opp. to Mot. to Amend at 4-5.) In response, Verley does not deny that he failed to appeal these grievances through the IGP. Rather, he argues that the IGP is not the "relevant administrative vehicle of exhaustion" for medical issues, and that such issues should instead be raised to the Chief Medical Officer in Albany. (Plaintiffs' Reply to the Defendants' Opposition to Plaintiffs' Motion for Leave to Amend the Complaint dated Aug. 28, 2003 ("Verley Reply Mem.") P 20.) Verley contends that the IGP is an inappropriate method to challenge medical decisions because, through that procedure, grievances are decided by individuals who are not all medical personnel, and because non-medical personnel should not be privy to sensitive medical information. (Verley Reply Mem. P 22.) Yet even if the Court were to accept Verley's arguments and find that an acceptable method for exhausting his claims would have been by filing a grievance with the Chief Medical Officer in Albany, a procedure that may have allowed for resolution of his grievances through informal channels, see e.g., *Marvin v. Goord, 255 F.3d 40, 43 n.3 (2d Cir. 2001)*, Verley does not allege that he in fact[*95] filed a grievance with the Chief Medical Director, after his grievances were denied by the IGRC.

As Verley has not pleaded exhaustion of his proposed new claims against Klyszejko, Isudenzo, Parikh, and Sohng, I recommend that his motion for leave to amend his Complaint to add such claims be denied without prejudice. n22

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n22 It should also be noted that, even if Verley is able to plead exhaustion of his claims against the Fishkill doctors and seek further leave to amend on that basis, any claims for declaratory or injunctive relief regarding practices at Fishkill would be moot, as Verley has been transferred again, to Auburn. (See n.1 and discussion at 19-20, supra.)

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

CONCLUSION

For the foregoing reasons, I hereby respectfully recommend that:

(1) the motions to dismiss all claims against defendants Phillip Marrone, Goord, Rush, Antonelle, Vincent Marrone, and Rosensweig be granted, and any motion by Verley to amend such claims be denied;

(2) the motion to dismiss the *Section 1983*[*96] deliberate indifference claim against defendant Weinstein be granted, but Verley's motion for leave to amend this claim be granted to the extent the Proposed Amended Complaint seeks monetary damages against Weinstein in his individual capacity;

(3) the motion to dismiss the following claims be granted, and Verley's motion to amend these claims be denied, without prejudice to Verley to seek further leave to amend, if he is able to remedy the deficiencies in these claims as currently pleaded:

(a) the *Section 1983* deliberate indifference claims against defendants Stevens, and Greiner;

(b) the privacy claims against defendants Weinstein, Stevens, and Greiner; and

(c) the equal protection and ADA claims against defendants Weinstein, Stevens, and Greiner;

(4) the motion to dismiss the Rehabilitation Act claims against defendants Weinstein, Stevens, and Greiner be granted, and Verley's motion to amend those claims be denied;

(5) the motion to dismiss the claims against defendants CPS and PHS be denied, and Verley's motion to amend those claims be granted;

(6) Verley's motion to amend the Complaint to add a new claim and/or allegations against[*97] defendant Koenigsmann be denied, without prejudice to Verley to seek further leave to amend, if he is able to plead exhaustion; and

(7) Verley's motion to amend the Complaint to add defendants Klyszejko, Isudenzo, Parikh, and Sohng be denied, without prejudice to Verley to seek further leave to amend, if he is able to plead exhaustion.

Pursuant to *28 U.S.C. § 636(b)(1)* and *Rule 72(b) of the Federal Rules of Civil Procedure*, the parties shall have ten (10) days from service of this Report to file written objections. See also *Fed. R. Civ. P. 6*. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable P. Kevin Castel, United States Courthouse, 500 Pearl Street, Room 2260, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 40 Centre Street, Room 631, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Castel. FAILURE TO FILE OBJECTIONS WITHIN TEN (10) DAYS WILL RESULT IN A WAIVER[*98] OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. See *Thomas v. Arn, 474 U.S. 140, 155, 88 L. Ed. 2d 435, 106 S. Ct. 466 (1985)*; *IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993)*; *Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992)*; *Wesolek v. Canadair Ltd., 838 F.2d 55, 58 (2d Cir. 1988)*; *McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983)*.

