RICHARD BLUMENTHAL
ATTORNEY GENERAL

RECEIVED

JUL 19   10 23 AM '05

MacKenzie Hall
110 Sherman Street
Hartford, CT 06105-2294

Office of The Attorney General
**State of Connecticut**

CHAMBERS
ROBERT N. CHATIGNY
U.S. DISTRICT JUDGE

Tel: (860) 808-5450
Fax: (860) 808-5591

July 18, 2005

The Honorable Robert N. Chatigny
Chief United States District Judge
United States District Court
450 Main Street
Hartford, CT 06103

Re: Coderre v. Pesanti et al 3:02CV1096

Dear Chief Judge Chatigny:

I am writing to advise your honor of a decision recently issued by the Second Circuit Court of Appeals in a hepatitis C case. Johnson v. Wright, 04-3234 pr (attached). I believe the case is completely distinguishable from the case before your honor referenced above.

In Johnson, the district court granted summary judgment in favor of the defendants solely on the grounds that the refusal to treat the inmate with Rebetron therapy was medically justifiable and thus defendants could not be deemed to be deliberately indifferent. The court did not reach any of the other issues raised by the defendants. On appeal, the Second Circuit court of appeals vacated the decision and remanded it back to the district court holding that a jury could find that defendants acted with deliberate indifference because 1) every one of plaintiff's treating physicians indicated to the defendants that prescribing Ribavirin to the plaintiff was the medically appropriate course of action, 2) there was conflicting evidence about whether or not the decision not to prescribe Ribavirin to the plaintiff was, in fact, medically justifiable and 3) there was no evidence suggesting that the defendants took any step whatsoever to investigate, let alone verify whether it would be medically appropriate to ignore the unanimous advice of Johnson's treating physicians. In vacating the district court's decision, the Second Circuit considered no other alternative grounds for affirming the district court decision stating that the district court had not yet considered those grounds.

Here, in its September 2004 ruling which gave plaintiff additional time to get expert evidence, this court noted that the basis for plaintiff's deliberate indifference claim was a delay in treatment. The court further noted that under the Second Circuit decision Smith v. Carpenter, 316 F.3d 178, 186 (2d Cir. 2003), plaintiff needed to offer expert evidence from which a reasonable juror could conclude that the delay in treating plaintiff's Hepatitis C exposed him to a substantial risk of serious harm, and that the defendants failed to act for any legitimate reason. Plaintiff has not offered such evidence. Instead, the unrefuted evidence is that the interferon

The Honorable Robert N. Chatigny
July 18, 2005
Page 2

treatment available in 1998, 1999, 2000, or 2001, and even in the summer of 2002 was not as good as the treatment plaintiff received.  See Paragraphs 43, 44 and 45 of Defendants' Local 56(a)(2) Statement.   The side effects of the treatments in 1998, 1999, 2000 or 2001 were much more frequent and the success rate in clearing the virus was lower.  Paragraph 43 of Defendants' Local 56(a)(2) Statement.  Defendants are entitled to summary judgment as the plaintiff has not presented the court with any evidence  from which a reasonable juror could find that the delay in providing plaintiff treatment exposed him to a substantial risk of serious harm for no legitimate reason.

        In conclusion, the recent decision <u>Johnson v. Wright</u> does not control your honor's decision in this matter.

                                    Very truly yours,


                                    Ann E. Lynch
                                    Assistant Attorney General



AEL

Cc:  Gerald Coderre (w/enc.)
        C/O Neon House
        100 South Main St
        Norwalk Ct 06854



law.com
online CLE

FIND JUDGMENT    FIND ANYONE    CRIMINAL    REC...

First [          ]    Last [          ]    State [          ]

• Law.com Home    • Newswire    • LawJobs    • CLE Center    • LawCatalog    • Our Sites    • Advertise