Dated: January 22, 2004

Respectfully Submitted,

DEBRA FREEMAN

United States Magistrate Judge

Copyright 2004 SHEPARD'S - 2 Citing references

**Verley v. Goord, 2004 U.S. Dist. LEXIS 857 (S.D.N.Y. Jan. 22, 2004)**

**SHEPARD'S(R) Signal: Citing Refs. With Analysis Available**
Restrictions: *Unrestricted*
FOCUS Terms:  *None*
Print Format: *FULL*
Citing Ref. Signals: *Hidden*

**PRIOR HISTORY** (1 citing case)

*Verley v. Goord*, 2003 U.S. Dist. LEXIS 15065 (S.D.N.Y. Aug. 29, 2003)

> ***Magistrate's recommendation at***
> ***Citation you entered***
> ***Verley v. Goord, 2004 U.S. Dist. LEXIS 857 (S.D.N.Y. Jan. 22, 2004)***

**CITING DECISIONS** (1 citing decision)

**2ND CIRCUIT - U.S. DISTRICT COURTS**

**Cited by**
*Lumaj v. Williams*, 2004 U.S. Dist. LEXIS 8178 (S.D.N.Y. May 6, 2004)
> **Cited by**
> 2004 U.S. Dist. LEXIS 8178

Copyright 2004 SHEPARD'S - 2 Citing references

**Graham v. Wright, 2003 U.S. Dist. LEXIS 16106 (S.D.N.Y. Sept. 11, 2003)**

**SHEPARD'S(R) Signal: Citation Information Available**
Restrictions: *Unrestricted*
FOCUS Terms: *None*
Print Format: *FULL*
Citing Ref. Signals: *Hidden*


**PRIOR HISTORY** (0 citing cases)


*Citation you entered*
***Graham v. Wright, 2003 U.S. Dist. LEXIS 16106 (S.D.N.Y. Sept. 11, 2003)***


**CITING DECISIONS** (2 citing decisions)


**2ND CIRCUIT - U.S. DISTRICT COURTS**


**Cited by**
*Johnson v. Wright*, 2004 U.S. Dist. LEXIS 7543 (S.D.N.Y. May 3, 2004)
   **Cited by**
   2004 U.S. Dist. LEXIS 7543


**Cited by**
*Verley v. Goord*, 2004 U.S. Dist. LEXIS 857 (S.D.N.Y. Jan. 22, 2004)
   **Cited by**
   2004 U.S. Dist. LEXIS 857

FRANK GRAHAM, Plaintiff, - against - LESTER N. WRIGHT, etc.,et al., Defendant(s).
01 Civ. 9613 (NRB)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OFNEW YORK

2003 U.S. Dist. LEXIS 16106

September 11, 2003, Decided
September 12, 2003, Filed

DISPOSITION: [*1] All claims dismissed against defendants with exception of plaintiff's claims for monetary damages against defendants Graceffo, Makram, Lancellotti, and Milicevic in their individual capacities.

CASE SUMMARY:

PROCEDURAL POSTURE: In a *42 U.S.C.S. § 1983* case, pro se plaintiff inmate sued defendants, six prison employees, including four doctors, alleging violations of the Eighth and Fourteenth Amendments because his Hepatitis C condition was not diagnosed in a timely manner and a failure to provide him with adequate medical treatment. A magistrate judge recommended that defendants' *Fed. R. Civ. P. 12(b)(1)* and *12(b)(6)* motion be granted in part and denied in part.