LAW.COM Connecticut

The
Online S

LawCatalog

July 11, 2005

SEARC
s a
hig
contract

**News & Information**
• Home
• Commentary
• In Practice
• Search Stories

**Resources**
• Law Firm Central
• Online CLE
• Legal Dictionary

**Classified Ads**
• LawJobs

**Practice Centers**
• Business Law
• Employment Law
• IP Law
• Litigation
• Tech Law

**About Us**
• about law.com
• advertise@law.com
• Print Advertising

### decision

**Johnson v. Wright**

2nd Cir.
06-24-2005
Katzmann, Circuit Judge:
04-3234-pr

Argued: May 20, 2005

Before KATZMANN, HALL, Circuit Judges. and MURTHA, District Judge.*fn1

New York State Department of Corrections ("DOCS") policy generally forbids the prescription of hepatitis C medication to any prisoner with evidence of active substance abuse within the preceding two years. Consistent with DOCS policy, the defendants in this case refused to prescribe plaintiff -- who suffers from chronic hepatitis C -- with a new regimen of medication because he had, on one occasion in the relevant time period, tested positive for marijuana use. Here, however, all of plaintiff's treating physicians, including prison physicians, believed that the medically appropriate course of treatment was to prescribe him the new regimen of hepatitis C medication, and they expressly and repeatedly recommended that DOCS approve a prescription for the medication notwithstanding the fact that DOCS policy suggested otherwise.

Because the defendants reflexively applied DOCS policy in the face of the unanimous, express, and repeated -- but contrary -- recommendations of plaintiff's treating physicians, including prison physicians, we believe a jury could reasonably find that the

🖨 **Printer-friendly version**
💬 **Comment on this item**
©️ **Reprint this article**



BUSIN
DEVEL
PRACT
SURVE
For further info
alimsearch

defendants here acted with deliberate indifference to the plaintiff's medical needs. Accordingly, we vacate the district court's grant of summary judgment to the defendants on that basis, and we remand the case for further proceedings consistent with this opinion.

I. BACKGROUND

A. Factual History

The pertinent facts -- either undisputed or, where disputed, taken most favorably to the plaintiff -- are as follows. The plaintiff, James Johnson, is an inmate in the custody of the New York State Department of Corrections ("DOCS") and is currently incarcerated at the Great Meadow Correctional Facility. From February 28, 1997 to November 9, 1999, Johnson was incarcerated at Green Haven Correctional Facility ("Green Haven").

In May 1997, following a liver biopsy, plaintiff learned that he suffers from chronic hepatitis C, a serious liver disease, and that his disease was in advanced Stage III with bridging fibrosis, approaching cirrhosis. At the time of his diagnosis, Johnson's treating physician at Green Haven was Tom Scales, M.D. Johnson also visited regularly with an outside gastroenterologist named "Dr. Antonelle."

In February 1998, Johnson began "Interferon therapy" as treatment for his hepatitis C, i.e., Johnson began receiving the drug alpha interferon at a dosage of 3 million units, three times per week. At first, Johnson responded quite positively to this therapeutic regimen: When Johnson began Interferon therapy in February 1998, he had a viral load count of 1.5 million units, but by June 1998, Johnson's viral load count had decreased to 943,396 units, and by October 1998, his viral load was classified as undetectable (less than 2000). However, Johnson's condition soon worsened. In December 1998, for example, Dr. Antonelle (Johnson's outside gastroenterologist) noted that Johnson's liver enzyme counts were increasing. Lab tests

performed in January 1999 showed a further increase in Johnson's liver enzyme count and also revealed that Johnson's viral load had dramatically increased from previously undetectable levels to a viral load of over 500,000 units.

In light of these changes, on February 2, 1999, Dr. Antonelle recommended that Johnson commence "Rebetron therapy," that is, treatment with both the drug alpha interferon (given in Interferon therapy) and the drug Ribavirin. Similarly, on February 4, 1999, Dr. Tom Scales, Johnson's treating physician at Green Haven Correctional Facility, indicated that in light of plaintiff's January 1999 lab reports, Johnson was "to be started on Ribovarin [sic] as soon as approval can be obtained." Dr. Scales also noted that he "anticipate[d] a new set of" tests "to evaluate for any developing anemia."

In a report dated either May 19, 1999 or May 24, 1999 -- the document contains conflicting dates -- Dr. Antonelle reiterated his belief that Johnson should be given Rebetron therapy, and shortly thereafter, on May 24, 1999, a note was made in Johnson's file that a request for Ribavirin would be submitted to the central prison pharmacy. Pursuant to DOCS policies at the time, such a request was made to defendant Lester Wright, M.D., DOCS Deputy Commissioner and Chief Medical Officer, by defendant Carl Koenigsmann, M.D., the Health Service Director of Green Haven Correctional Facility. On June 1, 1999, however, Dr. Koenigsmann was informed by Rita Gavin that Dr. Wright "denied the request for Ribavaron [sic] due to drug use within the past year."