OVERVIEW: The inmate's claim against one prison employee stemmed entirely from that employee's denial of his grievance. There was no way that the individual could have responded to and/or remedied the inmate's allegations of deliberate indifference that occurred prior to inmate's transfer to the facility where the employee was employed. The inmate failed to state a claim against that employee in his individual capacity. The inmate's claim for monetary damages against one doctor failed because the inmate did not allege that he was ever treated by the doctor. In regards to two other doctors, dismissal was inappropriate since those doctors treated the inmate. Relevant to the inmate's claim was the time frame in which the medical community acquired sufficient knowledge of Hepatitis C so that a failure to diagnose the condition might possibly be an Eighth Amendment violation. Neither party submitted admissible evidence on the precise time frame in which the medical community acquired its knowledge of Hepatitis C. While the doctors might prevail at the summary judgment stage of the proceedings, dismissal was inappropriate.

OUTCOME: All claims against all defendants were dismissed except for monetary claims against four doctors in their individual capacities.

CORE TERMS: deliberate indifference, grievance, recommendation, medical community, monetary damages, inmate, motion to dismiss, time frame, summary judgment, medical staff, diagnosed, diagnose, prisoner, immunity, stem, injunctive relief, decision to deny, ordering, patient, liver

LexisNexis(R) Headnotes

Constitutional Law: State Autonomy
Constitutional Law: Civil Rights Enforcement: Immunity: Public Officials
[HN1] In a *42 U.S.C.S. § 1983* case, a plaintiff's claims against individual defendants in their personal capacity are not barred by Eleventh Amendment immunity.

Constitutional Law: Cruel & Unusual Punishment
Constitutional Law: Civil Rights Enforcement: Prisoners: Medical Treatment
[HN2] In order to survive, a plaintiff's deliberate indifference claims against each of these defendants must demonstrate a level of culpable recklessness beyond ordinary negligence. A complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

Constitutional Law: Civil Rights Enforcement: Prisoners: Medical Treatment
[HN3] It is well established that prison supervisory officials are generally entitled to delegate medical responsibility to facility medical staffs and are entitled to rely on the opinion of medical staff concerning the proper course of treatment.

COUNSEL: Frank Graham, Plaintiff, Pro se, Dannemora, NY.

For Defendants: Kevin P. McCaffrey, Esq., Assistant Attorney General, State of New York, New York, NY.

JUDGES: NAOMI REICE BUCHWALD, UNITED STATES DISTRICT JUDGE.

OPINIONBY: NAOMI REICE BUCHWALD

OPINION: MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

On October 31, 2001, plaintiff, Frank Graham ("plaintiff" or "Graham"), an incarcerated inmate in the custody of the New York State Department of Correctional Services ("DOCS"), filed this complaint pursuant to *42 U.S.C. § 1983* alleging violations of the *Eighth* and *Fourteenth Amendments.* Specifically, plaintiff, who has been diagnosed with Hepatitis C, alleged in his complaint that the defendants failed to diagnose his condition in a timely manner and to provide him with adequate medical treatment. In addition, plaintiff alleged that DOCS' policy of imposing special requirements for the treatment of inmates diagnosed with Hepatitis C violates[*2] the *Fourteenth Amendment.* On February 4, 2002, defendants moved to dismiss plaintiff's complaint for lack of subject matter jurisdiction and for failure to state claim. On August 22, 2003, Magistrate Judge Pitman issued a Report and Recommendation granting defendants' motion in part and denying it in part. Familiarity with that Report and Recommendation is assumed. On September 8, 2003 defendants filed objections to the Report and Recommendation only with respect to defendants Graceffo, Matthews, and Keane.

We concur with Judge Pitman's decision to dismiss plaintiff's claims for: (1) injunctive relief ordering a liver biopsy and evaluation by a liver specialist; (2) injunctive relief ordering a revision of the DOCS Guidelines; and (3) monetary damages against all of the individual defendants in their official capacity. n1 We also concur with Judge Pitman's decision to deny defendants' motion to dismiss plaintiff's claim for monetary damages against Drs. Graceffo, Makram, Lancellotti, and Milicevic in their individual capacities. n2 We disagree, however, with Judge Pitman's decision to sustain plaintiff's monetary damages claims against defendants Wright n3 and Keane.