At this point, a word about plaintiff's "drug use" is in order. In May 1998 -- roughly one year before the request to provide Johnson with Ribavirin was denied -- Johnson tested positive for marijuana use following the administration of a urine toxicology screen, i.e. a urinalysis test. It is undisputed that this single, positive urinalysis test is the only evidence in the record on summary judgment indicating that plaintiff took drugs at any time after he was diagnosed with hepatitis C.

It is also undisputed that internal Department of Corrections policy permits prison physicians to deny hepatitis C treatment, in certain circumstances, to prisoners who show "evidence of active substance abuse." To wit, on March 31, 1999, the Department of Corrections issued its initial Hepatitis C Primary Care Practice Guideline ("the Guideline"). The Guideline represents, as stated in the Introduction, "an approach to the current management of hepatitis C disease which is consistent with community standards of care and is appropriate in our corrections settings." The Guideline expressly notes, however, that "the treatment plans recommended in this document are not necessarily all inclusive" and that the Guideline "represents the current state of knowledge regarding treatment agents for the management of hepatitis C."

Under the Guideline, hepatitis C treatment (specifically Interferon therapy) is to be considered in accordance with various criteria, one of which is "10. No evidence of active substance abuse (drug and/or alcohol) during the past 2 years (check urine toxicology screen if drug use is suspected)." Moreover, a "Hepatitis C Treatment Referral Checklist" attached to the Guideline -- a Checklist whose completion is, at least according to the Guideline, intended to "assist the clinician in evaluating the inmate for possible treatment"-- further provides, as one of its eleven exclusion criteria, "Active alcohol or other substance abuse within past two years."

The Checklist then provides space for an inmate's primary care physician to verify (when recommending hepatitis C treatment) that the "inmate has met all the inclusion criteria and does not have any of the exclusion criteria (exceptions may be HIV or psychiatric disease)."

On August 17, 1999, after Dr. Antonelle had learned that the request for Rebetron therapy had been denied due to Johnson's drug use, Dr. Antonelle renewed his request to prescribe Ribavirin to Johnson, notwithstanding the fact that DOCS policy provided otherwise. Dr. Antonelle wrote:

Request for ribavirin was refused because of bad urine test for marijuana. Do not feel that this should preclude [prescription for] ribavirin.

Had initially responded to alpha interferon [but] relapsed [with] last viral load > 500,000.

Would again request approval for ribavirin [prescription]. Will [increase alpha interferon] to 5 M units... in interim.

Repeat viral load in 2 mos.

On October 2, 1999, Dr. Antonelle yet again indicated in his notes that he "still feel[s Johnson] should be on ribavirin in spite of drug policy."

On November 9, 1999, Johnson was transferred from Green Haven to Great Meadow Correctional Facility and William Smith, M.D., became Johnson's treating physician there. On January 21, 2000, Dr. Smith recorded in his notes that Johnson had been denied Ribavirin and indicated his disapproval of this denial, noting that he would "call Dr. Wright to obtain approval for Ribavarin [sic]." As of March 10, 2000, however, Dr. Smith still had not received an "update" from Dr. Wright regarding "possible use of Ribavarin [sic]."

Johnson then took matters into his own hands. On June 15, 2000, Johnson filed an "Inmate Grievance Complaint" in which he requested that DOCS's drug use policy be retracted and that he be permitted to begin Rebetron therapy immediately. The next day, Johnson proceeded to contact Dr. Wright directly, writing a letter requesting that he begin such therapy. On July 10, 2000, in response to Johnson's grievance, P. Bundrick, R.N., N.A. prepared an investigation sheet indicating that "Mr. Johnson is correct," that Rebetron had been recommended, that "there were other mitigating factors to receiving approval for this therapy" and that further lab work needed to be conducted.

On July 25, 2000, Dr. Wright wrote Johnson a letter informing him that

Rebetron therapy had been approved and that the health staff will "begin your therapy, if they have not already done so, in the near future." Johnson finally commenced Rebetron therapy in August 2000.

B. Procedural History

Johnson filed his original complaint, pro se, on March 13, 2001 and, after the defendants moved to dismiss that complaint, filed an amended complaint, pro se, on December 9, 2001. Both complaints alleged, inter alia, that the defendants had deprived him of his civil rights under the Eighth Amendment due to their deliberate indifference in providing him with medical treatment.