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n1 To avoid confusion, we note that there appears to be a typographical error on page 20 of Judge Pitman's Opinion. The sentence which currently reads, "However, plaintiff's claims against the individual defendants in their personal capacity are barred by *Eleventh Amendment* immunity" should instead read as follows: "However, [HN1] plaintiff's claims against the individual defendants in their personal capacity are not barred by *Eleventh Amendment* immunity."

[*3]

n2 While we ultimately concur with Judge Pitman's decision to deny defendants' motion to dismiss plaintiff's deliberate indifference claims on the theory that "certain instances of medical malpractice may rise to the level of deliberate indifference", *Hathaway v. Coughlin, 99 F.3d 550, 553 (1996)* we note that [HN2] in order to survive, plaintiff's deliberate indifference claims against each of these defendants must demonstrate a level of "culpable recklessness" beyond ordinary negligence. Id. See also *Estelle v. Gamble, 429 U.S. 97, 106, 50 L. Ed. 2d 251, 97 S. Ct. 285* & n.14, *429 U.S. 97, 50 L. Ed. 2d 251, 97 S. Ct. 285,* (1976); ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the *Eighth Amendment.* Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.") Thus, while it would be inappropriate to dismiss plaintiff's claims on the merits at this stage, going forward, plaintiff has a heavy burden in order to sustain his claims against these defendants.

[*4]

n3 Defendants have not specifically objected to Judge Pitman's denial of their motion to dismiss plaintiff's claims against defendant Wright.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

I. Defendant Keane

While Judge Pitman found that plaintiff sufficiently alleged the requisite "personal involvement" we find that plaintiff's claim against defendant Keane should be dismissed for failure to state a claim. Plaintiff's claim against Keane stems entirely from Keane's review and denial of plaintiff's grievance. To the extent that plaintiff argues that Keane ignored the allegations within his grievance of deliberate indifference by medical personnel at facilities prior to his transfer to the Woodbourne facility, we fail to see how Keane could have responded to and/or remedied these allegations within the framework of the grievance process. n4 Moreover, as to Keane's determination that "plaintiff must use the sick call procedure and obtain a doctor's appointment if he wishes to receive treatment", Plaintiff's Complaint, Ex. B, Inmate Grievance Response, we note that this determination was unanimously upheld by the Central Office Review [*5] Committee "upon a full hearing of the facts and circumstances ... and upon recommendation of the Division of Health Services." Id., Inmate Grievance Program Central Office Review Committee Denial of Grievance. [HN3] It is well established that supervisory officials are "generally entitled to delegate medical responsibility to facility medical staffs and are entitled to rely on the opinion of medical staff concerning the proper course of treatment." *Abdush-Shahid v. Coughlin, 933 F. Supp. 168, 183 (N.D.N.Y. 1996)*. In the instant case, plaintiff has not suggested that defendant Keane, as part of his investigation of plaintiff's grievance, failed to appropriately rely on the opinion of medical staff in coming to his determination, nor has he alleged that defendant Keane was deliberate or malicious in his ultimate denial of the grievance. Accordingly, we find that plaintiff has failed to state a claim against Keane and dismiss plaintiff's claim against him in his individual capacity.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n4 Plaintiff filed his grievance while at the Woodbourne facility. The evidence indicates that Keane did not "ignore" plaintiff's allegations of past deliberate indifference but rather notified plaintiff that his request for a monetary judgment "is not accepted and is not a part of the grievance mechanism." This determination was subsequently affirmed on review by the Central Office Review Committee.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*6]