On December 6, 2002, Magistrate Judge Gorenstein partially granted and partially denied defendants' motion to dismiss Johnson's amended complaint. See Johnson v. Wright, 234 F. Supp. 2d 352, 368 (S.D.N.Y. 2002).*fn2 Magistrate Judge Gorenstein granted the motion as to certain defendants for their lack of personal involvement in the alleged civil rights violation. Id. at 365. But Magistrate Judge Gorenstein held that the amended complaint stated a claim for deliberate indifference against the remaining individual defendants -- Dr. Koenigsmann, Superintendent Duncan, Dr. Wright, and Commissioner Goord -- because, in Magistrate Judge Gorenstein's view, Johnson adequately alleged their personal involvement and because these defendants were not entitled to qualified immunity. Id. at 359-362, 364-68. Subsequently, Magistrate Judge Gorenstein requested that this case be placed on the Pro Se Office's list of cases for which volunteer counsel had been requested, and the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP ultimately was appointed to represent Johnson.

On February 27, 2003, Magistrate Judge Gorenstein ordered that discovery begin, but he limited that discovery to the following two topics: "(1) Whether it was reasonable for defendants to believe in 1998-2000 that it was medically justifiable to treat Johnson's Hepatitis C with Interferon rather than Rebetron Therapy; and (2) Whether being treated

with Interferon rather than Rebetron Therapy in 1998-2000 caused any injury to Johnson." See Johnson v. Wright, No. 01 Civ. 2122, 2004 WL 938299, at *5 (S.D.N.Y. May 3, 2004) (internal punctuation omitted).

At the conclusion of the limited discovery, the defendants moved for summary judgment on Johnson's deliberate indifference claim on a number of grounds. They claimed: (1) Johnson did not suffer any injury; (2) the initial refusal to treat Johnson with Rebetron therapy was medically justifiable; (3) the claim must be dismissed as against Koenigsmann, Duncan and Commissioner Goord for lack of personal involvement; and (4) all defendants are entitled to qualified immunity. Magistrate Judge Gorenstein granted the defendants' motion on the ground that the refusal to treat Johnson with Rebetron therapy was medically justifiable and accordingly did not reach the other issues. Id., at *12. This appeal ensued, and we review Magistrate Judge Gorenstein's grant of summary judgment de novo, construing the facts in the light most favorable to the plaintiff and resolving all ambiguities and drawing all reasonable inferences against the defendants. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).

## II. DISCUSSION

To establish an Eighth Amendment violation arising out of inadequate medical treatment, a prisoner must prove "deliberate indifference to [his] serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104 (1976). A prisoner must satisfy two requirements -- one objective and one subjective -- in order to prevail on such a "deliberate indifference" claim. See Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998). First, the prisoner must prove that the alleged deprivation of medical treatment is, in objective terms, "sufficiently serious" -- that is, the prisoner must prove that his medical need was "a condition of urgency, one that may produce death, degeneration, or extreme pain." See Hemmings v. Gorczyk, 134 F.3d 104, 108 (2d Cir. 1998) (quoting Hathaway v. Coughlin,

99 F.3d 550, 553 (2d Cir. 1996)). Second, the prisoner must prove that the charged official acted with a "sufficiently culpable state of mind," Chance, 143 F.3d at 702 (quotation omitted). This requires that the prisoner prove that the charged official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994).

In the instant case, the district court granted summary judgment to the defendants in connection with the latter of these two requirements. Specifically, Magistrate Judge Gorenstein held that because the defendants reasonably could have believed that the policy embodied in the Guideline was medically justified, Johnson necessarily could not prove that they acted with deliberate indifference in initially refusing to prescribe Ribavirin to him. On appeal, Johnson principally contends that a jury could, in fact, reasonably find that the defendants here acted with a "sufficiently culpable state of mind" in mechanically following the Guideline and refusing to prescribe him Ribavirin. Chance, 143 F.3d at 702 (quotation omitted). We agree.

The operative question in this case is not whether the Guideline's substance abuse policy is generally justifiable, but whether a jury could find that the application of the policy in plaintiff's case could have amounted to deliberate indifference to plaintiff's medical needs. See Brock v. Wright, 315 F.3d 158, 166 (2d Cir. 2003) ("Since both [doctors] have cited the policy as the reason for their actions ... the question before us is whether following the policy resulted in deliberate indifference to [the plaintiff's] medical needs." (emphasis added)). We believe that this is a question of fact that ought to be submitted to a jury.