II. Defendant Wright

Plaintiff's claims against defendant Wright, the Associate Commissioner Chief Medical Officer of DOCS, stem from his allegations that he was injured as a result of Wright's implementation of Guidelines for the diagnosis and treatment of Hepatitis C. However, as plaintiff does not allege that he was ever personally treated by Dr. Wright, and as we concur with Judge Pitman's determination that plaintiff lacks standing to challenge the Guidelines' special requirements for the treatment of Hepatitis C, we find that plaintiff cannot sustain a claim against Wright. n5 Accordingly, we hold that defendant's claim for monetary damages against this defendant is dismissed.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n5 As an aside, we note that the portions of the Guidelines challenged by plaintiff, namely that the inmate must successfully complete an ASAT program or at least be concurrently enrolled in such a program and that there must be an anticipated incarceration period for the inmate of at least 12 months appear to be highly rational in light of the fact that severe side effects, including death, may result from treatment of the patient with interferon-alpha-2b or 2a combined with ribavirin for 6-12 months, and that active substance abuse, including alcohol abuse, can cause life threatening consequences to a patient following the treatment regimen.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*7]

III. Defendants Graceffo and Matthews

With respect to Graceffo and Matthews, despite defendants' objections, we continue to concur with Judge Pitman's decision not to dismiss plaintiff's claims against these defendants. Drs. Graceffo and Matthews treated plaintiff between the years 1990 and 1992. As Judge Pitman indicated in footnote 1 of his Report and Recommendation, there exists a discrepancy with regard to the date on which plaintiff alleges his deliberate indifference claim commenced. Clearly relevant to a proper analysis of the date on which a deliberate indifference claim accrued is the time frame in which the medical community acquired sufficient knowledge of Hepatitis C so that a failure to diagnose the condition might possibly be an *Eighth Amendment* violation. Neither party has submitted admissible evidence on the precise time frame in which the medical community acquired its knowledge of Hepatitis C. n6 While defendants may ultimately prevail at the summary judgment stage if the facts show that Drs. Graceffo and Matthews could not, based on the knowledge available to the medical community generally, have knowingly disregarded an excessive risk to plaintiff's[*8] health or safety during the period of 1990-1992, we find that it is not appropriate at this time to grant defendant's motion to dismiss plaintiff's claim against these defendants on the pleadings alone.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n6 While plaintiff does alleges a time frame in which the medical community became aware of Hepatitis C,

he provides no support for this assertion nor does he do so with any degree of precision. See Compl. P 19 ("The beginning of defendants deliberate indifference started in 1992-93 when the medical community became aware of the Hep. C virus ....")

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

CONCLUSION

For the reasons set forth in this Opinion and in Judge Pitman's Report and Recommendation, we dismiss all claims against the defendants with the exception of plaintiff's claims for monetary damages against Drs. Graceffo, Makram, Lancellotti, and Milicevic in their individual capacities. Having resolved this initial motion, we note that it would assist the resolution of this case, perhaps even by summary judgment, if plaintiff's entire medical[*9] record was made available.

IT IS SO ORDERED.

DATED: New York, New York

September 11, 2003

NAOMI REICE BUCHWALD

UNITED STATES DISTRICT JUDGE

```
****------------------------------------------------------------------------****
*      9 PAGES                230 LINES              JOB  33822   100PJQ       *
*  11:33 A.M. STARTED   11:34 A.M. ENDED                  07/01/04             *
****------------------------------------------------------------------------****
****------------------------------------------------------------------------****
*                        EEEEE    N   N    DDDD                                *
*                        E        N   N    D   D                               *
*                        E        NN  N    D   D                               *
*                        EEE      N N N    D   D                               *
*                        E        N  NN    D   D                               *
*                        E        N   N    D   D                               *
*                        EEEEE    N   N    DDDD                                *
*                                                                             *
****------------------------------------------------------------------------****
*                                                                             *
****------------------------------------------------------------------------****
```

```
SEND TO: LYNCH, ANN
         CONNECTICUT ATTORNEY GENERAL STATE OF
         55 ELM ST
         HARTFORD, CONNECTICUT 06106-1746
```