On the one hand, we believe that a jury could reasonably infer that none of the defendants here acted with a "sufficiently culpable state of mind," that is, none of the defendants knew of and

disregarded an excessive risk to inmate health or safety. A jury could well find that the defendants rejected the requests to treat plaintiff with Rebetron therapy, not because the defendants were in any way indifferent to plaintiff's needs, but because the defendants sincerely and honestly believed that they were required to comply with the substance abuse policy articulated in the Guideline and that applying this policy was, in plaintiff's case, medically justifiable. To be sure, the Guideline's introduction does provide that "the treatment plans recommended in this document are not necessarily all inclusive," and elsewhere implies that the substance abuse disqualification is merely one of the "considerations" for treatment. However, the Hepatitis C Treatment Referral Checklist attached to the Guideline makes clear that if an individual satisfies any of the exclusion criteria -- including the alcohol and drug use criterion -- the individual cannot receive hepatitis C treatment, unless the individual satisfies other exceptions not here relevant. The defendants may well have genuinely believed, then, that they had no choice but to comply with the policy articulated in the Guideline.

But we believe that a jury could also reasonably reach the contrary result, namely, that the defendants here did subjectively know of, and disregard an excessive risk to, plaintiff's health. This is true principally for three reasons: (1) every single one of plaintiff's treating physicians, including prison physicians, indicated to the defendants that prescribing Ribavirin to the plaintiff was the medically appropriate course of treatment; (2) there is conflicting evidence about whether or not the decision not to prescribe Ribavirin to the plaintiff was, in fact, medically justifiable; and (3) there is no evidence suggesting that the defendants took any step whatsoever to investigate -- let alone verify -- whether it would be medically appropriate to ignore the unanimous advice of Johnson's treating physicians, including prison physicians, and apply the Guideline's substance abuse policy in Johnson's case.

To begin with, we have previously held that a deliberate indifference claim can lie where prison officials deliberately

ignore the medical recommendations of a prisoner's treating physicians. See Gill v. Mooney, 824 F.2d 192, 196 (2d Cir. 1987) ("Prison officials are more than merely negligent if they deliberately defy the express instructions of a prisoner's doctors."). While admittedly the defendants in Gill were not medical personnel with responsibility for implementing various treatment policies, here, it is beyond cavil that all of plaintiff's treating physicians, including two prison physicians, expressly recommended that the plaintiff be prescribed Ribavirin. Indeed, the defendants conceded at oral argument that plaintiff's treating physicians put them on direct notice that Rebetron therapy was the medically appropriate course of treatment for plaintiff's hepatitis C regardless of what the Guideline implied.

In addition, contrary to what the defendants contend, there is ample reason here that a jury could question whether the decision to deny the plaintiff Rebetron therapy was itself medically appropriate. The parties agree that the Guideline's substance abuse policy can, as a general matter, be justified on only two grounds -- those grounds provided in the NIH Consensus Development Statement on the Management of Hepatitis C, one of several documents listed as "references" in the Guideline. These grounds are: (1) so-called toxicity concerns, because patients abusing alcohol and other drugs are at risk for "potential toxic effects," given that alcohol and narcotics might independently contribute to liver damage and therefore undermine the efficacy of any hepatitis C drugs; and (2) so-called compliance concerns, because patients abusing alcohol and other drugs "present problems with compliance," given that they may miss appointments and otherwise fail to adhere to the therapeutic regimen prescribed for "clean" hepatitis C patients. As clarified at oral argument, the parties further agree that only the second of these two grounds -- concerns about compliance -- could potentially justify the application of the Guideline's substance abuse policy in Johnson's particular case.

It is undisputed that compliance

concerns can, as a general matter, justify the decision not to prescribe hepatitis C drugs, including Ribavirin, to substance abusers.*fn3 Here, however, we believe there is sufficiently conflicting evidence about whether compliance concerns justified the decision not to prescribe Ribavirin to Johnson. On the one hand, the record reveals that Johnson at times either missed appointments or refused to take his Interferon prescription. On the other hand, the fact that all of plaintiff's treating physicians -- including prison physicians -- expressly recommended that plaintiff receive Rebetron therapy indicates that, in their view, compliance concerns would not justify the denial of Rebetron therapy. In fact, the record is devoid of any evidence indicating that compliance was at all an issue in the minds of Johnson's physicians,*fn4 and several of Johnson's physicians affirmatively recommended Rebetron therapy even after they became aware that the requests for Rebetron therapy had been denied due to concerns about Johnson's drug use and in spite of their knowledge of Johnson's one positive test for marijuana abuse. The record reflects that the plaintiff substantially complied with his Interferon therapy over the course of the fifteen months prior to the date when the request for Rebetron therapy was denied. The defendants have conceded that "similar patient compliance concerns exist with both interferon monotherapy and combination Rebetron therapy," see 2004 WL 938299, * 11, and that the plaintiff was allowed to continue his Interferon therapy even as compliance concerns putatively prevented the defendants from allowing the plaintiff to commence Rebetron therapy. Viewing the facts in the light most favorable to the plaintiff, as we must, this concession enables a jury to conclude that the plaintiff reasonably could and should have been expected to substantially comply with Rebetron therapy in the future and that compliance concerns did not justify denying plaintiff the opportunity to begin Rebetron therapy.

Third and finally, we believe a jury could find that the defendants acted with deliberate indifference by reflexively relying on the medical soundness of the Guideline's substance abuse policy when

they had been put on notice that the medically appropriate decision could be, instead, to depart from the Guideline and prescribe Ribavirin to the plaintiff. Here, after all, there is no evidence suggesting that the defendants took any steps whatsoever to assure themselves that applying the Guideline in plaintiff's case was, in fact, a medically justifiable course of action. Indeed, the defendants conceded at oral argument that there is no evidence showing that Dr. Wright reviewed Johnson's file to determine whether compliance concerns in fact justified the decision not to prescribe Ribavirin. Rather, the record strongly suggests that Dr. Wright simply assumed the medical soundness of following the Guideline in plaintiff's case, notwithstanding the fact that all of plaintiff's treating physicians, including prison physicians, had indicated their views that the medically appropriate decision was to depart from the Guideline, and notwithstanding the Guideline's own express admonition that it was "not necessarily all inclusive."

Accordingly, we believe that Johnson has adduced sufficient evidence to support the subjective element of his deliberate indifference claim. In our view, a jury could reasonably find that the defendants here acted with a sufficiently culpable state of mind -- that is, the defendants knew of and disregarded an excessive risk to Johnson's health -- by reflexively following the Guideline's substance abuse policy in the face of the unanimous, express, and repeated recommendations of plaintiff's treating physicians, including prison physicians, for the prison officials to depart from the Guideline and approve a Ribavirin prescription for the plaintiff.

III. CONCLUSION

For all the reasons stated above, the judgment of the district court is VACATED and REMANDED for further proceedings consistent with this opinion.*fn5

Opinion Footnotes

*fn1 The Honorable J. Garvan Murtha, United States District Judge for the

District of Vermont, sitting by designation.

*fn2 The parties consented to disposition of this matter by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

*fn3 See, e.g., NIH Consensus Development Statement on the Management of Hepatitis C at ¶ 4; see also Report of Defendants' Expert Mark A. Korsten, M.D. dated Aug. 28, 2003 at 4 (concluding that generally speaking, "[t]he standard of care during 1998-1999 was not to treat patients infected with [hepatitis C] if there was evidence of drug or alcohol abuse" precisely because of compliance concerns). Indeed, even plaintiff's own expert, Dr. Efsevia Albanis, conceded during her deposition that "people who are actively abusing drugs will have a hard time being compliant with their medication and with follow-up appointments, which are very important [because . . .] they're being treated with medications that can affect their blood count, their various blood counts. So they'd be noncompliant patients and put themselves at risk if they wouldn't follow up with the prescribing physician." Deposition of Efsevia Albanis, M.D. dated Sept. 25, 2003 at 44-45.

*fn4 Although the treating doctors apparently did not know of compliance concerns, we do note an indication in the medical records made just weeks prior to the decision not to order Rebetron therapy that Johnson "stopped taking meds x6 days ago on his own!! MD does not know this."

*fn5 The defendants-appellees contend that the judgment of the district court should be affirmed on other grounds. Because the district court has not yet considered these alternative grounds, we choose not to consider them here and express no opinion as to their appropriate disposition.

---

• About ALM        • About law.com        • Privacy Policy        • Terms & Conditions

Copyright 2005 ALM Properties, Inc. All right